## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; and Entergy Texas, Inc., ) ) ) ) | |
| Petitioners ) ) | No. 22-_1334_ |
| v. ) ) | |
| Federal Energy Regulatory Commission, ) ) | |
| Respondent. ) | |

## PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Rule 15(a) of the Federal Rules of Appellate Procedure and the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, petitioners Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; and Entergy Texas, Inc., petition this Court for review of the following orders of the Federal Energy Regulatory Commission ("FERC"), copies of which are attached:

> *Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Tariff Revisions, Docket Nos. ER22-496-000 and ER22-496-001, 180 FERC ¶ 61,142 (August 31, 2022) ("August 31st Order").

> *Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. ER22-496-002, 181 FERC ¶ 62,080 (October 31, 2022) ("October 31st Order").

The above-captioned Petitioners are transmission-owning members of Midcontinent Independent System Operator, Inc. ("MISO"), and load serving entities in the MISO region that are participants in the MISO-administered capacity and energy markets. The FERC Orders with respect to which the Petitioners seek review address MISO's proposal to amend its Open Access Transmission, Energy, and Operating Reserves Tariff ("MISO Tariff") to institute a "minimum capacity obligation" applicable to MISO market participants that represent load-serving entities in the MISO capacity market.

The Petitioners intervened in the underlying FERC proceedings on December 14, 2021, and filed a timely request for rehearing of the August 31st Order on September 30, 2022. FERC denied rehearing of the August 31st Order by operation of law on October 31, 2022.

This petition for review is timely filed within sixty (60) days of the October 31st Order in accordance with 16 U.S.C. § 8251(b). This Court has subject matter jurisdiction under 16 U.S.C. § 8251(b).

Also attached to this Petition are: (1) the Corporate Disclosure Statement required by Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1; and (2) a Certificate of Service, with the list of parties to the underlying proceedings.

Respectfully submitted,

/s/     Michael Griffen

_____

Michael C. Griffen
Entergy Services, LLC
101 Constitution Avenue, NW
Suite 200 East
Washington, DC 20001
(202) 530-7323
mgriffe@entergy.com

Attorney for Entergy Arkansas, LLC;
Entergy Louisiana, LLC; Entergy
Mississippi, LLC; Entergy New Orleans,
LLC; and Entergy Texas, Inc.

December 28, 2022

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, Entergy Texas, Inc., | ) ) ) | |
| | ) | No. 22- 1334 |
| Petitioners | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

**CORPORATE DISCLOSURE STATEMENT OF**
**ENTERGY ARKANSAS, LLC; ENTERGY LOUISIANA, LLC;**
**ENTERGY MISSISSIPPI, LLC; ENTERGY NEW ORLEANS, LLC;**
**AND ENTERGY TEXAS, INC.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; and Entergy Texas, Inc. (the "Entergy Operating Companies"), provide the following Corporate Disclosure Statement.

The Entergy Operating Companies are utility operating subsidiaries of Entergy Corporation. Entergy Corporation is a public utility holding company organized under Delaware law and with its principal office in New Orleans, Louisiana. Entergy Corporation owns all or a majority of the outstanding shares of

stock of the Entergy Operating Companies, and no other publicly held corporation owns 10% or more of any Entergy Operating Company's stock.

The Entergy Operating Companies are engaged in the manufacture, generation, transmission, distribution, and sale of electric energy primarily in portions of Arkansas, Louisiana, Mississippi, and Texas.

The Entergy Operating Companies are transmission-owning members of Midcontinent Independent System Operator, Inc. ("MISO"), and load serving entities in the MISO region that are participants in the MISO-administered capacity and energy markets.

Respectfully submitted,

/s/    Michael Griffen
_____
Michael C. Griffen
Entergy Services, LLC
101 Constitution Avenue, NW
Suite 200 East
Washington, DC 20001
(202) 530-7323
mgriffe@entergy.com

Attorney for Entergy Arkansas, LLC;
Entergy Louisiana, LLC; Entergy
Mississippi, LLC; Entergy New Orleans,
LLC; and Entergy Texas, Inc.

December 28, 2022

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, Entergy Texas, Inc., | ) ) ) | |
| | ) | No. 22-1334 |
| Petitioners | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

### CERTIFICATE OF SERVICE

Pursuant to Rules 15(c) and 25 of the Federal Rules of Appellate Procedure and Rules 15(a) and 25 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, I hereby certify that I have this 28th day of December 2022, served by email the foregoing Petition for Review and Corporate Disclosure Statement of the Petitioners on the Solicitor of the Federal Energy Regulatory Commission ("Commission") and on all parties on the Commission's service list in the underlying proceedings in Docket Nos. ER22-496-000, ER22-496-001, and ER22-496-002.

Upon receiving a file-stamped copy of this Petition, I will cause a paper copy of it to be mailed to the Commission's Solicitor and the Commission's Secretary via first class mail.

/s/      Michael Griffen

_____
Michael C. Griffen
Entergy Services, LLC
101 Constitution Avenue, NW
Suite 200 East
Washington, DC 20001
(202) 530-7323
mgriffe@entergy.com

Attorney for Entergy Arkansas, LLC;
Entergy Louisiana, LLC; Entergy
Mississippi, LLC; Entergy New Orleans,
LLC; and Entergy Texas, Inc.

December 28, 2022

**Federal Energy Regulatory Commission Recipients**:

| <u>Via First Class Mail</u> | <u>Via Email and First Class Mail</u> |
|---|---|
| Hon. Kimberly D. Bose, Secretary | Robert Solomon, Solicitor |
| Federal Energy Regulatory Commission | Federal Energy Regulatory Commission |
| 888 First Street, NE | 888 First Street, NE |
| Washington, DC 20426 | Washington, DC 20426 |
| | robert.solomon@ferc.gov |

**FERC Docket No. ER22-496 Service List Recipients**:

   See the attached official service list for FERC Docket No. ER22-496 maintained by the Secretary of the Federal Energy Regulatory Commission.



**FERC** Online - Web Applications of the Federal Energy Regulatory Commission



| | | |
|---|---|---|
| **FERC Online Home** | | |
| **About FERC Online** | | |
| **Log Out** | | |
| **Edit Registration** | | |
| **Company Registration** | | |
| **eFiling** | | |
| **eSubscription** | | |
| **eComment** | | |
| **Query Mailing List/Recipients by State** | | |
| **Query Service List** | | |
| **My Service List** | | |
| **My Filing List** | | |
| **eLibrary** | | |
| **eTariff Viewer** | | |
| **Help** | | |

### Service List for ER22-496-000 Midcontinent Independent System Operator, Inc.

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Alliant Energy Corporate Services, Inc. | Cortlandt Choate<br>Senior Attorney<br>ALLIANT ENERGY<br>4902 N. Biltmore Lane<br>Madison, WISCONSIN 53718<br>UNITED STATES<br>CortlandtChoate@alliantenergy.com | |
| Ameren Services Company | Matthew Tomc<br>Director and Assistant General<br>Ameren Corporation<br>1901 Chouteau Ave<br>MC 1310<br>St. Louis, MISSOURI 63040<br>UNITED STATES<br>mtomc@ameren.com | Jamie Simler<br>VP, Federal Regulatory<br>Ameren Service Company, as agent for Union Electric Compa<br>d/b/a Ameren MS, Ameren IL Company d/b/a Ameren IL an<br>Ameren Transmission Company of IL<br>1331 PENNSYLVANIA AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>JSimler@ameren.com |
| Ameren Services Company | | Denice Simpson<br>Regulatory Affairs Specialist<br>Ameren Corporation<br>1331 Pennsylvania Ave, NW<br>Suite 550 South<br>Washington, DISTRICT OF COLUMBIA 20004<br>dsimpson@ameren.com |
| American Clean Power Association | Gabriel Tabak<br>Counsel<br>American Clean Power Association<br>1501 M St NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>gtabak@cleanpower.org | Daniel Y Hall<br>Central Region Senior Director<br>American Clean Power Association<br>1501 M ST NW STE 900<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>dhall@cleanpower.org |
| American Electric Power Service Corporation | Jessica Cano<br>Senior Counsel<br>AEP Service Corporation<br>1 RIVERSIDE PLZ<br>COLUMBUS, OHIO 43215<br>UNITED STATES<br>jacano@aep.com | |
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org | Gerit F. Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>ghull@amppartners.org |
| American Municipal Power, Inc. | | Christopher J Norton<br>Director of Market Regulatory<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>cnorton@amppartners.org |
| Arkansas Electric Cooperative Corporation | Jennifer Loiacano<br>Staff Attorney<br>Arkansas Electric Cooperative Corporation<br>1 Cooperative Way<br>Little Rock, ARKANSAS 72209<br>UNITED STATES<br>jennifer.loiacano@aecc.com | |
| Arkansas Public Service Commission | Justin Craig<br>Attorney Specialist<br>Arkansas Public Service Commission<br>1000 Center Street<br>Little Rock, ARKANSAS 72201<br>UNITED STATES<br>justin.craig@arkansas.gov | Glen Ortman<br>glen.ortman@stinson.com |

| | | |
|---|---|---|
| Arkansas Public Service Commission | | Keith Berry<br>38 River Ridge Circle<br>Little Rock, ARKANSAS 72227<br>berry@hendrix.edu |
| Association of Businesses Advocating Tariff Equity | Michael Pattwell<br>Attorney<br>Clark Hill PLC<br>212 East Cesar E. Chavez Avenue<br>Lansing, MICHIGAN 48906<br>UNITED STATES<br>mpattwell@clarkhill.com | |
| Association of Businesses Advocating Tariff Equity | Omar Bustami<br>Attorney<br>Clark Hill PLC<br>1001 Pennsylvania Ave NW<br>1300<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>obustami@clarkhill.com | |
| Big Rivers Electric Corporation | John Lilyestrom<br>Hogan Lovells LLP<br>555 Thirteenth St., NW<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>john.lilyestrom@hoganlovells.com | Marlene S Parsley<br>Director Resources and Forecas<br>Big Rivers Electric Corporation<br>201 3RD ST<br>HENDERSON, KENTUCKY 42420<br>Marlene.Parsley@BigRivers.com |
| Calpine Corporation | Sarah Novosel<br>Senior VP and Managing Counsel<br>Calpine Corporation<br>717 TEXAS ST STE 1000<br>HOUSTON, TEXAS 77002<br>UNITED STATES<br>snovosel@calpine.com | Brett Kruse<br>Vice President, Market Design<br>Calpine Corporation<br>717 Texas Ave.<br>Suite 1000<br>Houston, TEXAS 77002<br>bkruse@calpine.com |
| Clean Grid Alliance | Natalie McIntire<br>Consultant<br>Clean Grid Alliance<br>335 37TH ST<br>PORT TOWNSEND, WASHINGTON 98368<br>UNITED STATES<br>natalie.mcintire@gmail.com | |
| Cleco Cajun LLC | Noel Symons<br>Attorney<br>McGuireWoods LLP<br>888 16TH ST NW STE 500<br>BLACK LIVES MATTER PLAZA<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nsymons@mcguirewoods.com | Colin Francis<br>McGuireWoods LLP<br>2001 K St NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>cfrancis@mcguirewoods.com |
| Cleco Cajun LLC | | Jill Kelone<br>Cleco Corporation<br>2030 DONAHUE FERRY RD<br>PINEVILLE, LOUISIANA 71360<br>Jill.Kelone@cleco.com |
| Cleco Corporate Holdings LLC | Noel Symons<br>Attorney<br>McGuireWoods LLP<br>888 16TH ST NW STE 500<br>BLACK LIVES MATTER PLAZA<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nsymons@mcguirewoods.com | Colin Francis<br>McGuireWoods LLP<br>2001 K St NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>cfrancis@mcguirewoods.com |
| Cleco Corporate Holdings LLC | | Jill Kelone<br>Cleco Corporation<br>2030 DONAHUE FERRY RD<br>PINEVILLE, LOUISIANA 71360<br>Jill.Kelone@cleco.com |
| Cleco Power LLC | Noel Symons<br>Attorney<br>McGuireWoods LLP<br>888 16TH ST NW STE 500<br>BLACK LIVES MATTER PLAZA<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nsymons@mcguirewoods.com | Colin Francis<br>McGuireWoods LLP<br>2001 K St NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>cfrancis@mcguirewoods.com |

| | | |
|---|---|---|
| Cleco Power LLC | | Jill Kelone<br>Cleco Corporation<br>2030 DONAHUE FERRY RD<br>PINEVILLE, LOUISIANA 71360<br>Jill.Kelone@cleco.com |
| Coalition of Midwest Power Producers, Inc. | Scott Storms<br>Coalition of Midwest Power Pro<br>Coalition of Midwest Power Producers, Inc.<br>5898 Garden Gate Way<br>Suite 300<br>Carmel, INDIANA 46033<br>UNITED STATES<br>scott.storms@compp.org | Mark J Volpe<br>mark.volpe@compp.org |
| Coalition of MISO Transmission Customers | Kenneth Stark<br>McNees Wallace & Nurick LLC<br>100 PINE ST<br>HARRISBURG, PENNSYLVANIA 17101<br>UNITED STATES<br>kstark@mcneeslaw.com | Kevin M Murray<br>Technical Specialist<br>McNees Wallace & Nurick LLC<br>21 East State Street<br>17th Floor<br>Columbus, OHIO 43215-4228<br>murraykm@mcneeslaw.com |
| Coalition of MISO Transmission Customers | | Robert A Weishaar, JR<br>McNees Wallace & Nurick LLC<br>1200 G Street, NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA 20005<br>bweishaar@mcneeslaw.com |
| Constellation Energy Generation, LLC | Christopher Wilson<br>Director, Federal Regulatory A<br>Constellation Energy Generation, LLC<br>101 Constitution Ave, NW<br>Suite 400E<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>FERCe-filings1@Constellation.com | cynthia brady<br>Assistant General Counsel<br>Exelon BSC-Legal Regulatory<br>Exelon Business Services Company<br>4300 Winfield Road<br>Warrenville, ILLINOIS 60555<br>cynthia.brady@exeloncorp.com |
| Constellation Energy Generation, LLC | | John R. Orr, JR<br>Vice President, Energy Policy<br>Constellation Companies<br>1221 Lamar Street, Suite 700<br>Houston, TEXAS 77010<br>John.OrrJr@Constellation.com |
| Constellation Energy Generation, LLC | | Jason C Barker<br>Director, Wholesale Market Dev<br>Exelon Business Services<br>1310 POINT ST FL 9<br>BALTIMORE, MARYLAND 21231<br>jason.barker@constellation.com |
| Consumers Energy Company | Deborah Moss<br>Principal Attorney<br>1730 Rhode Island Avenue NW<br>Suite 1007<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>deborah.moss@cmsenergy.com | Emerson Hilton<br>Assistant General Counsel<br>One Energy Plaza<br>Jackson, MICHIGAN 49201<br>emerson.hilton@cmsenergy.com |
| Cooperative Energy | Matthew Rudolphi<br>Attorney<br>Thompson Coburn LLP<br>55 E MONROE ST<br>37TH FLOOR<br>CHICAGO, ILLINOIS 60603<br>UNITED STATES<br>mrudolphi@thompsoncoburn.com | Joshua E. Adrian<br>Thompson Coburn LLP<br>1909 K Street, NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>jadrian@thompsoncoburn.com |
| Cooperative Energy | | Nathan T Bellville<br>Regulatory Affairs Specialist<br>South Mississippi Electric Power Association<br>P.O. Box 15849<br>Hattiesburg, MISSISSIPPI 39404-5849<br>nbellville@cooperativeenergy.com |
| Council of the City New Orleans | David Shaffer<br>Mr.<br>Dentons US LLP<br>1900 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>david.shaffer@dentons.com | |

USCA Case #22-1334      Document #1979425      Filed: 12/28/2022      Page 11 of 74

| | | |
|---|---|---|
| Council of the City New Orleans | | Presley Reed, Jr<br>Partner<br>Dentons US LLP<br>1900 K St. NW,<br>Washington, DISTRICT OF COLUMBIA 20006<br>presley.reedjr@dentons.com |
| Council of the City New Orleans | | Cassandra Mastrostefano<br>Attorney<br>Dentons US LLP<br>1900 K St NW<br>washington, DISTRICT OF COLUMBIA 20006<br>cassandra.mastrostefano@dentons.com |
| Council of the City New Orleans | | Joseph W Rogers<br>President<br>Legend Consulting Group Limited<br>6041 S SYRACUSE WAY STE 105<br>GREENWOOD VILLAGE, COLORADO 80111<br>jrogers@legendcgl.com |
| Council of the City New Orleans | | Erin Spears<br>Chief of Staff, Council Utilit<br>Council of the City of New Orleans, Louisiana<br>1300 Perdido Street<br>Room 6E07<br>New Orleans, LOUISIANA 70112<br>espears@nola.gov |
| DTE Electric Company | Lauren Donofrio<br>DTE Energy Company<br>1 ENERGY PLZ<br>DETROIT, MICHIGAN 48226<br>UNITED STATES<br>Lauren.donofrio@dteenergy.com | Adam Gamez<br>DTE Electric Company<br>1 Energy Plaza<br>Detroit, MICHIGAN 48226<br>adam.gamez@dteenergy.com |
| Duke Energy Corporation | Molly Suda<br>Duke Energy Corporation<br>1301 PENNSYLVANIA AVE NW STE 200<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>molly.suda@duke-energy.com | |
| East Texas Electric Cooperative, Inc. | | Alvin Taylor<br>1301 K Street, NW, Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>ataylor@mccarter.com |
| EDF Energy Services, LLC | Jason Cox<br>Director, Regulatory Affairs<br>EDF Energy Services, LLC<br>601 Travis<br>Suite 1700<br>Houston, TEXAS 77002<br>UNITED STATES<br>jason.cox@edfenergyservices.com | Karl Ebert<br>Manager, Regulatory Reporting<br>601 TRAVIS ST STE 1700<br>HOUSTON, TEXAS 77002<br>Karl.Ebert@edfenergyservices.com |
| EDF Trading North America, LLC | Jason Cox<br>Director, Regulatory Affairs<br>EDF Energy Services, LLC<br>601 Travis<br>Suite 1700<br>Houston, TEXAS 77002<br>UNITED STATES<br>jason.cox@edfenergyservices.com | Karl Ebert<br>Manager, Regulatory Reporting<br>601 TRAVIS ST STE 1700<br>HOUSTON, TEXAS 77002<br>Karl.Ebert@edfenergyservices.com |
| ENERGY MICHIGAN, INC. | Laura Chappelle<br>Potomac Law Group, PLLC<br>120 N. Washington Square<br>Suite 300<br>Lansing, MICHIGAN 48933<br>UNITED STATES<br>lchappelle@potomaclaw.com | |
| Entergy Arkansas, LLC | Michael Griffen<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW STE 200E<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgriffe@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Louisiana, LLC | Michael Griffen<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW STE 200E<br>WASHINGTON, DISTRICT OF COLUMBIA 20001 | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST |

USCA Case #22-1334          Document #1979425          Filed: 12/28/2022          Page 12 of 74

| | | |
|---|---|---|
| | UNITED STATES<br>mgriffe@entergy.com | WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Mississippi, LLC | Michael Griffen<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW STE 200E<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgriffe@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy New Orleans, LLC | Michael Griffen<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW STE 200E<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgriffe@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Services, LLC | Michael Griffen<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW STE 200E<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgriffe@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Texas, Inc. | Michael Griffen<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW STE 200E<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgriffe@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Fresh Energy | Michael Schowalter<br>Senior Policy Associate<br>Fresh Energy<br>408 St. Peter St.<br>Suite 350<br>Saint Paul, MINNESOTA 55102<br>UNITED STATES<br>schowalter@fresh-energy.org | Allen Gleckner<br>Fresh Energy - Senior Policy A<br>408 St. Peter Street<br>Suite 220<br>Saint Paul, MINNESOTA 55105<br>gleckner@fresh-energy.org |
| Great Lakes Utilities | Cynthia Bogorad<br>Spiegel & McDiarmid LLP<br>1875 Eye Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne<br>Attorney<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 I. St., NW, Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>jeffrey.bayne@spiegelmcd.com |
| Great Lakes Utilities | | Anree G Little<br>Associate<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 Eye St NW Ste 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>Anree.little@spiegelmcd.com |
| Great Lakes Utilities | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Great Lakes Utilities | | Troy J Adams<br>tadams@mpu.org |
| Great River Energy | Donna Stephenson<br>Associate General Counsel<br>Great River Energy<br>12300 Elm Creek Blvd N<br>Maple Grove, MINNESOTA 55369<br>UNITED STATES<br>dstephenson@grenergy.com | |
| Hoosier Energy Rural Electric Cooperative, Inc. | Barry Cohen<br>Special Counsel<br>McCarter & English LLP<br>1301 K Street, N.W.<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005 | |

| | | |
|---|---|---|
| | UNITED STATES
bcohen@mccarter.com | |
| Illinois Commerce Commission | Christine Ericson
Special Assistant Attorney Gen
Illinois Commerce Commission
160 N. LaSalle St.
Suite C-800
Chicago, ILLINOIS 60601
UNITED STATES
Christine.Ericson@illinois.gov | Katharine McCormick
Illinois Commerce Commission
160 N. LaSalle N925
Chicago, ILLINOIS 60601
katharine.mccormick@illinois.gov |
| Illinois Commerce Commission | | William VanderLaan
bill.vanderlaan@illinois.gov |
| Illinois Industrial Energy Consumers | Eric Robertson
Senior Partner
INDIVIDUAL
1939 Delmar Avenue
P. O. Box 735
Granite City, ILLINOIS 62040
UNITED STATES
erobertson@lrklaw.com | |
| Illinois Municipal Electric Agency | Michael Postar
Attorney
Duncan, Weinberg, Genzer & Pembroke PC
1667 K Street, N.W., Suite 700
Duncan Weinberg Genzer & Pembroke
Washington, DISTRICT OF COLUMBIA 20006
UNITED STATES
mrp@dwgp.com | Linda L. Murray-Kimball
Legal Assistant
Duncan, Weinberg, Genzer & Pembroke PC
1667 K Street, NW
Suite 700
Washington, DISTRICT OF COLUMBIA 20006-1654
lmk@dwgp.com |
| Illinois Municipal Electric Agency | Bhaveeta Mody
Duncan, Weinberg, Genzer & Pembroke PC
1667 K ST NW STE 700
WASHINGTON, DISTRICT OF COLUMBIA 20006
UNITED STATES
bkm@dwgp.com | Troy A Fodor
Illinois Municipal Electric Agency
3400 Conifer Drive
Springfield, ILLINOIS 62711
tfodor@imea.org |
| INDIANA INDUSTRIAL GROUP | Joseph Rompala
Lewis & Kappes, P.C.
Lewis & Kappes, P.C.
One American Square
Suite 2500
Indianapolis, INDIANA 46282
UNITED STATES
jrompala@lewis-kappes.com | |
| Indiana Municipal Power Agency | Colten Mitchell
Staff Counsel
Indiana Municipal Power Agency
11610 North College Ave
Carmel, INDIANA 46032
UNITED STATES
coltenm@impa.com | Peter J. Prettyman
Sr. V.P. & General Counsel
Indiana Municipal Power Agency
11610 N COLLEGE AVE
CARMEL, INDIANA 46032
pprettyman@impa.com |
| Indiana Office of Utility Consumer Counselor | Arthur Iler
Deputy Consumer Counsel - Fede
Indiana Office of Utility Consumer Counselor
115 W Washington St
Ste 1500 South
Indianapolis, INDIANA 46204
UNITED STATES
ailer@oucc.in.gov | |
| Indiana Utility Regulatory Commission | Beth Heline
General Counsel
Indiana Utility Regulatory Commission
Suite 1500 East
101 West Washington Street
Indianapolis, INDIANA 46204
UNITED STATES
BHeline@urc.in.gov | Steve L Davies
Assistant General Counsel
Indiana Utility Regulatory Commission
101 W. Washington Street, Suite 1500 E
Indianapolis, INDIANA 46204
sdavies@urc.in.gov |
| Indianapolis Power and Light Company | Nicholas Grimmer
Director, Fuel Supply
Indianapolis Power & Light Company
One Monument Circle
Indianapolis, INDIANA 46204
UNITED STATES
nick.grimmer@aes.com | Matthew D Fields
Indianapolis Power & Light Company
1 MONUMENT CIR
INDIANAPOLIS, INDIANA 46204
matthew.fields@aes.com |
| Indianapolis Power and Light | Randall Griffin
Chief Regulatory Counsel | |

| Company | | |
|---|---|---|
| | The AES Corporation<br>1065 WOODMAN DR<br>DAYTON, OHIO 45432<br>UNITED STATES<br>randall.griffin@aes.com | |
| Kentucky Public Service Commission | Justin McNeil<br>Executive Advisor Attorney<br>Kentucky Public Service Commission<br>211 Sower Blvd<br>Frankfort, KENTUCKY 40601<br>UNITED STATES<br>Justin.McNeil@ky.gov | John E Pinney<br>Executive Advisor<br>Kentucky Public Service Commission<br>211 Sower Blvd<br>P.O. Box 615<br>Frankfort, KENTUCKY 40602<br>jeb.pinney@ky.gov |
| Louisiana Public Service Commission | Noel Darce<br>Attorney<br>Stone Pigman Walther Wittmann L.L.C.<br>909 Poydras St. Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>UNITED STATES<br>ndarce@stonepigman.com | Kathryn H Bowman<br>Executive Counsel<br>Louisiana Public Service Commission<br>602 N 5TH ST<br>BATON ROUGE, LOUISIANA 70802<br>kathryn.bowman@la.gov |
| Louisiana Public Service Commission | | Melissa Watson<br>Deputy General Counsel<br>Louisiana Public Service Commission<br>602 North Fifth Street<br>Galvez Bldg, FL 12<br>Galvez Building, 12th Floor<br>Baton Rouge, LOUISIANA 70821-9154<br>melissa.watson@la.gov |
| Madison Gas and Electric Company | Cynthia Bogorad<br>Spiegel & McDiarmid LLP<br>1875 Eye Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne<br>Attorney<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 I. St., NW, Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>jeffrey.bayne@spiegelmcd.com |
| Madison Gas and Electric Company | | Anree G Little<br>Associate<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 Eye St NW Ste 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>Anree.little@spiegelmcd.com |
| Madison Gas and Electric Company | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Madison Gas and Electric Company | Scott Smith<br>Vice President, Business Regul<br>Madison Gas & Electric Company<br>133 S BLAIR ST<br>PO BOX 1231<br>MADISON, WISCONSIN 53788<br>UNITED STATES<br>ssmith@mge.com | |
| Michigan Public Service Commission | Nicholas Taylor<br>Assistant Attorney General<br>Michigan Attorney General<br>7109 W Saginaw Hwy<br>3rd floor<br>Lansing, MICHIGAN 48917<br>UNITED STATES<br>taylorn10@michigan.gov | Steven D Hughey<br>Assistant Attorney General<br>Department of Attorney General<br>7109 W. Saginaw Hwy.<br>3rd Floor<br>Lansing, MICHIGAN 48917<br>hugheys@michigan.gov |
| MidAmerican Energy Company | Kady Alexander<br>Attorney<br>MIDAMERCIAN ENERGY COMPANY<br>666 GRAND AVE STE 500<br>DES MOINES, IOWA 50309<br>UNITED STATES<br>kady.alexander@midamerican.com | |
| Midcontinent Independent System Operator, Inc. | Michael Kessler<br>MISO<br>PO Box 4202<br>Carmel, INDIANA 46082<br>UNITED STATES<br>mkessler@misoenergy.org | Midwest ISO<br>Midcontinent Independent System Operator, Inc.<br>PO Box 4202<br>Carmel,INDIANA<br>misolegal@misoenergy.org |

USCA Case #22-1334      Document #1979425      Filed: 12/28/2022      Page 15 of 74

| | | |
|---|---|---|
| Midcontinent Independent System Operator, Inc. | Jim Holsclaw jholsclaw@calfee.com | Julie Bunn Midcontinent Independent System Operator, Inc. 720 CITY CENTER DR CARMEL, INDIANA 46032 jbunn@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | Matthew Barbara mbarbara@calfee.com | |
| Midcontinent Independent System Operator, Inc. | Midwest ISO Midcontinent Independent System Operator, Inc. PO Box 4202 Carmel,INDIANA UNITED STATES misolegal@misoenergy.org | |
| Midwest Municipal Transmission Group | Cynthia Bogorad Spiegel & McDiarmid LLP 1875 Eye Street, N.W. Suite 700 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne Attorney Spiegel & McDiarmid LLP Spiegel & McDiarmid LLP 1875 I. St., NW, Suite 700 Washington, DISTRICT OF COLUMBIA 20006 jeffrey.bayne@spiegelmcd.com |
| Midwest Municipal Transmission Group | | Anree G Little Associate Spiegel & McDiarmid LLP Spiegel & McDiarmid LLP 1875 Eye St NW Ste 700 Washington, DISTRICT OF COLUMBIA 20006 Anree.little@spiegelmcd.com |
| Midwest Municipal Transmission Group | | E Service Spiegel & McDiarmid LLP 1875 Eye St, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20006 eService@spiegelmcd.com |
| Midwest Municipal Transmission Group | | Robert Jagusch rjagusch@mmua.org |
| Mississippi Public Service Commission | William Booth Partner Michael Best & Friedrich, LLP 1000 Maine Ave SW Suite 400 Washington, D.C., DISTRICT OF COLUMBIA 20024 UNITED STATES wdbooth@michaelbest.com | Roxane E Maywalt, ESQ Senior Counsel Michael Best & Friedrich, LLP 1000 MAINE AVE SW STE 400 WASHINGTON, DISTRICT OF COLUMBIA 20024 remaywalt@michaelbest.com |
| Mississippi Public Service Commission | | Katherine Collier Mississippi Public Service Commission And Public Utilities Sta P.O. Box 1174 Jackson, MISSISSIPPI 39215 katherine.collier@psc.ms.gov |
| Mississippi Public Service Commission | | David N Carr Special to the Commission for Mississippi Public Service Commission 501 N West St Jackson, MISSISSIPPI 39201 david.carr@psc.ms.gov |
| Mississippi Public Utilities Staff | William Booth Partner Michael Best & Friedrich, LLP 1000 Maine Ave SW Suite 400 Washington, D.C., DISTRICT OF COLUMBIA 20024 UNITED STATES wdbooth@michaelbest.com | Roxane E Maywalt, ESQ Senior Counsel Michael Best & Friedrich, LLP 1000 MAINE AVE SW STE 400 WASHINGTON, DISTRICT OF COLUMBIA 20024 remaywalt@michaelbest.com |
| Mississippi Public Utilities Staff | | Emily Kruger General Counsel P.O. Box 1174 Jackson, MISSISSIPPI 39215-1174 Emily.Kruger@mpus.ms.gov |
| Missouri Joint Municipal Electric Utility Commission | Cynthia Bogorad Spiegel & McDiarmid LLP 1875 Eye Street, N.W. Suite 700 Washington, DISTRICT OF COLUMBIA | Jeffrey M. Bayne Attorney Spiegel & McDiarmid LLP Spiegel & McDiarmid LLP 1875 I. St., NW, Suite 700 |

| | | |
|---|---|---|
| | 20006<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | Washington, DISTRICT OF COLUMBIA 20006<br>jeffrey.bayne@spiegelmcd.com |
| Missouri Joint Municipal Electric Utility Commission | | Anree G Little<br>Associate<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 Eye St NW Ste 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>Anree.little@spiegelmcd.com |
| Missouri Joint Municipal Electric Utility Commission | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Missouri Joint Municipal Electric Utility Commission | | John E Grotzinger<br>INDIVIDUAL<br>1808 I-70 Drive SW<br>Columbia, MISSOURI 65203<br>jgrotzinger@mpua.org |
| Missouri Joint Municipal Electric Utility Commission | | Douglas L Healy<br>3010 E BATTLEFIELD ST STE A<br>SPRINGFIELD, MISSOURI 65804<br>doug@healylawoffices.com |
| Missouri Public Service Commission | Rodney Massman<br>Assistant General Counsel<br>Missouri Public Service Commission<br>200 Madison St.<br>Jefferson City, MISSOURI 65101<br>UNITED STATES<br>Rodney.Massman@psc.mo.gov | John D. Borgmeyer<br>Attorney<br>Missouri Public Service Commission<br>PO Box 360<br>Jefferson City, MISSOURI 65109<br>john.borgmeyer@psc.mo.gov |
| Missouri Public Service Commission | | Valerie Groose<br>200 Madison St<br>Jefferson City, MISSOURI 65109<br>valerie.groose@psc.mo.gov |
| Missouri Public Service Commission | | Shelley S Brueggemann<br>Missouri Bar No. 52173<br>Missouri Public Service Commission<br>PO Box 360<br>, 65102<br>shelley.brueggemann@psc.mo.gov |
| Missouri Public Service Commission | | Jennie Wells<br>Paralegal<br>Missouri Public Service Commission<br>200 Madison Street<br>Jefferson City, MISSOURI 65101<br>jennie.wells@psc.mo.gov |
| Missouri Public Service Commission | | Jennifer Heintz<br>Chief Litigation Attorney<br>Missouri Public Service Commission<br>200 Madison St<br>PO Box 360<br>Jefferson City, MISSOURI 65102<br>jennifer.heintz@psc.mo.gov |
| Missouri Public Service Commission | | Carrie L. Bumgarner<br>PO Box NA<br>Jefferson City, 65102<br>carrie.bumgarner@psc.mo.gov |
| Missouri Public Service Commission | | Walter (Walt) Cecil<br>walt.cecil@psc.mo.gov |
| Missouri Public Service Commission | | Adam McKinnie<br>200 Madison Street<br>Columbia, MISSOURI 65102<br>adam.mckinnie@psc.mo.gov |
| Missouri Public Service Commission | | Dana Adams<br>Missouri Public Service Commission<br>200 Madison St<br>Jefferson City, MISSOURI 65101<br>dana.adams@psc.mo.gov |
| Missouri Public Service Commission | | Jan Kay Davidson<br>Utility Policy Analyst I<br>Missouri Public Service Commission<br>200 Madison St<br>Jefferson City, MISSOURI 65101<br>janette.davidson@psc.mo.gov |
| Missouri River Energy Services | Cynthia Bogorad<br>Spiegel & McDiarmid LLP | Jeffrey M. Bayne<br>Attorney |

| | | |
|---|---|---|
| | 1875 Eye Street, N.W. Suite 700 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES cynthia.bogorad@spiegelmcd.com | Spiegel & McDiarmid LLP 1875 I. St., NW, Suite 700 Washington, DISTRICT OF COLUMBIA 20006 jeffrey.bayne@spiegelmcd.com |
| Missouri River Energy Services | | Anree G Little Associate Spiegel & McDiarmid LLP Spiegel & McDiarmid LLP 1875 Eye St NW Ste 700 Washington, DISTRICT OF COLUMBIA 20006 Anree.little@spiegelmcd.com |
| Missouri River Energy Services | | E Service Spiegel & McDiarmid LLP 1875 Eye St, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20006 eService@spiegelmcd.com |
| Missouri River Energy Services | | Terry Wolf terry.wolf@mrenergy.com |
| MTDUs | Cynthia Bogorad Spiegel & McDiarmid LLP 1875 Eye Street, N.W. Suite 700 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne Attorney Spiegel & McDiarmid LLP Spiegel & McDiarmid LLP 1875 I. St., NW, Suite 700 Washington, DISTRICT OF COLUMBIA 20006 jeffrey.bayne@spiegelmcd.com |
| MTDUs | | Anree G Little Associate Spiegel & McDiarmid LLP Spiegel & McDiarmid LLP 1875 Eye St NW Ste 700 Washington, DISTRICT OF COLUMBIA 20006 Anree.little@spiegelmcd.com |
| MTDUs | | E Service Spiegel & McDiarmid LLP 1875 Eye St, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20006 eService@spiegelmcd.com |
| NATURAL RESOURCES DEFENSE COUNCIL | Elizabeth Pearlman Attorney NATURAL RESOURCES DEFENSE COUNCIL 20 N WACKER DR STE 1600 CHICAGO, ILLINOIS 60606 UNITED STATES tpearlman@nrdc.org | |
| NATURAL RESOURCES DEFENSE COUNCIL | Elizabeth Pearlman Attorney NATURAL RESOURCES DEFENSE COUNCIL 20 N WACKER DR STE 1600 CHICAGO, ILLINOIS 60606 UNITED STATES tpearlman@nrdc.org | |
| NextEra Energy Resources, LLC | Gunnar Birgisson Senior Attorney NextEra Energy Resources, LLC 801 Pennsylvania Ave., N.W. Suite 220 Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES gunnar.birgisson@nee.com | |
| NRG Power Marketing LLC | Cortney Slager Assistant General Counsel - Re NRG Companies 804 Carnegie Center Princeton, NEW JERSEY 08540 UNITED STATES cortney.slager@nrg.com | Neal Fitch Sr. Director, Regulatory Affai NRG Energy, Inc. 804 CARNEGIE CTR PRINCETON, NEW JERSEY 08540 neal.fitch@nrg.com |
| NRG Power Marketing LLC | Jennifer Hsia NRG Energy 211 Carnegie Center Princeton, NEW JERSEY 08540 | |

USCA Case #22-1334          Document #1979425          Filed: 12/28/2022          Page 18 of 74

| | | |
|---|---|---|
| | UNITED STATES<br>jennifer.hsia@nrg.com | |
| Organization of<br>MISO States, Inc. | Brad Pope<br>Organization of MISO States, I<br>811 E WASHINGTON AVE STE 400<br>MADISON, WISCONSIN 53703<br>UNITED STATES<br>brad@misostates.org | Marcus Hawkins<br>Organization of MISO States, Inc.<br>811 E Washington Ave<br>Suite 400<br>Madison, WISCONSIN 53703<br>marcus@misostates.org |
| Potomac<br>Economics, Ltd. | David Patton<br>Potomac Economics<br>9990 FAIRFAX BLVD STE 560<br>FAIRFAX, VIRGINIA 22030<br>UNITED STATES<br>dpatton@potomaceconomics.com | |
| Public Service<br>Commission of<br>Wisconsin | Sophia Rogers<br>Assistant General Counsel<br>PO Box NA<br>MADISON,WISCONSIN 53705-7854<br>UNITED STATES<br>sophia.rogers1@wisconsin.gov | |
| Public Utility<br>Commission of<br>Texas | Debra Roby<br>Member<br>Jennings, Strouss & Salmon, P.L.C.<br>1300 I Street NW<br>Suite 1120<br>Washington, DISTRICT OF COLUMBIA<br>20005<br>UNITED STATES<br>droby@jsslaw.com | Jessie Lance<br>Jessie Lance<br>Public Utility Commission of Texas<br>PO BOX 13326<br>AUSTIN, TEXAS 78711<br>jessie.lance@puc.texas.gov |
| Public Utility<br>Commission of<br>Texas | Alan Robbins<br>Member<br>Jennings, Strouss & Salmon, P.L.C.<br>1300 I ST NW STE 1120<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>arobbins@jsslaw.com | |
| Shell Energy<br>North America<br>(U.S.), L.P. | Matthew Picardi<br>Vice President<br>Shell Energy North America (US), L.P.<br>36 Pinewood Ave.<br>Saratoga Springs, NEW YORK 12866<br>UNITED STATES<br>Matthew.Picardi@shell.com | |
| Sierra Club | Gregory Wannier<br>Associate Attorney<br>Sierra Club<br>2101 Webster St., Ste. 1300<br>Oakland, CALIFORNIA 94612<br>UNITED STATES<br>greg.wannier@sierraclub.org | |
| Sierra Club | Casey Roberts<br>Senior Attorney<br>Sierra Club<br>1536 Wynkoop St, Suite 200<br>Denver, COLORADO 80202<br>UNITED STATES<br>casey.roberts@sierraclub.org | |
| SLEMCO and<br>Concordia Elec.<br>Cooperatives | Gregg Ottinger<br>Attorney - Duncan & Allen<br>INDIVIDUAL<br>1730 Rhode Island Avenue, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA<br>20036-3115<br>UNITED STATES<br>gdo@duncanallen.com | |
| Solar Energy<br>Industries<br>Association | Melissa Alfano<br>Manager of Regulatory Affairs<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DISTRICT OF COLUMBIA<br>20005<br>UNITED STATES<br>malfano@seia.org | Gizelle Wray<br>Manager of Regulatory Affairs<br>Solar Energy Industries Association<br>1425 K St NW Ste. 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>gwray@seia.org |
| Solar Energy<br>Industries<br>Association | | Sean Gallagher<br>Solar Energy Industries Association<br>1425 K St NW<br>Suite 1000 |

USCA Case #22-1334    Document #1979425    Filed: 12/28/2022    Page 19 of 74

| | | |
|---|---|---|
| | | Washington, DISTRICT OF COLUMBIA 20009<br>sgallagher@seia.org |
| Southern Illinois Power Cooperative | Barry Cohen<br>Special Counsel<br>McCarter & English LLP<br>1301 K Street, N.W.<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>bcohen@mccarter.com | |
| Southern Minnesota Municipal Power Agency | Cynthia Bogorad<br>Spiegel & McDiarmid LLP<br>1875 Eye Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne<br>Attorney<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 I. St., NW, Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>jeffrey.bayne@spiegelmcd.com |
| Southern Minnesota Municipal Power Agency | | Anree G Little<br>Associate<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 Eye St NW Ste 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>Anree.little@spiegelmcd.com |
| Southern Minnesota Municipal Power Agency | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Southwest Louisiana Electric Membership Corporation | Cynthia Bogorad<br>Spiegel & McDiarmid LLP<br>1875 Eye Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne<br>Attorney<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 I. St., NW, Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>jeffrey.bayne@spiegelmcd.com |
| Southwest Louisiana Electric Membership Corporation | | Anree G Little<br>Associate<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 Eye St NW Ste 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>Anree.little@spiegelmcd.com |
| Southwest Louisiana Electric Membership Corporation | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Southwest Louisiana Electric Membership Corporation | | Gregg D Ottinger<br>Attorney - Duncan & Allen<br>INDIVIDUAL<br>1730 Rhode Island Avenue, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>gdo@duncanallen.com |
| Southwest Louisiana Electric Membership Corporation | | David W Sandefur<br>Prinicple Engineer / Owner<br>967 E NICHOLAS LN<br>ELLETTSVILLE, INDIANA 47429<br>dwsandefur@gmail.com |
| Sustainable FERC Project | John Moore<br>Senior Attorney<br>Sustainable FERC Project<br>2 N Riverside Plz Ste 2250<br>RTS-RETURN TO SENDER<br>Chicago, ILLINOIS 60606-2640<br>UNITED STATES<br>moore.fercproject@gmail.com | |
| Sustainable FERC Project | John Moore<br>Senior Attorney<br>30 North wacker<br>Chicago, ILLINOIS 60606<br>UNITED STATES<br>jmoore@nrdc.org | |

USCA Case #22-1334     Document #1979425     Filed: 12/28/2022     Page 20 of 74

| | | |
|---|---|---|
| Texas Industrial Energy Consumers | Katherine Coleman<br>Attorney<br>O'Melveny & Myers LLP<br>303 Colorado St.<br>Suite 2750<br>Austin, TEXAS 78701<br>UNITED STATES<br>kcoleman@omm.com | John Hubbard<br>O'Melveny & Myers LLP<br>303 COLORADO ST STE 2750<br>AUSTIN, TEXAS 78701<br>jhubbard@omm.com |
| Texas Industrial Energy Consumers | | Kellie Balli<br>Paralegal<br>O'Melveny & Myers LLP<br>303 COLORADO ST STE 2750<br>AUSTIN, TEXAS 78701<br>kballi@omm.com |
| The Retail Energy Supply Association | Elizabeth Whittle<br>Partner<br>Nixon Peabody LLP<br>799 9TH ST NW STE 500<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>ewhittle@nixonpeabody.com | |
| Upper Michigan Energy Resources Corporation | Conor Ward<br>Attorney<br>WEC Energy Group, Inc.<br>231 W. Michigan Street A292<br>Milwaukee, WISCONSIN 53203<br>UNITED STATES<br>conor.ward@wecenergygroup.com | FERC AT WECENERGYGROUP.<br>Federal Regulatory Affairs Gro<br>WEC Energy Group<br>231 West Michigan Street<br>Milwaukee, WISCONSIN 53201<br>ferc@wecenergygroup.com |
| Upper Michigan Energy Resources Corporation | | Beth Martin<br>Project Manager<br>Wisconsin Electric<br>333 W. Everett Street<br>Milwaukee, WISCONSIN 53012<br>beth.martin@we-energies.com |
| Wabash Valley Power Association, Inc. | Randolph Holt<br>General Counsel<br>Parr Richey LLP<br>6702 Intech Boulevard<br>Indianapolis, INDIANA 46278<br>UNITED STATES<br>r_holt@wvpa.com | **Jeremy Lee Fetty<br>Attorney<br>Parr Richey Obremskey & Morton<br>PO Box 668<br>Lebanon,INDIANA 46052-0668 |
| Wisconsin Electric Power Company | Conor Ward<br>Attorney<br>WEC Energy Group, Inc.<br>231 W. Michigan Street A292<br>Milwaukee, WISCONSIN 53203<br>UNITED STATES<br>conor.ward@wecenergygroup.com | FERC AT WECENERGYGROUP.<br>Federal Regulatory Affairs Gro<br>WEC Energy Group<br>231 West Michigan Street<br>Milwaukee, WISCONSIN 53201<br>ferc@wecenergygroup.com |
| Wisconsin Electric Power Company | | Beth Martin<br>Project Manager<br>Wisconsin Electric<br>333 W. Everett Street<br>Milwaukee, WISCONSIN 53012<br>beth.martin@we-energies.com |
| Wisconsin Public Service Corporation | Conor Ward<br>Attorney<br>WEC Energy Group, Inc.<br>231 W. Michigan Street A292<br>Milwaukee, WISCONSIN 53203<br>UNITED STATES<br>conor.ward@wecenergygroup.com | FERC AT WECENERGYGROUP.<br>Federal Regulatory Affairs Gro<br>WEC Energy Group<br>231 West Michigan Street<br>Milwaukee, WISCONSIN 53201<br>ferc@wecenergygroup.com |
| Wisconsin Public Service Corporation | | Beth Martin<br>Project Manager<br>Wisconsin Electric<br>333 W. Everett Street<br>Milwaukee, WISCONSIN 53012<br>beth.martin@we-energies.com |
| WPPI Energy | Cynthia Bogorad<br>Spiegel & McDiarmid LLP<br>1875 Eye Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | Jeffrey M. Bayne<br>Attorney<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 I. St., NW, Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>jeffrey.bayne@spiegelmcd.com |

USCA Case #22-1334     Document #1979425         Filed: 12/28/2022     Page 21 of 74

| | | |
|---|---|---|
| WPPI Energy | | Anree G. Little<br>Associate<br>Spiegel & McDiarmid LLP<br>Spiegel & McDiarmid LLP<br>1875 Eye St NW Ste 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>Anree.little@spiegelmcd.com |
| WPPI Energy | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| WPPI Energy | | Thomas Hanrahan<br>General Counsel<br>WPPI Energy<br>1425 Corporate Center Drive<br>Sun Prairie, WISCONSIN 53590<br>thanrahan@wppienergy.org |
| Xcel Energy Services Inc. | David Pettit<br>Assistant General Counsel<br>Xcel Energy Services Inc.<br>1800 Larimer Street<br>Suite 1400<br>Denver, COLORADO 80202<br>UNITED STATES<br>david.e.pettit@xcelenergy.com | Diane Watkins<br>Manager, Federal Regulatory Af<br>Xcel Energy Services Inc.<br>1800 Larimer St<br>Suite 1200<br>Denver, COLORADO 80202<br>diane.watkins@xcelenergy.com |
| Xcel Energy Services Inc. | | Kari C Hassler<br>Senior Manager, Market Operati<br>Xcel Energy Services Inc.<br>1800 LARIMER ST STE 1000<br>DENVER, COLORADO 80202<br>kari.hassler@xcelenergy.com |

Back to Query Service List   Back to FERCOnline

**Title 18, U.S.C. 1001 makes it a crime for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious or fraudulent statements as to any matter within its jurisdiction.**

FERC Online does not require the submission of personally identifiable Information (PII) (e.g. social security numbers, birthdates, and phone numbers), an FERC will not be responsible for any PII submitted to FERC Online, including any accidental or inadvertent submissions of PII.

This site contains information collections that are subject to the Paperwork Reduction Act (PRA). Among other things, the PRA requires FERC to provide yo with an estimate of the average burden of completing the information collections on this site. Comments regarding the burden estimate or any other aspec these forms can be directed to FERC's Information Collection Branch at DataClearance@ferc.gov.

In addition, you are not required to respond to any collection of information unless it displays a currently valid Office of Management and Budget (OMB) co number. FERC provides the OMB Control Numbers of the information collections on this site at www.ferc.gov/information-collections.

For any issues regarding FERC Online, please contact FERC Online Support or call Local: 202-502-6652 | Toll-free: 866-208-3676. Please include a current ma address, telephone number, and e-mail address.

## FERC Orders For Which Review is Requested

*Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Tariff Revisions, Docket Nos. ER22-496-000 and ER22-496-001, 180 FERC ¶ 61,142 (August 31, 2022)

*Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER22-496-002, 181 FERC ¶ 62,080 (October 31, 2022)

180 FERC ¶ 61,142
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Richard Glick, Chairman;
                       James P. Danly, Allison Clements,
                       Mark C. Christie, and Willie L. Phillips.

Midcontinent Independent System Operator, Inc.          Docket Nos. ER22-496-000
                                                                    ER22-496-001

ORDER REJECTING PROPOSED TARIFF REVISIONS

(Issued August 31, 2022)

1.     On November 30, 2021, pursuant to section 205 of the Federal Power Act (FPA),[1]
Midcontinent Independent System Operator, Inc. (MISO) submitted proposed revisions
(Filing) to Module E-1 of MISO's Open Access Transmission, Energy, and Operating
Reserve Markets Tariff (Tariff) to require Market Participants representing Load Serving
Entities (LSEs)[2] participating in MISO's Planning Resource Auction (Auction) to
implement a Minimum Capacity Obligation (MCO).  As discussed below, we reject
MISO's proposed Tariff revisions.

I.     **Background**

2.     MISO's currently effective resource adequacy construct, primarily located in
Module E-1 of its Tariff, requires LSEs in each Local Resource Zone (Zone) to procure
sufficient Zonal Resource Credits (ZRCs)[3] to meet their respective annual Planning

---

[1] 16 U.S.C. § 824d.

[2] For purposes of this order, references to LSEs also refer to Market Participants
representing LSEs.

[3] A ZRC is a megawatt (MW) unit that has been converted from a MW of
Unforced Capacity and is eligible to be offered by a Market Participant into the Auction,
to be sold bilaterally, or to be submitted through a Fixed Resource Adequacy Plan.
MISO, FERC Electric Tariff, Module A, § 1.Z (38.0.0).

Reserve Margin Requirements (Reserve Requirements) for each Planning Year,[4] so that the LSEs in each Zone meet their aggregate Reserve Requirements.[5] An LSE can satisfy its Reserve Requirement in any combination of the following four options: (1) purchase ZRCs through the Auction process; (2) submit a Fixed Resource Adequacy Plan (FRAP) to demonstrate that it has designated ZRCs to meet all or a portion of its Reserve Requirement; (3) self-schedule ZRCs and bid them into the Auction at a price of zero; or (4) pay the Capacity Deficiency Charge.[6] Currently, an LSE may procure anywhere between 0% and 100% of its Reserve Requirement through MISO's Auction.

## II.    Filing

3.    MISO states that its generation fleet is undergoing an unprecedented transformation, causing increasing uncertainty for resource adequacy under current and expected future conditions. MISO further states that, in recent years, certain Market Participants representing LSEs have relied primarily on MISO's Auction to procure capacity for the upcoming Planning Year. MISO contends that allowing LSEs to procure high percentages of their Reserve Requirements through the Auction introduces higher than acceptable risk that an LSE, and potentially all or a portion of MISO, will have insufficient capacity if the quantity of capacity offered into the Auction drops sharply. MISO states that potentially high levels of thermal generation retirement and uncertainty in the performance characteristics of the resource mix that will replace this generation could result in a resource mix that provides a lower than intended level of reliability. MISO asserts that, as such, the reliability impact of errors in setting the Planning Reserve Margin[7] and resource capacity values would be magnified if too many LSEs procure very small proportions of their Reserve Requirements prior to the Auction, thus contributing to potential capacity shortfalls in the Auction.[8]

---

[4] The Planning Year runs from June 1 through May 31 of the following year. *Id.* § 1.P (63.0.0).

[5] *Id.*, Module E-1, § 68A.7 (32.0.0).

[6] *Id.* § 69A (35.0.0). The Capacity Deficiency Charge is equal to the Cost of New Entry (CONE) in the Zone where the LSE is deficient ZRCs, multiplied by 2.478, for each ZRC. *Id.* § 69A.10 (35.0.0).

[7] The Planning Reserve Margin is the percentage of capacity above forecasted Coincident Peak Demand in MISO needed to meet MISO's reliability criteria. MISO, FERC Electric Tariff, Module E-1, § 68A.2.1 (32.0.0).

[8] Transmittal at 4-5 (citing Tab C (Testimony of Dr. Scott Harvey), at 1 (Harvey Test.)).

4.    MISO states that, while the current resource adequacy construct permits LSEs the option of purchasing capacity in the Auction, there is no assurance that sufficient capacity will be offered in the Auction to satisfy the demand for capacity.  MISO adds that, without a formal requirement to do so, it is not prudent to assume that any LSE will carry more capacity than it needs to serve its load.  Thus, MISO argues that requiring sizable LSEs to carry some amount of capacity either to cover their loads or to offer into the Auction is an important guardrail that will help keep Market Participants focused on resource adequacy now and into the future.[9]

5.    MISO states that, under the instant proposal, Market Participants representing LSEs will be required to procure, either through ownership or bilateral contracts, sufficient ZRCs to meet 50% of their LSEs' total Reserve Requirements prior to the Auction.  MISO adds that this obligation will be subject to a 50 MW *de minimis* exemption wherein LSEs with Reserve Requirements of 100 MW or less are not subject to the MCO.  MISO states that LSEs that fail to satisfy the MCO will incur a non-compliance charge (MCO Non-Compliance Charge), which is set at 1.5 times the daily Cost of New Entry (CONE) for each deficient ZRC.[10]

6.    MISO argues that imposing an MCO will reduce the potential for capacity shortfalls in future Auctions.[11]  MISO states that imposing charges on LSEs that do not procure 50% of their capacity obligation prior to the Auction will incent LSEs to contract forward for at least a portion of their Reserve Requirements.  MISO states that this incentive will be particularly strong when LSEs recognize the tightening capacity supply-demand balance.[12]

7.    MISO states that the 50% MCO threshold was selected because it is high enough to ensure that LSEs with over 100 MW of Reserve Requirements have some capacity contracted prior to the Auction, but still low enough as to not be overly burdensome.  MISO argues that the 50% MCO threshold avoids infringing unnecessarily on state and Relevant Electric Retail Regulatory Authority (RERRA) resource planning authority and is unlikely to result in the potential for bilateral market power on a MISO region-wide

---

[9] *Id.* at 5-6 (citing Tab D (Testimony of Scott Wright), at 18 (Wright Test.)).

[10] *Id.* at 6-7.  CONE is the capital, operating, financial, and other costs of acquiring a new generation resource in MISO, calculated for each Zone.  CONE is also the maximum Auction Clearing Price in the annual Auction.  *See* MISO, FERC Electric Tariff, Module A, § 1.C (65.0.0).  *See also* MISO, FERC Electric Tariff, Module E-1, § 69A.7.1 (44.0.0).

[11] Transmittal at 7 (citing Wright Test. at 15-16).

[12] *Id.*

basis.[13]  MISO further argues that the 50 MW *de minimis* exemption is necessary to avoid placing an overly burdensome MCO on small LSEs that may not be well positioned to meet their obligations through the bilateral markets.[14]

8.      MISO proposes to assess a one-time charge to non-compliant Market Participants immediately after the Auction, and to distribute any collected non-compliance charges to all Market Participants that met their MCO on the Market Participant's MW-weighted share of the total MCO for the MISO region.  MISO states that the charge was established to align with the current Auction economic incentives.  Specifically, MISO explains that the MCO Non-Compliance Charge (which is CONE multiplied by 1.5) will exceed the maximum Auction Clearing Price (which is CONE), but will not exceed the Auction's current Capacity Deficiency Charge (which is CONE multiplied by 2.748).  MISO states that the level of the MCO Non-Compliance Charge appropriately incents Market Participants to participate in the Auction, even if they are subject to the MCO Non-Compliance Charge, for any capacity they are deficient, rather than opt-out of the Auction.  MISO states that the MCO Non-Compliance charge should incent LSEs to contract forward for capacity, particularly at times where they see a potential for the market to tighten prior to the Auction.  MISO states that, according to Dr. Harvey's testimony, there is no corresponding benefit to capacity suppliers to withhold forward bilateral sales, as withholding bilateral forward capacity sales will not raise the prices that Market Participants would receive in the Auction, because of the large number of non-pivotal suppliers to meet the capacity obligation created by the MCO and the fact that past Auctions have cleared well below the mitigation floor.[15]

9.      MISO proposes to first apply the MCO on a MISO-wide basis commencing with the 2023/2024 Planning Year.  MISO states that this MISO-wide application will provide LSEs an opportunity to become accustomed to complying with the obligation and will allow LSEs to rely on capacity across the region to meet their MCOs while still respecting the Local Clearing Requirements for each Zone.  Beginning with the 2025/2026 Planning Year, MISO proposes to apply the MCO separately to Planning Area 1 and Planning Area 2.[16]  MISO states that this transition will respect the major constraint between the two Planning Areas by only allowing LSEs to meet their MCOs using capacity located in the same Planning Area as their loads.  MISO asserts that this approach better aligns the

---

[13] *Id.* (citing Wright Test. at 17, 19-20).

[14] *Id.* (citing Wright Test. at 23).

[15] *Id.* at 7-8 (citing Harvey Test. at 18-19).

[16] Planning Area 1 is MISO North, which contains Zones 1-7, and Planning Area 2 is MISO South, which contains Zones 8-10.

resources relied upon to meet the MCO with the loads these resources serve, ultimately ensuring that resources will be available when and where they are needed most.[17]

10.     MISO states that, to address concerns regarding the potential exercise of market power when the MCO is applied on a subregional basis (i.e., by Planning Areas), the MISO Independent Market Monitor (Market Monitor) will complete a market power analysis in advance of the transition, which will be filed with the Commission to provide stakeholders an opportunity to review and comment on the Market Monitor's findings. MISO commits that, to the extent that the Market Monitor's analysis identifies the potential for the exercise of market power as a result of the transition to subregional application of the MCO, MISO will work with stakeholders to develop and file with the Commission the necessary market power mitigation provisions.  MISO states that this requirement is memorialized in MISO's proposed Tariff revisions.[18]

11.     MISO contends that it has conducted a market power analysis that supports MISO-wide implementation of the MCO.  MISO explains that it commissioned the Brattle Group, Inc. (Brattle Group) to conduct a net pivotal supplier analysis of capacity available for sale to meet MISO's proposed 50% MCO.  MISO states that its analysis found that, not only can the MISO region and respective Planning Areas pass a two pivotal supplier test with the application of the MCO, but that there are a significant number of non-pivotal suppliers available with which LSEs may contract to satisfy the MCO.[19]  MISO acknowledges that, because the proposed MCO Non-Compliance Charge will incent LSEs to contract forward for supply, there is a reasonable concern for the potential exercise of market power in the bilateral markets.  MISO argues, however, that this concern is mitigated by applying the MCO initially at the MISO-wide level and deferring the application by Planning Area until the 2025/2026 Planning Year.[20]

12.     Finally, in support of its argument that its proposal will not lead to the exercise of market power in forward bilateral capacity transactions, MISO states that Dr. Harvey's testimony indicates that historical data shows that Auction Clearing Prices have not been materially impacted by the existence of market power or the application of offer market power mitigation.[21]

---

[17] Transmittal at 8.

[18] *Id.* at 9.

[19] *Id.* at 9-10.

[20] *Id.* at 10.

[21] *Id.* (citing Harvey Test. at 11).

13.    MISO requests an effective date of September 1, 2022 for its proposed Tariff revisions.[22]

14.    Concurrently with this filing, MISO submitted, in Docket No. ER22-495-000, proposed revisions to its resource adequacy construct (Seasonal RA Filing).  Among other things, MISO proposed to establish Reserve Requirements on a seasonal basis and to implement an availability-based accreditation methodology for certain resources. Concurrently with this order, the Commission accepts MISO's Seasonal RA Filing, subject to condition.[23]

## III.    Notice of Filing and Responsive Pleadings

15.    Notice of the Filing was published in the *Federal Register*, 86 Fed. Reg. 69,024 (Dec. 6, 2021), with interventions and protests due on or before December 21, 2021.  On December 7, 2021, Solar Energy Industries Association (SEIA), American Clean Power Association (ACP), Clean Grid Alliance (CGA), Fresh Energy, Natural Resources Defense Council (NRDC), and Sustainable FERC Project filed a motion for an extension of time, from December 21, 2021, to January 14, 2022, of the comment date.  On December 13, 2021, the Commission granted Clean Energy Coalition's motion for an extension of the comment date to January 14, 2022.

16.    Notices of intervention were filed by:  the Mississippi Public Service Commission and Mississippi Public Utilities Staff; the Missouri Public Service Commission; the Illinois Commerce Commission (Illinois Commission); the Michigan Public Service Commission; the Public Service Commission of Wisconsin; the Arkansas Public Service Commission; the Louisiana Public Service Commission; the Public Utility Commission of Texas; the Indiana Utility Regulatory Commission (Indiana Commission); and the Kentucky Public Service Commission.

17.    Timely motions to intervene were filed by:  the City Council of the City of New Orleans; the Organization of MISO States; Cooperative Energy; NRG Power Marketing LLC; American Municipal Power, Inc. (AMP); Energy Michigan, Inc. (Energy Michigan); Alliant Energy Corporate Services; Wabash Valley Power Association, Inc.; Indiana Municipal Power Agency; Exelon Generation Company, LLC (Exelon); Solar Energy Industries Association (SEIA); American Clean Power Association (ACP) and Clean Grid Alliance (CGA); Fresh Energy; the Sustainable FERC Project and Natural Resources Defense Council (NRDC); Duke Energy Corporation (Duke Energy); Indianapolis Power and Light Company; Calpine Corporation; Ameren Services Company (Ameren); NextEra Energy Resources, LLC; Entergy Services, LLC.

---

[22] *Id.* at 13.

[23] *Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,141 (2022).

(Entergy); MidAmerican Energy Company (MidAmerican); Great River Energy; Illinois Municipal Electric Agency; Xcel Energy Services Inc.; Indiana Office of Consumer Counselor; Illinois Industrial Energy Consumers (IIEC); Association of Businesses Advocating Tariff Equity (ABATE); Indiana Industrial Group (IIG); the Louisiana Energy Users Group (LEUG); Texas Industrial Energy Consumers (TIEC); the Coalition of MISO Transmission Customers (CMTC); Southwest Louisiana Electric Membership Corporation and Concordia Electric Cooperative, Inc.; Arkansas Electric Cooperative Corporation; EDF Trading North America, LLC and EDF Energy Services, LLC; East Texas Electric Cooperative; Wisconsin Electric Power Company, Wisconsin Public Service Corporation and Upper Michigan Energy Resources Corporation; DTE Electric Company (DTE Electric); Coalition of Midwest Power Producers, Inc.; Sierra Club; Consumers Energy Company (Consumers Energy); Great Lakes Utilities, Madison Gas and Electric Company, Midwest Municipal Transmission Group, Missouri Joint Municipal Electric Utility Commission, Missouri River Energy Services, Southern Minnesota Municipal Power Agency, Southwest Louisiana Electric Membership Corporation, and WPPI Energy (collectively, Midwest TDUs); American Electric Power Service Corporation (AEP); Retail Energy Supply Association (RESA); Cleco Corporate Holdings LLC and Cleco Cajun LLC (collectively, Cleco); the Coalition of Midwest Power Producers, Inc. (COMPP); Big Rivers Electric Corporation (Big Rivers); Hoosier Energy Rural Electric Cooperative, Inc. (Hoosier); Southern Illinois Power Cooperative (SIPC); Shell Energy North America (U.S.), L.P. (Shell); and Potomac Economics, Ltd. (Potomac Economics), which is the Market Monitor.

18.     Protests were filed by:  AMP; Midwest TDUs; Exelon; Energy Michigan; RESA; SEIA, ACP, CGA, Sierra Club, NRDC, and the Sustainable FERC Project (collectively, Clean Energy Coalition); Ameren; IIEC, ABATE, IIG, LEUG, TIEC, and CMTC (collectively, Industrial Customers); Big Rivers, Hoosier and SIPC (collectively, Joint Commenters); Shell; the Illinois Commission, and Potomac Economics.  Comments were filed by:  MidAmerican; the Indiana Commission; Consumers Energy; AEP; DTE Electric; Cleco; Duke Energy; COMPP; and Entergy.

19.     On January 31, 2022, Entergy filed a motion for leave to respond and response to the protest of Potomac Economics (Entergy January 31 Answer).

20.     On February 9, 2022, MISO filed a motion for leave to answer and answer to the comments and protests (MISO February 9 Answer).  On February 24, 2022, Midwest TDUs filed a motion for leave to respond and response to MISO's February 9 Answer. On March 2, 2022, Industrial Customers filed a motion for leave to answer and answer to MISO's February 9 Answer.

21.     On March 9, 2022, Commission staff issued a deficiency letter seeking additional information about, among other things, MISO's proposed transition to a subregional MCO and liquidity in MISO's bilateral markets.

22.    MISO filed its response to the deficiency letter (Deficiency Letter Response) on
April 8, 2022.  Notice of MISO's Deficiency Letter Response was published in the
*Federal Register*, 87 Fed. Reg. 22,200 (Apr. 14, 2022), with interventions and protests
due on or before April 29, 2022.  Timely comments and protests were filed by AMP,
Potomac Economics, and Midwest TDUs.  On April 29, 2022, Entergy filed comments in
support of MISO's Deficiency Letter Response.  On May 20, 2022, MISO filed a motion
for leave to answer and answer to the comments and protests (MISO May 20 Answer).
On June 6, 2022, Midwest TDUs filed a motion for leave to respond and response to
MISO's May 20 Answer (Midwest TDUs June 6 Answer).

## IV.    **Comments and Protests**

### A.    **Supporting Comments**

23.    Entergy, Cleco, the Indiana Commission, DTE Electric, Consumers Energy,
MidAmerican, COMPP, and Duke Energy support MISO's proposal.  Cleco supports
MISO's argument that a forward capacity obligation is necessary since the prompt
year Auction is too late to address any shortfall of supply in the Auction, but argues that
MISO's proposal does not go far enough.[24]  MidAmerican, Entergy, DTE Electric, and
Duke Energy submit that an MCO will lead to greater reliability in the MISO region and
will reinforce a fundamental assumption that all LSEs are appropriately planning.[25]
Duke Energy explains that, the greater reliance on the Auction to procure capacity, the
greater the risk that there will be insufficient capacity available, threatening reliability of
the entire MISO region.[26]  The Indiana Commission states that it supports MISO's aims
and approach to assuring and safeguarding the capacity reserve margin and agrees that
compliance with MISO's MCO should not be difficult.[27]  The Indiana Commission notes
that MISO's proposal aligns with the objectives of Indiana's recent codification of good
utility practices encouraging local resource development and procurement through annual
reporting on, and compliance with, statutory reliability adequacy metrics.[28]  COMPP

---

[24] Cleco Comments at 5-6.

[25] MidAmerican Comments at 2; Entergy Comments at 1, 8; DTE Electric
Comments at 3; Duke Energy Comments at 2.

[26] Duke Energy Comments at 2.

[27] Indiana Commission Comments at 3.

[28] *Id.* at 3-4.  *See* Indiana Code § 8-1-8.5- 13(a); Indiana Code § 8-1-8.5-13(e):

As used in this section, "reliability adequacy metrics", [sic]
with respect to a public utility, means calculations used to
demonstrate both of the following:  (1) That the public utility:

argues that the MCO proposal strikes a good balance between relying on the Auction versus incentivizing LSEs to maintain sufficient capacity.[29]

24.    Several commenters note that all LSEs share responsibility for maintaining reliability and that over-reliance on the Auction can lead to resource adequacy issues. DTE Electric recognizes that the vast majority of LSEs use the Auction as intended to balance modest short or long positions resulting from fluctuations in supply accreditation or demand — and not as the primary source of capacity to serve customer needs. DTE Electric states that some LSEs, however, do not proactively procure capacity and, to satisfy their own requirements, instead rely on the excess capacity offered into the Auction by other entities, and therefore risk capacity shortages. DTE Electric posits that MISO's proposal recognizes this shortcoming in the current construct by incentivizing LSEs to contract forward for a portion of their capacity obligation.[30]

25.    DTE Electric contends that the large excess reserve margins on which those making year-to-year spot purchases in the Auction could previously rely are quickly diminishing. DTE Electric states that, if this issue impacted only those without dedicated capacity, the effect would be contained; however, in the interconnected grid in which all MISO LSEs operate, a reliability issue for some is a reliability issue for all, including those who prudently planned in advance for their customers' needs. DTE Electric asserts that the MCO would act as an important insurance policy for the MISO region, minimally affecting those entities that engage in proper planning, while eliminating the ability of others to forego this necessary activity and improperly rely on year-to-year spot purchases that may or may not be available.[31]

26.    The Indiana Commission agrees with MISO's assessment that, without a formal requirement to procure more capacity from outside the Auction, LSEs might not do so, and argues that MISO's concerns are exacerbated by the decline of MISO system's

---

            (A) has in place sufficient summer UCAP; or (B) can reasonably acquire not more than thirty percent (30%) of its total summer UCAP from capacity markets, such that it will have sufficient summer UCAP; to provide reliable electric service to Indiana customers, and to meet its planning reserve margin requirement and other federal reliability requirements described in subsection (i)(4). . . .

[29] COMPP Comments at 5.

[30] DTE Electric Comments at 4.

[31] *Id.* at 4-5.

reserve margin over the last decade.[32]  Consumers Energy argues that continued total reliance on "just-in-time" procurement of capacity can and will eventually lead to dire consequences should sufficient capacity fail to appear in the Auction.[33]  MidAmerican states that, while there are financial consequences within the Tariff to account for inappropriate planning and reliance on MISO's short term capacity balancing auction, long-term resource adequacy is best served by ensuring that all LSEs bring a reasonable amount of physical assets to the Auction.[34]

27.     Entergy states that the MCO proposal is consistent with the conception of MISO's resource adequacy construct, and that the Commission has recognized that "MISO's [A]uction is not — and has never been — the primary mechanism for LSEs to procure capacity."[35]  Entergy contends that the MCO proposal is also consistent with an element of Southwest Power Pool, Inc.'s (SPP) resource adequacy construct, which includes a requirement for each LSE to demonstrate that it owns or has bilateral contracts sufficient to meet 100% of its summer and winter peak load plus a reserve margin, as well as a non-compliance penalty equal to 125-200% CONE.[36]

28.     Entergy asserts that MISO's capacity market is based on LSEs owning and/or contracting bilaterally for capacity resources to meet the bulk of their capacity needs to satisfy Reserve Requirements.[37]  Therefore, according to Entergy, if an LSE fails to engage in long-term planning and relies on the Auction to meet the majority of its Reserve Requirements, it increases the likelihood that individual Zones may not have enough capacity to meet their Local Clearing Requirements, which would result in the Auction clearing at CONE and in higher local reliability risks.

29.     Entergy states that LSEs are "tempted" to forgo long-term capacity obligations and rely on the Auction because the planning actions of vertically integrated utilities have typically resulted in surplus capacity which can be offered into the Auction, and that has

---

[32] Indiana Commission Comments at 3.

[33] Consumers Energy Comments at 3.

[34] MidAmerican Comments at 2.

[35] Entergy Comments at 11 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,215, at P 13 (2020) (2020 Rehearing Order)).

[36] *Id.* at 11-12 (citing *Sw. Power Pool, Inc.*, 164 FERC ¶ 61,092 (2018)).

[37] *Id*. at 4-5.

historically kept capacity prices low.[38]  Entergy asserts, therefore, that LSEs enjoy the benefits of reliability conferred by others' investments while contributing relatively nothing to the cost of those investments.[39]  Entergy also states that the answer to any "free rider" problem with the MISO capacity market is to ensure that all LSEs engage in planning and investment commitments to maintain a robust and reliable level of capacity on a long-term basis.  Entergy states that, as an example of the increasing reliability risk associated with increased reliance on the Auction, one of its operating companies is engaged in a regulatory proceeding before its state regulatory commission in which a relatively small LSE located in its Zone is seeking regulatory certification for a portfolio of resources to serve the LSE's load, much of which sits in a load pocket, on a long-term basis.  Entergy states that the proposed portfolio does not include any physical generating capacity under the LSE's ownership or control; rather, the LSE applicant in that proceeding seeks to "lean on" the Auction for some of its capacity needs and rely on power purchase agreements that are not supported by specific, deliverable resources for the remainder of its needs.  Entergy states that because the LSE has failed to identify a supply portfolio that it can use to reliably serve its customers, the affected Entergy Operating Company is opposing certification of the portfolio as a means of protecting its customers from the reliability risks and shifts caused by the LSE's proposal.[40]

30.      Entergy contends that, because the Auction is capped at CONE, even if CONE or near CONE pricing were to occur in a single year, a small LSE may assume that larger LSEs that are subject to state regulatory oversight will build more capacity to rebuild the Zone's capacity position and lower Auction Clearing Prices.[41]  Consequently, Entergy states that the risk of CONE pricing under the current capacity supply construct is insufficient to deter some LSEs from relying on the Auction to meet the majority of their Reserve Requirements because those LSEs can satisfy their capacity requirements at prices well below what is necessary to maintain adequate supply of physical capacity.[42]  Entergy asserts that the 50% MCO will restore the Auction to a more limited role, help contain the negative reliability impacts and effects of cost shifts from free riders, and

---

[38] *Id*. at 5-6, 9.

[39] *Id*. at 6, 9.

[40] *Id*. at 6-7.

[41] *Id*. at 9.

[42] *Id*. at 9-10.

Docket Nos. ER22-496-000 & ER22-496-001                                    - 12 -

retain an LSE's ability to procure a significant portion of its capacity requirements through the Auction.[43]

31.     COMPP, the Indiana Commission, Duke Energy, and Consumers Energy argue that MISO's changing resource mix demonstrates the need for MISO's proposed MCO.[44] The Indiana Commission notes MISO's observation that high thermal generation retirement and uncertainty in the performance characteristics of replacement generation could impact reliability, and argues that inaction is not an option, given the consequences of a capacity shortfall.[45] COMPP notes that MISO has seen a shift in resources at the same time that non-summer periods are now experiencing supply shortfalls, and argues that MISO should move to a more robust resource adequacy system.[46] Duke Energy explains that any risk to the Auction is compounded by high levels of thermal generation retirement and uncertainty in the performance characteristics of the resource mix that will replace this retiring generation.[47] Consumers Energy states that MISO's rapidly evolving resource mix, combined with increasingly frequent and adverse weather events, creates uncertainty about whether there will be sufficient systemwide capacity available for LSEs to continue satisfying their Reserve Requirements in this fashion.[48]

32.     Consumers Energy contends that many entities are already subject to similar requirements and will be unaffected by the MCO change.  Consumers Energy explains that it and other Michigan electric utilities must comply with Michigan's State Reliability Mechanism, which requires that they demonstrate, four years in advance, that they have sufficient capacity outside of the Auction to cover 95% of their Reserve Requirements. Consumers Energy believes MISO's MCO proposal is beneficial for resource adequacy and as a way to move toward a more level playing field among Market Participants who are not already subject to such requirements and those, like Consumers Energy, that are.[49]

---

[43] *Id*. at 10-11.

[44] COMPP Comments at 5; Indiana Commission Comments at 3; Duke Energy Comments at 1; Consumers Energy Comments at 2.

[45] Indiana Commission Comments at 3.

[46] COMPP Comments at 5.

[47] Duke Energy Comments at 2.

[48] Consumers Energy Comments at 2.

[49] *Id.* at 3.

B.    **Protests**

33.    Several commenters generally oppose MISO's proposal.[50]  Clean Energy Coalition
argues that the Commission should reject MISO's MCO proposal as unjust,
unreasonable, and unduly discriminatory to allow MISO more time to create a market
construct that will solve resource adequacy issues.[51]  Potomac Economics notes that the
idea for MISO's MCO proposal came from Entergy, a market participant with a key role
in MISO South.[52]  Potomac Economics argues that neither MISO nor Entergy provided
credible arguments that the MCO is necessary or reasonable.[53]  Potomac Economics adds
that reliability concerns cited by MISO are implausible in MISO South, noting that MISO
South had a 44.7% capacity margin in the summer of 2021.[54]  Exelon argues that shifting
resource adequacy procurement obligations for small LSEs to the bilateral market will
increase costs, undermine capacity seller incentives, and obscure price transparency.[55]
RESA argues that MISO's proposal reduces transparency, reduces flexibility, shifts risks
onto LSEs, permits the use of market power, and will ultimately increase capacity costs
for consumers.[56]  RESA suggests that MISO is looking for a quick-fix and in exchange is
abrogating its planning responsibilities.[57]

34.    Some commenters suggest that MISO's proposal will impose an administrative
burden and distort market efficiencies.  Potomac Economics states that the MCO
proposal will be complex to implement, costly, and administratively burdensome.[58]
Potomac Economics argues that the MCO will require a myriad of rules to determine the
quantity, documentation, and contractual requirements for the capacity demonstration.

---

[50] Potomac Economics, Midwest TDUs, Clean Energy Coalition, Industrial
Customers, Energy Michigan, Exelon, RESA, AMP, the Illinois Commission, Ameren
Joint Commenters, AEP, and Shell Energy.

[51] Clean Energy Coalition Protest at 2.

[52] Potomac Economics Protest at 2.

[53] *Id.*

[54] *Id.* at 6.

[55] Exelon Protest at 5.

[56] RESA Protest at 3.

[57] *Id.* at 8.

[58] Potomac Economics Protest at 19.

Potomac Economic adds that such rules may have unintended consequences and issues that must be navigated, such as: (1) whether contracts that do not specify a specific resource qualify; (2) whether certain pre-existing contracts will need to be renegotiated or modified to qualify under the MCO; (3) whether an LSE's capacity sales would offset its purchases for purposes of satisfying the MCO; and (4) what processes will MISO develop to monitor MCO compliance.[59]  Clean Energy Coalition states that it is inefficient and counterproductive to attempt to solve an alleged pricing problem by imposing new administrative burdens, restrictions, and requirements on market activity and that MISO should instead improve the Auction's design.[60]

35.    Other commenters argue that MISO's filing lacks clarity.  RESA notes that MISO does not identify terms of bilateral contracts or arrangements that would satisfy the MCO.[61]

36.    Ameren states that MISO's proposal is premature, fundamentally flawed, and should be rejected.[62]  The Illinois Commission contends that MISO fails to demonstrate that individual LSEs are overly reliant on the Auction to meet their capacity obligations, shifting costs to other Market Participants, and/or threatening reliability by doing so.[63] Exelon argues that MISO fails to provide basic data for what it claims to be the justification of the MCO filing to include:  the number of Market Participants representing LSEs that are increasingly relying on the Auction; what percentage of the market those LSEs represent; by what percentage these Market Participants' reliance on the Auction is increasing; and how the 50 MW *de minimis* threshold impacts these totals.[64]  Energy Michigan argues that, despite stakeholders' repeated requests for more granular information and data regarding MISO's problem statement necessitating a MCO, MISO's filing remains based on conjecture and unsupported opinions, not hard facts or data.[65]

---

[59] *Id.*

[60] Clean Energy Coalition Protest at 7.

[61] RESA Protest at 5.

[62] Ameren Protest at 4.

[63] Illinois Commission Protest at 8.

[64] Exelon Protest at 4.

[65] Energy Michigan Protest at 3.

37.     Several protestors suggest that current Auction participation rates undermine
MISO's justification for the MCO.  Exelon notes that 96.4% of Reserve Requirements
were satisfied through a FRAP or self-scheduling in the most recent Auction, and
contends that only a few LSEs in the entire MISO footprint are relying substantially on
the Auction.[66]  Industrial Customers argue that an extremely high proportion of the total
Reserve Requirements within the MISO footprint has been, and continues to be, obtained
by LSEs from capacity they have acquired through ownership, lease or bilateral
contracting rather than through the Auction.  Industrial Customers state that, according to
a recent presentation, the portion of the total Reserve Requirements within the MISO
footprint that was met through a FRAP or self-scheduled was 95.3% for the 2019/2020
Planning Year, 94.5% for the 2020/2021 Planning Year, and 96.4% for the 2021/2022
Planning Year.[67]  Industrial Customers assert that this suggests a slightly increasing trend
toward the use of ownership, leasing, and bilateral contracting, rather than an increased
reliance on the Auction to obtain capacity.  Industrial Customers argue that there is no
evidence of either LSEs in MISO as a whole, or LSEs in aggregate within any Zone,
being anywhere near or approaching 50% or more reliance upon the Auction.  Clean
Energy Coalition alleges that MISO admits that the market is not over-relying on the
Auction, as only approximately 8% of ZRCs would have been offered in the Auction if
the MCO were applied in the 2021/2022 Planning Year, and only 0.5% of Reserve
Requirements would be implicated.[68]

38.     Several commenters protest the filing on market efficiency grounds.  Industrial
Customers contend that the Auction is the prompt or "spot" market for capacity within
MISO, which provides final available means to trade capacity and establish prices that
reflect the current balance between the supply and demand of capacity.[69]  Potomac
Economics disagrees with MISO's concerns that LSEs are overly reliant, or "free-riding,"
on the Auction, explaining that forward contracting exists as a hedge against Auction
price volatility in the prompt Auction market.[70]  Industrial Customers and Potomac
Economics both contend that there is no reasonable economic basis to discourage

---

[66] Exelon Protest at 5 (citing MISO 2021/2022 Planning Resource Auction
Results, at 7 (Apr. 15, 2021), https://cdn.misoenergy.org/PY21-
22%20Planning%20Resource%20Auction%20Results541166.pdf).

[67] Industrial Customers Protest at 6 (citing MISO 2021/2022 Planning Resource
Auction Results, at 7 (Apr. 15, 2021)).

[68] Clean Energy Coalition Protest at 14 (citing Wright Test. at 4).

[69] Industrial Customers Protest at 12.

[70] Potomac Economics Protest at 9.

transactions in the prompt Auction market.[71]  Clean Energy Coalition argues that the
MCO would further reduce the ability of the Auction to act as a balancing market, as
forward contracting in commodity markets is voluntary and driven primarily by
participants' expectations of the spot market prices.  Clean Energy Coalition contends
that the Auction's ability to send a signal for new capacity may be dulled or muted by
requiring 50% procurement in advance of the Auction, and that "[b]y muting the
transparent signals of the [Auction], MISO's proposal may deter new entry, reduce
capacity supply, increase Power Purchase Agreement prices for that limited supply, [and]
ultimately raise costs to customers."[72]

39.    Industrial Customers assert that, for the LSEs that are not subject to local
regulation or state capacity requirements, MISO has not shown that its existing resource
adequacy provisions provide insufficient incentive for LSEs to reasonably balance
meeting their Reserve Requirements between capacity arrangements entered into before
the Auction and capacity purchased in the Auction.[73]

40.    Exelon argues that the notion that an LSE should not be able to rely on the
Auction to procure capacity is antithetical to the design and purpose of the Auction.[74]
Exelon notes that the Auction incents additional resources through higher prices when
resources are scarce and disincentivizes new resource entry when prices are low, and that
LSEs make individual business decisions based on their view of costs and risks of
alternatives available.[75]  Exelon notes that the Commission has supported flexibility in
MISO's current resource adequacy construct and has rejected mandatory features like a
mandatory auction to enable LSEs and regulators to develop resource plans.[76]

41.    Clean Energy Coalition argues that the MCO would reduce competition, lead to
inefficient market outcomes, and diminish the ability of competitive suppliers to respond
to changes in information over the forward-looking time period due to a loss of

---

[71] Industrial Customers Protest at 12; Potomac Economics Protest at 9.

[72] Clean Energy Coalition Protest at 8.

[73] Industrial Customers Protest at 5.

[74] Exelon Protest at 8.

[75] *Id.* at 8-9.

[76] *Id.* at 9 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 139 FERC
¶ 61,199, at PP 39-40 (2012), *order on reh'g,* 153 FERC ¶ 61,229 (2015)).

transparency.[77]  Clean Energy Coalition argues that constraining an LSE's option to purchase capacity in the Auction to fill gaps in lumpy capacity procurements may induce utilities to build uneconomic capacity.[78]

42.    Several commenters argue that MISO's proposal discriminates against LSEs in retail choice states.  Exelon argues that MISO's MCO filing inappropriately targets capacity purchases by competitive LSEs operating in retail choice states and public power entities.[79]  Exelon argues that the MCO conflicts with MISO's articulation that states have primary responsibility for reliability standards within their border by undermining the choices that state commissions make in allowing LSEs to fulfill their resource adequacy obligations.[80]  Energy Michigan claims that the brunt of the burden of the MCO will fall predominately on non-vertically integrated Market Participants that rely on the Auction, in whole or in part, given that they may not own capacity resources in a given Zone.  Energy Michigan states that this is especially true for those Market Participants that operate in Illinois (Zone 4) and Michigan (particularly Zone 7), serving customers pursuant to those states' retail electric choice programs.  Energy Michigan argues that the MCO is similar to the "Competitive Retail Solution" filing that the Commission rejected in 2017 with respect to the focus on the Auction and the non-vertically integrated Market Participants that use it along with the allegations that "time is of the essence" and dire predictions about what will allegedly occur barring its adoption.[81]

43.    Industrial Customers assert that the vast majority of LSEs within the MISO footprint are regulated by local or state regulatory bodies that have or can address reliability concerns at the local level where needed and appropriate and/or already subject to state imposed capacity demonstration requirements.  Industrial Customers assert that the reliability and cost of the electric service is already subject to scrutiny by local or state regulatory bodies, local governments, and/or electric cooperative member systems.  Furthermore, Industrial Customers note that states, most notably Michigan and Indiana, already impose capacity demonstration requirements on the electric suppliers they oversee.  Industrial Customers argue that the existence of such state provisions, on top of the predominance of local or state regulatory oversight of LSEs throughout the MISO

---

[77] Clean Energy Coalition Protest at 6.

[78] Id. at 6-7 (citing Harvey Test. at 23).

[79] Exelon Protest at 7.

[80] Id. at 9-10.

[81] Energy Michigan Protest at 5-7.

footprint, further demonstrates that there is no need for MISO to impose its proposed MCO.[82]

44.    Clean Energy Coalition notes the Commission's long recognized shared authority with states over resource adequacy.[83]  Clean Energy Coalition argues that MISO's proposal fails to acknowledge how the MCO would conflict with existing state resource planning authorities.  For example, Clean Energy Coalition notes that both Illinois and Michigan implemented plans to analyze capacity procurement strategies from LSEs and utilities.[84]  Clean Energy Coalition argues that the MCO proposal would constrain state regulators from determining that it is more prudent for their utilities to rely more on the Auction in certain Planning Years.[85]

45.    The Illinois Commission contends that MISO fails to explain how its proposal will impose quantity requirements and penalties on LSEs like those in Illinois that have fluctuating load.  RESA notes that the MCO is problematic for retail choice suppliers because any changes in their load over the Planning Year will not be reflected in their obligation.[86]  The Illinois Commission adds that the proposal does not explain how the MCO would work with procurement plans developed by the Illinois Power Agency and approved by the Illinois Commission.  The Illinois Commission states that the resulting procurements are subject to a competitive selection process, including pricing that is subject to confidential price thresholds established under Illinois statute.[87]  The Illinois

---

[82] Industrial Customers Protest at 8-9.

[83] Clean Energy Coalition Protest at 8-9 (citing *Cal. Indep. Sys. Operator Corp.*, 116 FERC ¶ 61,274, at P 1117 (2006); *CXA La Paloma, LLC v. Cal. Indep. Sys. Operator Corp.*, 165 FERC ¶ 61,148 (2018)).

[84] *Id.* at 9 (citing Illinois Power Agency, Final 2020 Electricity Procurement Plan 76 (2020), https://www2.illinois.gov/sites/ipa/Documents/2020%20Final%20Electricity%20Procurement%20Plan/IPA%20Fin al%202020%20Electricity%20Procurement%20Plan.pdf).

[85] *Id.* at 10.

[86] RESA Protest at 9.

[87] Illinois Commission Protest at 9 (citing Section 16-111.5(e) of the Illinois Public Utilities Act, 220 ILCS § 5/16-111.5(e); https://www.ilga.gov/legislation/ilcs/fulltext.asp?DocName=022000050K16-111.5).

Commission states that the MCO proposal would impose procurement quantity mandates without any price thresholds and any shortfall would be subject to significant penalties.[88]

46.     Potomac Economics contends that the reliability issues MISO cites are not issues that could be addressed by the MCO.[89]  First, Potomac Economics notes that forced outage rates are up only about one percent, likely due to maintenance deferrals that occurred during the pandemic, and is independent of whether MISO imposes the MCO.[90]  Second, Potomac Economics finds no increasing trend in correlated generation outages and notes that proposed changes to accreditation in the Seasonal RA Filing will improve the incentive to avoid correlated outages.[91]  Finally, Potomac Economics states that the MCO can do nothing to address reliability concerns associated with extreme weather events.[92]

47.     Potomac Economics states that reliability can only be improved by new rules that cause an increase in the total amount or availability of capacity, yet it is not clear that, by changing MISO's resource base, the MCO will do either.[93]  Potomac Economics notes that, although MISO defines "prudent resource planning" in the filing as not purchasing the majority of an LSE's capacity in the Auction, short-term bilateral contracts might not create incentives for new resources or avoid retirements.[94]

48.     Potomac Economics argues that, given that forward contracts reflect spot prices, the price for bilateral contracts should also be low, which will be insufficient to create incentives for investment or avoid retirements for high-cost resources.[95]  Furthermore, Potomac Economics notes that the incentive to procure capacity through long-term contracts already exists under the current Auction design and would not be changed by

---

[88] *Id.*

[89] Potomac Economics Protest at 7.

[90] *Id.*

[91] *Id.* at 7-8.

[92] *Id.* at 8.

[93] *Id.* at 10.

[94] *Id.*

[95] *Id.* at 10-11.

Docket Nos. ER22-496-000 & ER22-496-001                                                    - 20 -

the MCO.[96]  Potomac Economics warns that the MCO could lead to higher-priced forward contracts or new construction if suppliers withhold capacity, but that this would be anticompetitive.[97]

49.    The Illinois Commission contends that the proposed MCO does not address the bigger issues of generator performance, extreme weather events, or generator outage issues, noting that MISO cannot reliably operate the system if the resources on which it depends do not perform during periods of highest need.  The Illinois Commission argues that, if the MCO is implemented, addressing these concerns is critical, as these are the same resources that would both participate in the Auction and be acquired by LSEs with the MCO in the bilateral market.[98]  Energy Michigan argues that the notion that MISO members are projecting that "a huge amount of capacity will be built over the next decade" is contrary to MISO's rationale that the MCO is needed now to create incentives for even more capacity.[99]  Clean Energy Coalition argues that how LSEs meet their capacity requirements does nothing to address the concern of generator retirements and resource performance during periods of high need.[100]  Clean Energy Coalition argues that the MCO proposal does not ensure that resources are able to provide energy when called upon, and that it is incumbent upon MISO to address performance issues in the 2021 Winter Storm before implementing reforms to a residual market that would have a limited impact on reliability.[101]

50.    Exelon, the Illinois Commission, and Industrial Customers argue that the MCO as proposed would not lead to increased reliability because of the small number of LSEs that would be affected by it.[102]  Industrial Customers assert that approximately 129,044 MW of the 133,903 MW Reserve Requirements in MISO as a whole for the 2021/2022 Planning Year was capacity that was either submitted in a FRAP or self-scheduled in the

---

[96] *Id.* at 11.

[97] *Id.*

[98] Illinois Commission Protest at 7-8.

[99] Energy Michigan Protest at 13 n.26 (citing Harvey Test. at 18).

[100] Clean Energy Coalition Protest at 7-8.

[101] *Id.* at 16.

[102] Industrial Customers Protest at 11-12; Illinois Commission Protest at 6-7; Exelon Protest at 4-5.

Auction.[103]  The Illinois Commission explains that MISO witness Wright notes that only 742 MW would have been impacted by the MCO if it had been applied in the 2021/2022 Planning Year, which accounts for roughly one half of one percent of MISO's 133,903 MW Reserve Requirements for that same Planning Year.[104]  Exelon states that, because only 742 MW would be needed across all Market Participants to meet the MCO requirement, MISO's proposal is designed to address a problem that does not exist and the proposal does not justify adding substantial costs and risks to consumers.[105]

51.     Exelon states that the MCO will distort market signals and argues that, because an LSE can procure 50% of its capacity obligation one day before the Auction and comply with the MCO requirement, MISO's aim of enhancing long-term reliability is not improved compared to procuring 100% of an LSE's Reserve Requirements from the Auction.[106]  Potomac Economics agrees that, under the MCO, LSEs could procure capacity through bilateral contracts just before the Auction, and argues that this would be essentially the same as the current practice.[107]  Exelon argues that the implementation timeline further indicates that the MCO filing is not designed to improve reliability since there is not enough time to build physical resources, and the implementation date would force LSEs to contract bilaterally with much of the same excess capacity that is readily available across the MISO footprint.[108]  Shell Energy argues that this short timeframe between the Auction and the start of the delivery year does not provide MISO with any additional assurance that it can satisfy its resource adequacy needs.[109]

52.     The Illinois Commission suggests that MISO is trying to use the MCO to address the inability of its present capacity construct to create incentives for investment in new generation resources.  The Illinois Commission states that MISO's expert Dr. Harvey acknowledges that the MISO capacity construct design never intended capacity prices to

---

[103] Industrial Customers Protest at 11-12.

[104] Illinois Commission Protest at 6-7.

[105] Exelon Protest at 4-5.

[106] *Id.* at 5.

[107] Potomac Economics Protest at 11.

[108] Exelon Protest at 6-7.

[109] Shell Energy Protest at 3.

create incentives for capacity resource investment, due to the regulated nature of much of the MISO membership.[110]

53.     RESA argues that the MCO will reduce, rather than increase, reliability because requiring LSEs to enter into bilateral contracts to meet their Reserve Requirements removes MISO from its obligation to ensure that generation and load meet their obligations.  RESA states that, if a generator does not perform its contractual obligation to an LSE, MISO would have no ability to penalize generators that fail to perform and the LSE would only be able to enforce contract terms after the failure.[111]

54.     Joint Commenters argue that the MCO will provide improper incentives for generation owners.  Joint Commenters state that some LSEs may have not finalized their outage plans by the April deadline for the following spring season, and thus the MCO could lead a generation owner to not report an extended planned outage scheduled for the following spring season in order to qualify the resource under the MCO.  Joint Commenters aver that an incentive which could lead a generation owner to not finalize or report a planned outage prior to the MCO deadline would do more harm to reliability than good.[112]

55.     Several protestors contend that the proposed MCO raises market power concerns. Ameren states that MISO is effectively asking the Commission to approve a construct that will require LSEs to contract for capacity above and beyond an LSE's current Local Clearing Requirement and to do so when, as MISO acknowledges, the resource mix is changing and significant resource retirements are on the horizon, which creates the opportunity for the exercise of market power.[113]  Exelon argues that failure to address market power issues now undermines forward planning by Market Participants, since Market Participants do not know if or what the requirements will be or how MISO will address any identified market power concerns.[114]  Energy Michigan argues that, even if the MCO were initially implemented on a system-wide basis, the bilateral contract market would still be subject to capacity import limits.[115]

---

[110] Illinois Commission Protest at 8 (citing Harvey Test. at 19-21).

[111] RESA Protest at 7.

[112] Joint Commenters Protest at 4.

[113] Ameren Protest at 4.

[114] Exelon Protest at 13-14.

[115] *Id.* at 12.

56.    Energy Michigan, AMP, Clean Energy Parties, Exelon, RESA, Potomac Economics, the Illinois Commission, and AEP raise concerns that the MCO could incent capacity sellers to withhold capacity or to unreasonably raise prices.  Energy Michigan asserts that Michigan's investor-owned utilities own or control through contract an overwhelming majority of the resources in Zone 7, arguing that the MCO would place non-asset owning Market Participants at the mercy of monopoly providers.[116]  AMP argues that, under the MCO proposal, the combination of publicly identifying the quantity required to be secured and the extremely high MCO Non-Compliance Charge will result in capacity constraints and "quantity strategies" that increase sellers' market power.[117]  Clean Energy Coalition argues that MISO's proposal creates risks of unmitigated seller market power in the bilateral market, inhibits transparent capacity price signals, and threatens to lead to increased prices and undue discrimination by LSEs.[118]  Exelon, AMP, and the Illinois Commission argue the MCO effectively sets the floor on the price that suppliers would be willing to offer to LSEs bilaterally because LSE buyers will pay up to 1.5 times CONE to avoid the proposed MCO Non-Compliance Charge.[119]  RESA argues that the MCO proposal may create an incentive for generators to negotiate higher bilateral prices rather than participate in the Auction and can create market power concerns if generators withhold capacity.[120]

57.    Potomac Economics states that the MCO introduces opportunities to raise prices in the forward bilateral market.[121]  Potomac Economics contends that Dr. Harvey's testimony dismissing market power concerns comes to the wrong conclusion by focusing on the impact to Auction prices, rather than on bilateral contracts.[122]  Potomac Economics argues that the Brattle Group study does not consider changes in supply and demand or

---

[116] Energy Michigan Protest at 10-11.

[117] AMP Protest at 4-5 (citing Rob Gramlich and Michael Goggin, *Too Much of the Wrong Thing:  The Need for Capacity Market Replacement or Reform*, Sustainable FERC Project, at 16 (Nov. 2019), https://gridprogress.files.wordpress.com/2019/11/too-much-of-the-wrong-thing-the-need-for-capacity-market-replacement-or-reform.pdf).

[118] Clean Energy Coalition Protest at 2.

[119] Exelon Protest at 12; AMP Protest at 3; Illinois Commission Protest at 4.

[120] RESA Protest at 6.

[121] Potomac Economics Protest at 13.

[122] *Id.*

the likelihood that supply will be available in the bilateral capacity market.[123]  Potomac Economics notes that Entergy, the original proponent of the MCO plan, holds the largest share of capacity available in MISO South to be sold to LSEs to satisfy the MCO.[124] Potomac Economics argues that, while the MISO South capacity supply is only moderately concentrated currently, it will become highly concentrated following the planned retirements of Cleco units in the next few years.[125]  Potomac Economics states that these retirements substantially eliminate the available capacity owned by Entergy's largest competitor in MISO South, and will increase Entergy's market share to 41%. Potomac Economics states that its pivotal supplier analysis suggests that the current competitive environment could become concentrated to the point that Entergy is the pivotal supplier in MISO South, given planned retirements and a lack of participation by industrial entities and cooperative associations that do not usually engage in bilateral contracting.[126]

58.     Potomac Economics disagrees with Dr. Harvey's reasoning that, because LSEs could build new supply, market power is not a concern in the long-term.[127]  Potomac Economics argues that, if an LSE's primary recourse to paying an anticompetitive price to purchase low-cost surplus capacity is to incur the costs of building new generation, the Commission would in essence be allowing dominant suppliers to raise bilateral prices up to the lower of the MCO Non-Compliance Charge or the entry costs of new resources. Potomac Economics contends that this is not reasonable and is inconsistent with Commission policy and precedent regarding mitigating market power in any other context.[128]

59.     Potomac Economics and Clean Energy Coalition contend that the Auction plays an important role in discipling the prices of bilateral capacity sales.[129]  Clean Energy Coalition argues that Orders Nos. 697-A and 861 tailored horizontal market power mitigation based on the capacity markets disciplining the price of bilateral capacity

---

[123] *Id.* at 13-14.

[124] *Id.* at 14.

[125] *Id.* at 14-15.

[126] *Id.* at 16-17.

[127] *Id.* at 18.

[128] *Id.*

[129] *Id.* at 17; Clean Energy Coalition Protest at 4.

supply sales.[130]   Clean Energy Coalition notes that, despite differences between the
Auction and eastern capacity markets, the Commission in Order No. 861 concluded that
"MISO conducts annual capacity auctions subject to Commission-approved monitoring
and mitigation, thereby disciplining the price of bilateral capacity sales and providing
capacity buyers with protections."[131]   Clean Energy Coalition argues that the MCO
proposal will fundamentally change the basis for the Commission's determination in
Order No. 861, since the Auction can no longer discipline prices in the bilateral
transactions mandated by the MCO.[132]   Clean Energy Coalition argues that the
Commission must show that it has adequate market power mitigation in place in order to
approve market-based rates as just and reasonable and that the Commission cannot rely
upon a market structure that MISO claims will fundamentally change in the coming years
to protect consumers against excessive capacity prices.[133]

60.     Clean Energy Coalition notes the Brattle Group's assessment explaining that the
bilateral market is not monitored or mitigated and argues that market-based rates will
only be competitive if the market is structurally competitive.[134]   Clean Energy Coalition
notes that this reflects current market conditions of low Auction prices and a large
number of non-pivotal net suppliers and argues that, if conditions necessitating the MCO
were to prevail, the market structure underlying the Brattle Group's analysis would be
materially changed.[135]

---

[130] Clean Energy Coalition Protest at 4 (citing *Mkt.-Based Rates for Wholesale
Sales of Elec. Energy, Capacity & Ancillary Servs. by Pub. Utils.*, Order No. 697-A,
123 FERC ¶ 61,055, at P 285, *clarified*, 124 FERC ¶ 61,055, *order on reh'g*, Order
No. 697-B, 125 FERC ¶ 61,326 (2008), *order on reh'g*, Order No. 697-C, 127 FERC
¶ 61,284 (2009), *order on reh'g*, Order No. 697-D, 130 FERC ¶ 61,206 (2010), *aff'd sub
nom. Mont. Consumer Counsel v. FERC*, 659 F.3d 910 (9th Cir. 2011), *cert. denied*,
*sub nom. Pub. Citizen, Inc. v. FERC*, 567 U.S. 934 (2012); *Refinements to Horizontal
Mkt. Power Analysis for Sellers in Certain Reg'l Transmission Org. & Indep. Sys.
Operator Mkts*, Order No. 861, 168 FERC ¶ 61,040, at P 60 (2019), *order on reh'g*,
Order No. 861-A, 170 FERC ¶ 61,106 (2020)).

[131] *Id.* (citing Order No. 861, 168 FERC ¶ 61,040 at P 48).

[132] *Id.*

[133] *Id.*

[134] *Id.* at 3.

[135] *Id.*

61.    Energy Michigan argues that the Auction, combined with the requirement that all capacity must be submitted into the Auction, mitigates market power by providing an alternative for LSEs who are unable to acquire another party's extra capacity in the bilateral market.  Energy Michigan argues that under the MCO, there is no requirement that LSEs who own capacity must offer to the bilateral market any capacity above their own 50% requirement.  Energy Michigan asserts that merely selling excess capacity into the Auction becomes a form of physical withholding from the bilateral market, as LSEs seeking to purchase capacity would have no Auction backstop because they would be required to purchase 50% in the bilateral market, yet sellers with excess capacity would have no obligation to make the excess capacity available to the bilateral market.[136]  The Illinois Commission submits that there is no must-offer obligation for capacity sellers in the bilateral market and, unlike the Auction, where resources are cleared based on the level of their offer prices, the prices paid for bilateral transactions are based solely on negotiations between the buyer and seller.[137]  AEP states that it shares the Illinois Commission's concerns regarding market power.[138]

62.    Exelon argues that the absence of any market power mitigation in the proposed Tariff modifications warrants rejection of the MCO filing as the proposal fails to satisfy precedent requiring that market mitigation rules strike a balance between preventing unwanted conduct and not undermining legitimate business transactions.[139]

63.    RESA expresses concern that, although MISO acknowledges concerns about market power when the MCO is applied at the subregional level, MISO suggests no solution, and RESA argues that this will immediately harm competition and is unlikely to be overcome with a future fix.[140]  RESA argues that the MCO proposal is inherently anti-

---

[136] Energy Michigan Protest at 10-13.

[137] Illinois Commission Protest at 5-6.

[138] AEP Protest at 5-6.

[139] Exelon Protest at 14 (citing *PJM Interconnection, L.L.C.*, 175 FERC ¶ 61,137, at P 27 (2021) (holding that market rules must "strike a reasonable balance between deterring manipulative behavior and not burdening legitimate . . . activity")).

[140] RESA Protest at 3-4.

competitive and cannot be fixed with market power mitigation.[141]  RESA notes that
Dr. Harvey's testimony identifies deficiencies with the pivotal supplier test.[142]

64.    Energy Michigan contends that the MCO proposal lacks enforcement measures.
Energy Michigan asserts that, while MISO focuses on the market participant buyer side
of the equation, MISO does not discuss enforcement or penalties that would apply to the
market participant seller in a bilateral contract arrangement that changed the terms and/or
conditions of the contract in question.  Energy Michigan argues that the MCO cannot be
found to be just and reasonable without market power mitigation measures.[143]

65.    The Illinois Commission points out that, even though MISO's Market Monitor
believes that the MCO is likely to create market power concerns which will require some
form of mitigation, such mitigation plans will be determined in the future, after MISO has
implemented the MCO.  The Illinois Commission argues that implementation of the
MCO without a clear plan to detect and address market power concerns is premature, and
that, if the Commission adopts the MCO for the MISO markets, it must take appropriate
steps to ensure that proper mitigation measures are put in place to address these market
power concerns.[144]

66.    Energy Michigan contends that the filing lacks any suggested market power
mitigation measures that MISO would use; rather, MISO puts the onus of meeting any
potential market power constraints on the Market Participants.[145]

67.    Several protestors raise additional arguments that subregional implementation of
the MCO will amplify market power concerns.  Clean Energy Coalition states that
MISO's proposal to split the footprint into two separate resource Planning Areas will
result in unjust and unreasonable rates that exacerbate resource adequacy issues.[146]  For
instance, Clean Energy Coalition argues that the MCO proposal encourages further

---

[141] *Id.* at 4.

[142] *Id.*

[143] Energy Michigan Protest at 13-15.

[144] Illinois Commission Protest at 5.

[145] Energy Michigan Protest at 13.

[146] Clean Energy Coalition Protest at 11.

dividing the North/Central and South regions and discourages expanding the 1,000 MW
MISO North-South constraint that would ensure resource adequacy.[147]

68.    Several protestors argue that MISO's intent to file updated market power analysis
at a later date, sometime before the transition, constitutes a material omission from the
MCO filing and should be considered as part of the statutory context as the Commission
determines whether MISO has met its burden under section 205.[148]

69.    Several commenters provide arguments against the specifics of MISO's proposed
MCO.  Cleco contends that the MCO proposal does not sufficiently ensure that the
capacity procured will be deliverable in an emergency, such as from MISO North to
MISO South.[149]  Consequently, Cleco supports immediate implementation of a
subregional MCO. Joint Commenters contend that the 50% threshold is unreasonable, as
an LSE with one resource covering most of that LSE's needs may find it more difficult
than a large LSE, with many resources, to meet the 50% threshold.[150]  On the other hand,
Cleco, who supports the filing overall, argues that MISO's proposal for a 50% minimum
capacity requirement does not go far enough and argues that the MCO should be set at
90% of an LSE's total Reserve Requirement.[151]  The Illinois Commission, AEP, and
Exelon suggest that the 50 MW *de minimis* threshold may not be appropriate, as small
LSEs are still responsible for reliably delivering power to their customers, while
Midwest TDUs suggest that the 50 MW *de minimis* threshold may not be sufficient to
prevent the MCO from burdening smaller LSEs.[152]  AEP contends that MISO's
*de minimis* exemption does not address any potential undue burden the MCO might
otherwise impose on smaller LSEs because it does not help smaller wholesale customers,
such as municipalities, that have Reserve Requirements greater than 100 MW.[153]  AMP
argues that the MCO Non-Compliance Charge is overly punitive while Midwest TDUs

---

[147] *Id.* at 12-13.

[148] *Id.* at 5; Joint Commenters Protest at 3l; AMP Protest at 8.

[149] Cleco Comments at 9.

[150] Joint Commenters Protest at 3.

[151] Cleco Comments at 2.

[152] Illinois Commission Protest at 3; AEP Protest at 5; Exelon Protest at 5;
Midwest TDUs Protest at 6.

[153] AEP Protest at 3-4.

contend that it is not reasonable to assume that LSEs will be able to procure capacity in the bilateral market to avoid the charge.[154]

70.    Some commenters suggest alternative approaches to MISO's proposal.  Energy Michigan and Potomac Economics argue that a sloped demand curve would reflect the marginal reliability value of MISO's capacity and thus incent generation to be built.[155] Potomac Economics adds that increasing the Capacity Deficiency Charge could increase the incentive for Market Participants to procure capacity through forward contracts.[156]

71.    Midwest TDUs and Exelon allege that MISO's proposed Tariff language is ambiguous with regard to whether the MCO will be implemented on a seasonal or annual basis.[157]  Specifically, Midwest TDUs contend that section 69A7.1.A.B. of MISO's proposed Tariff explains how the MCO will be determined but does not indicate whether the MCO would be calculated on an annual or seasonal basis.[158]  Further, Midwest TDUs state that they are concerned that, in combination with provisions of MISO's Seasonal RA Filing, MISO's proposed MCO could operate in an unjust, unreasonable, and punitive way.  Midwest TDUs state that, if an LSE's resource has a lengthy unplanned outage, the resource's unavailability would reduce the accreditation value for that Season for future Auctions.  Midwest TDUs assert that, not only will the LSE suffer reduced accreditation for this resource in the future years, but this reduction in accreditation could affect the LSE's ability to meet its MCO in the subsequent Auction, creating a double penalty.  Midwest TDUs state that, although the Seasonal Accredited Capacity is determined on a three-year average, depending on the duration of the unplanned outage and the portion of the LSE's Reserve Requirements that the resource sustaining the extended outage constituted, that LSE might find itself short for MCO purposes. Midwest TDUs further state that, depending on the timing of the outage relative to the date for submitting ZRCs for the next Auction, the LSE could be faced with a limited period for securing alternative resources through the bilateral market.[159]

72.    Midwest TDUs state that they recognize that MISO cannot be sure that the Seasonal RA Filing will be accepted by the Commission.  Midwest TDUs assert,

---

[154] AMP Protest at 4; Midwest TDUs Protest at 8.

[155] Energy Michigan Protest at 15-16; Potomac Economics Protest at 9.

[156] Potomac Economics Protest at 11.

[157] Midwest TDUs Protest at 6-10; Industrial Customers Protest at 11.

[158] Midwest TDUs Protest at 9.

[159] *Id.* at 6-7.

however, that this uncertainty does not absolve MISO of responsibility to propose just and reasonable MCO Tariff changes that would accommodate acceptance, at some point and in some form, of its Seasonal RA Filing.  Midwest TDUs therefore request that the Commission direct MISO to amend the proposed Tariff language to clarify that the MCO would be determined and applied with a periodicity consistent with the then-applicable Resource Adequacy construct, whether annual, seasonal, or some other defined period.[160]

73.     Industrial Customers contend that MISO's Seasonal RA Filing creates greater price uncertainty in MISO's Auction and could cause LSEs to decrease their use of the Auction.  Industrial Customers argue that this price uncertainty alone could cause LSEs and their Market Participants to increase the degree to which they use ownership, leasing, and bilateral contracting of capacity, rather than use the Auction, to acquire capacity to meet their Reserve Requirements and that this is another reason why MISO's proposed MCO is unnecessary.[161]

## C.     Entergy January 31 Answer

74.     Entergy suggests that it is inappropriate for Potomac Economics to "baselessly impugn [Entergy's] motives for advocating on a policy matter before the Commission and MISO's motives for proposing a tariff change to address that policy issue."[162]  To address Potomac Economics' concerns, Entergy states that, if the MCO is adopted, Entergy will make any long-term surplus capacity available to LSEs in MISO South for purchase through bilateral contracting at Entergy's embedded cost-based rates, with contracts that are first filed with the Commission for review under section 205.  Entergy states that no LSE would be required to contract with Entergy, but any long-term surplus capacity Entergy maintains will be made available at cost-based rates should an LSE in MISO South wish to contract.[163]  Entergy adds that the MISO Tariff already contains capacity withholding provisions regarding the Auction with respect to capacity in MISO that is not contracted bilaterally.[164]

75.     Entergy also disputes Potomac Economics' characterization of capacity surplus in MISO South, noting that, while the Market Monitor describes a 44.7% capacity surplus in MISO South, Zone 9 has one of the smallest surplus capacity positions on a percentage

---

[160] *Id.* at 10.

[161] Industrial Customers Protest at 11.

[162] Entergy January 31 Answer at 2-3.

[163] *Id.* at 3.

[164] *Id.* at 11.

basis relative to its Local Clearing Requirement.  Entergy alleges that Zone 9's small and decreasing Local Clearing Requirement capacity position is cause for concern.[165] Further, Entergy submits that Potomac Economics' protest is contrasted by previous statements, such as the May 2021 Annual State of the Market Report, which states that Potomac Economics is "very concerned about MISO's resource adequacy" in the long term.[166]

76.     Entergy states that the Auction is a balancing market and was never intended to ensure generation entry and retention through wholesale price signals, but rather, MISO relies largely on LSEs to engage in long-term planning, subject to the oversight of state regulators where applicable, to plan enough capacity to meet their share of the pool-wide requirement, and to support that capacity through ownership or contract.  Entergy argues that the problem that MISO reasonably proposes to address with its MCO proposal is that some LSEs rely largely or solely on the Auction, with its low capacity prices, instead of engaging in reasonable long-term capacity planning and procurement.[167]  Entergy states that the current structure of the Auction provides an unintended incentive for LSEs to lean on the Auction as the primary or exclusive source of capacity.  Entergy states that the availability of surplus capacity in the Auction historically has tended to keep prices low in MISO's annual capacity market, leading some LSEs to forgo reasonable compliance with long-term capacity obligations and instead to rely on the Auction in a way that was not intended.  Entergy argues that this practice allows those LSEs to enjoy the benefits of reliability conferred to others' investments in capacity resources while contributing virtually nothing to the cost of those investments or to the collective cost of maintaining resources within MISO sufficient to reliably serve MISO load.[168]

77.     Entergy states that Potomac Economics' answer to this problem would be to have the Commission go against the views of MISO, retail regulators, and most MISO participants and instead impose a sloped demand curve.  Entergy notes that Potomac Economics has long publicly held that the Auction produces prices that are inefficiently low and, in its view, not just and reasonable, and has called the implementation of a sloped demand curve a "simple fix."[169]  Entergy submits that the MCO is a better solution because, in Entergy's view, it is far simpler and less controversial than adopting the sloped demand curve and other features used in the capacity markets in the eastern

---

[165] *Id.* at 4.

[166] *Id.* (citing 2021 Market Monitor State of the Market Report at vii).

[167] *Id.* at 5.

[168] *Id.* at 7.

[169] *Id.* at 8 (citing Potomac Economics Protest at 8-10).

regional transmission organizations (RTOs), which, unlike MISO and SPP, consist largely of restructured states in which many LSEs do not own or contract long-term with generating resources.[170]

78.    In response to the Potomac Economics' argument that concerns about leaning and free riding are misplaced, Entergy states that it is surprised that Potomac Economics now asks the Commission to dismiss concerns about LSEs being able to rely exclusively on the Auction for capacity.  Entergy asserts that the Auction is a balancing market, and on average prices will fall below the prices necessary to support entry and retention—which is precisely why LSEs should not be able to rely on the Auction for all of their capacity needs without doing their own long-term procurement.[171]

79.    Entergy disputes Potomac Economics' arguments on market power.  Entergy states that Potomac Economics ignores that a requirement for LSEs that is similar to MISO's proposed MCO is already in place in SPP without complaint or controversy with respect to market power.[172]  Entergy submits that the relative calm and regulatory quiet that surrounds the SPP requirement stands in contrast to the acrimony and regulatory controversy that accompanies the Minimum Offer Price Rule and other market design features of the eastern RTOs—design features that Potomac Economics has long advocated be implemented in MISO and that the Commission has repeatedly, and reasonably, declined to adopt in MISO.[173]

80.    Further, Entergy dismisses as speculation Potomac Economics' analysis about the potential for Entergy to exercise market power.  Entergy states that, although Potomac Economics claims that Entergy will be pivotal in the South only if non-Entergy parties in MISO South are unwilling to sell their surplus capacity bilaterally, Potomac Economics does not explain why it is plausible to assume that entities with a capacity surplus would

---

[170] *Id.* at 8-9.

[171] *Id.* at 9.

[172] *Id.* at 10.  Entergy states that in 2018, SPP implemented a requirement for each LSE to demonstrate that it owns or has bilateral contracts sufficient to meet 100% of its summer and winter peak load plus a reserve margin.  *See* Southwest Power Pool, Inc., OATT, Sixth Revised Vol. I, attach. AA, Section§ 5 (Summer Season Resource Adequacy Requirement) (0.0.0), § 6 (Winter Season Obligation) (0.0.0).

[173] *Id.* at 10-11.

not engage in bilateral contracting if there were a robust bilateral contracting requirement, such as an MCO, in place.[174]

### D.    MISO February 9 Answer

81.    MISO states that it disagrees with Potomac Economics' arguments that the MCO is not needed because there is new generating capacity being built that ensures reliability and that it would be inefficient for LSEs to contract for new capacity when no new capacity is needed.  MISO contends that it has not proposed the MCO to create incentives for construction of new generation, but rather the MCO is designed to ensure a minimum level of planning outside the Auction.  MISO submits that the MCO thus aligns with reasonable forward planning and reinforces the obligations of LSEs to help ensure sufficient capacity to meet their obligations.[175]

82.    In response to arguments that MISO has not demonstrated a need for the MCO, MISO explains that the most recent OMS-MISO survey noted that, by 2026, while at least 4 GW of additional committed capacity is needed to meet regional requirements, five Zones must convert potential capacity to committed capacity to meet Local Clearing Requirements.  MISO adds that the majority of resources currently being retired are thermal baseload resources, which generally are associated with relatively higher resource adequacy accreditation levels than the variable and/or intermittent resources with which they are being replaced.  MISO contends that failure to act now can thus produce capacity shortfalls in the near future.[176]

83.    MISO argues that resource adequacy in MISO is at risk because entities that currently have excess capacity are under no obligation to maintain that excess, unless bilaterally obligated to do so.  MISO further argues that the MCO would introduce a required, yet modest, obligation to help ensure that an appropriate level of capacity is maintained going forward, either in the various resource planning processes or through the bilateral procurement process.  MISO contends that the potential for future exercise of market power does not necessarily point to a shortcoming in the design of the MCO, but more likely is a result of poor long-term planning by those obligated to do so.[177]

84.    MISO disagrees that more stakeholder vetting is needed to implement the MCO, stating that the proposal is reasonable and appropriately addresses stakeholder concerns,

---

[174] *Id.* at 11.

[175] MISO February 9 Answer at 6-7.

[176] *Id.* at 15.

[177] *Id.* at 15-16.

including in those states where retail choice is permitted (i.e., Illinois and a portion of Michigan). MISO states that the argument that procuring capacity bilaterally versus continuing to exceed a 50% reliance upon the Auction would increase costs does not support the argument that the MCO is unreasonable. MISO states that the MCO still permits Market Participants to procure the majority of their capacity obligations through the Auction. MISO describes the proposed MCO as a "line-snap" looking only at load and acquired ZRCs at the time the Auction is conducted. MISO states that, to the extent retail choice loads fluctuate throughout the year, the MCO would not vary and the low level selected of 50% of Reserve Requirements minus the 50 MW *de minimis* threshold greatly reduces the likelihood of any given party greatly over procuring.[178]

85.    MISO contends that the MCO proposal does not infringe on state and RERRA resource planning authority, but rather MISO's resource adequacy construct specifically recognizes that the states have primary jurisdiction over the resource adequacy requirements of their jurisdictional utilities. MISO states that the MCO does not dictate the size, type, or specific location of resource selection, as these have been well recognized as being subject to the authority and obligation of the RERRA, but only requires that, depending on the size of load-serving obligation, no more than 50% of that obligation should be met through last-minute purchases in the annual Action.[179]

86.    MISO disagrees with the assertion that the MCO will cause an undue cost to Market Participants in retail choice areas in MISO. MISO states that its resource adequacy construct is premised on the assumption that LSEs do sufficient forward planning, and the MCO only reinforces this primary assumption. MISO asserts that it currently has no rules in place requiring those that have traditionally carried excess capacity beyond their own obligations to continue to do so. MISO further states that there is no requirement that any single market participant procure any capacity long-term.[180] MISO notes, however, that the current requirements were established at a time when MISO had significant levels of excess accredited capacity. MISO submits that its filing demonstrates that such levels of excess capacity are rapidly declining, as the generation fleet continues to experience substantial base-load unit retirements, which are being replaced by increasing amounts of renewable or other intermittent capacity with significantly lower levels of accreditation for resource adequacy purposes.[181]

---

[178] *Id.* at 16-17.

[179] *Id.* at 4-5.

[180] *Id.* at 5-6.

[181] *Id.* at 6.

87.    MISO argues that, contrary to assertions, the MCO will not place non-asset owning Market Participants at the mercy of monopoly providers, and the bilateral market will not be subject to capacity import limits.  MISO notes the MCO will initially be geographically unconstrained, accommodating compliance regardless of resource location.  MISO adds that, even if the MCO is implemented on a subregional basis, any ZRCs from resources located in any Zone within the LSE's subregion will satisfy the MCO.  MISO states that, under the currently effective Tariff, LSEs are provided with incentives but are not required to own or bilaterally contract for resources located in their Zones to avoid Auction Clearing Price differences (i.e., Zonal Deliverability Charges) when zones become import or export limited.[182]

88.    MISO disagrees with arguments that the MCO, even if applied across the entire MISO footprint, would still introduce opportunities for the exercise of seller market power.  MISO explains that there is a broad pool of resources available for Market Participants to draw upon to meet their MCO across the entire MISO region.  MISO adds that there is more than adequate transfer capability between and among the Zones, further reducing market power concerns.  MISO contends that there is currently sufficient capacity available to meet the 50% MCO and observes that this percentage is well below the total Reserve Requirements required and has been met every year to date, most of it outside of the Auction.  MISO argues that application of the MCO going forward will help ensure that sufficient supply is available in the long term to meet resource adequacy requirements.  In response to Potomac Economics' argument that many electric cooperatives have not sold their excess capacity, thus creating the potential for the exercise of market power in the bilateral markets, MISO submits that the manner in which these entities transact is not remarkable in the current environment.  MISO states that, as Potomac Economics describes in its pleading, Auction prices and bilateral prices are far below the going-forward cost of existing capacity, assuming bilateral contracts mirror anticipated Auction prices.  MISO states that, although Potomac Economics hypothesizes that there would be an exercise of market power that results in anti-competitive prices above going forward costs, Potomac Economics provides no evidence that these entities would not be willing to contract forward for a portion of their capacity at competitive price levels.[183]  MISO notes that Module D of the Tariff authorizes the Market Monitor to request data relating to bilateral capacity contracts, including in response to allegations by a market participant that bilateral contract prices reflect the exercise of market power.  MISO states that, although the Market Monitor does not have specific authority to mitigate bilateral contract prices, the Market Monitor does have the ability to refer matters to the Commission if review of such contract data indicates the

---

[182] *Id.* at 8.

[183] *Id.* at 10.

potential exercise of market power.[184]  Additionally, according to MISO, the Commission retains the authority to review the potential exercise of market power with respect to bilateral transactions and to apply penalties as may be appropriate.[185]

89.    MISO disputes arguments that the MCO Non-Compliance Charge level may introduce an incentive for exerting market power.  MISO states that there is currently sufficient supply such that no one member is limited in the sources from which it could potentially procure capacity.  MISO argues that there would be little or no incentive for stakeholders with excess capacity to withhold from a bilateral purchase at reasonable price if the alternative would be to get only a very modest amount, or potentially nothing, depending on the Auction Clearing Price.  Further, due to the limited quantity of reserve requirement MWs the MCO would have applied to historically, MISO disagrees with arguments that the MCO may create incentives for withholding of capacity from bilateral transactions because of the redistribution of the noncompliance charge.[186]

90.    MISO disputes arguments that a transition to a subregional implementation would create new resource adequacy issues.  MISO states that the MCO's 50% requirement, with a 50 MW *de minimis* threshold applied to the entire MISO region, was specifically designed so that it would not increase current Local Clearing Requirements.  MISO states that the MCO proposal was also designed so that it would not affect or be dependent on capacity import or export limits of any Local Resource Zone.  MISO further adds that application of the MCO proposal on a subregional basis will require further evaluation of potential market power concerns and will require another section 205 filing prior to implementation.[187]

91.    MISO contends that the 50% threshold and 50 MW *de minimis* exemption are reasonable and have been designed to ensure that LSEs take appropriate measures to meet their commitments during this period of extreme uncertainty and significant generation fleet change.  MISO states that it has set the level of the MCO below any other reliability requirement to ensure that it does not infringe on other rules already in place. MISO further argues that the MCO does not prevent LSEs from deferring purchases to the Auction when bilateral prices are high, because the 50% requirement allows LSEs to

---

[184] *Id.* at 12.

[185] *Id.* at 12

[186] *Id.* at 12-13.

[187] *Id.* at 7-8.

purchase 50% of their capacity needs in bilateral transactions, thereby providing substantial elasticity in responding to demand for capacity.[188]

92.    MISO contends that the 50 MW *de minimis* exemption appropriately relieves very small Market Participants from application of the MCO and ensures that these small LSEs are not overburdened by the 50% threshold requirement.  MISO states that the 50 MW level was suggested early in the stakeholder process as a way of protecting smaller utilities from penalties for failing to meet an MCO of very small amounts.  MISO further states that it has demonstrated that this level of threshold showed very little impact to the overall capacity (in MW) impacted by the MCO.[189]

93.    MISO states that the proposed MCO Non-Compliance Charge (1.5 times CONE) was designed to increase the penalty for not satisfying the MCO while at the same time not being punitive.  MISO contends that, specifically, that Market Participants choosing to entirely opt out of the MISO Resource Adequacy construct would pay the maximum Capacity Deficiency Charge equal to 2.748 times the daily CONE value per MW.  MISO states that because LSEs procuring ZRCs in the Auction are willing to pay CONE if there are insufficient ZRCs to meet the Local Clearing Requirement or to meet the systemwide Reserve Requirement, the MCO Non-Compliance Charge plus the Auction charge should not exceed the 2.748 times CONE value.  MISO states that considering this along with the proposed MCO level of 50%, the Non-Compliance Charge is a just and reasonable incentive for stakeholders to meet almost half of their load serving obligation with firm commitments beyond "last minute" Auction purchases.[190]

## E.    Industrial Customers Answer to MISO February 9 Answer

94.    Industrial Customers reiterate their concerns that MISO's Seasonal RA Filing, if accepted by the Commission, would likely increase price uncertainty within the Auction and that this uncertainty alone could increase the degree to which LSEs use ownership, leasing, and bilateral contracting of capacity, instead of acquiring capacity from the Auction.  Industrial Customers assert that MISO did not respond to this point.[191]

---

[188] *Id.* at 9-10.

[189] *Id.* at 10 (citing MISO Resource Adequacy Subcommittee, March 10, 2021 presentation at 27, https://cdn.misoenergy.org/20210310%20RASC%20Item%2004a%20Sub-Annual%20Construct%20(RASC010,%20011,%20012)529458.pdf).

[190] *Id.* at 8-9.

[191] Industrial Customers Answer at 3.

95.     Industrial Customers assert that they have shown that an extremely high portion of the total MISO capacity requirement both on a MISO-wide and Zonal level has been, and continues to be, met with LSE owned, leased, and bilaterally contracted capacity, not capacity acquired from the Auction.  Industrial Customers assert that they emphasized that no evidence has been presented by MISO to support a forthcoming precipitous drop by LSEs in their use of owned, leased and/or bilaterally contracted capacity.  They argue that MISO did not respond to those points.[192]

### F.     Midwest TDUs Answer to MISO February 9 Answer

96.     Midwest TDUs argue that MISO's February 9 Answer does not address how the proposed MCO will operate in combination with MISO's pending Seasonal RA Filing, specifically Midwest TDUs' assertion that the risk that a single extended outage could result in an unreasonably punitive "triple whammy":  a reduced Seasonal Accredited Capacity value, Capacity Deficiency Charges, and Capacity Replacement Non-Compliance Charges.[193]  Midwest TDUs argue that MISO's February 9 Answer does not address whether or how the MCO would be implemented on a seasonal basis, despite MISO's apparent intention to do so if the Commission approves the Seasonal RA Filing.[194]

## V.     Deficiency Letter Response and Responsive Pleadings

### A.     Deficiency Letter Response

97.     As noted above, on March 9, 2022, Commission staff issued a deficiency letter and requested additional information, and MISO submitted its Deficiency Letter Response on April 8, 2022.  In response to a question regarding the difference between the availability obligations between participation in the Auction and the MCO, MISO states that the MCO provisions form a simple snapshot at the time the Auction is settled and do not impose availability obligations on resources designated for resource adequacy after the time of the Auction.[195]  In response to a question about bilateral market liquidity, MISO states that specifics to confidential bilateral contracts are not readily supplied to MISO, but notes that the main data available to MISO are the volume of capacity transacted outside of the Auction and the level of ZRC transactions that occur in the Module E Tracking Center tool used for confirming and tracking capacity leading up to

---

[192] *Id.* at 3-4.

[193] Midwest TDUs Answer at 2-3.

[194] *Id.* at 3.

[195] Deficiency Letter Response at 1.

the Planning Year. MISO states that tens of thousands of MWs change hands through ZRC transactions, suggesting a high level of capacity liquidity.[196] MISO adds that the MCO will likely require 700 MW to 1,500 MW in additional bilateral contracting and submits that this demonstrates that the market has enough liquidity to accommodate a modest increasing in forward contacting.[197] MISO further states that the 151.5 GW of generation in the interconnection queue is significantly more than the amount of capacity needed to meet the MCO.[198] In response to a staff question regarding MISO's bilateral contract bulletin board, MISO states that it has no knowledge of any transactions, including the percent of bilateral capacity sales conducted via the bulletin board, and has not considered making use of the bulletin board mandatory.[199]

### B. Deficiency Letter Response Responsive Pleadings

98. AMP states that the Deficiency Letter Response regarding market power reinforces AMP's argument that the MCO Non-Compliance Charge establishes a price floor. AMP contends that it, and other Market Participants, have raised significant market power concerns, and the Commission sought additional information to support MISO's claim that there is sufficient liquidity in the bilateral markets to nullify those concerns. AMP argues that MISO's Deficiency Letter Response demonstrates that the MCO Non-Compliance Charge will result in sellers having unmitigated market power in bilateral transactions, inappropriately increased prices, and undue discrimination.[200]

99. Potomac Economics suggests that MISO substantially underestimates the amount of additional MWs in bilateral contracting needed to satisfy the MCO. Potomac Economics states that expiring contracts will increase the quantity of load that will be compelled to procure capacity bilaterally. Potomac Economic adds that excess capacity is controlled by a small number of suppliers, particularly in MISO South, which may create incentives to withhold capacity from bilateral market under a mandatory MCO to restrict liquidity and limit competition.[201] In response to MISO's reference to the amount of generation in the interconnection queue, Potomac Economics states that much of the generation in the queue is intermittent generation that will be accredited at levels far

---

[196] *Id.* at 5.

[197] *Id.* at 6.

[198] *Id.*

[199] *Id.* at 7-8. *See* MISO, FERC Electric Tariff, Module E-1, § 69A.6.3 (31.0.0).

[200] AMP Protest to Deficiency Letter Response at 2-3.

[201] Potomac Economics Protest to Deficiency Letter Response at 3.

below their queue capacity, will be used to replace existing capacity, and will not be built until long after the MCO is imposed.[202]  Finally, Potomac Economics suggests that a mandatory bulletin board would allow monitoring of withholding by the suppliers that have a large amount of excess capacity and who will dominate the market, and would allow monitoring of the bilateral contracts market created by the MCO to be comparable to the monitoring and mitigation in MISO's other electricity markets.  Potomac Economics states that, without potential mandatory use of the bulletin board, the market activity compelled by the MCO will be opaque and potentially subject to market abuses that will be difficult to monitor, calling into question whether the MCO is just and reasonable.[203]

100.    Midwest TDUs argue that MISO's Deficiency Letter Response fails to clarify the relationship between the MCO proposal and the Seasonal RA Filing.[204]  Midwest TDUs further contend that MISO's Deficiency Letter Response raises additional reasons for concern regarding liquidity in the bilateral markets, suggesting that MISO's claim that five months is sufficient time is little comfort if there is no assurance that short-term ZRCs will be available in the bilateral market.[205]  Midwest TDUs argue that MISO's Deficiency Letter Response highlights the need for Commission action to clarify the effect of MISO's proposed Tariff provisions on a future subregional MCO filing.[206]

101.    Entergy states that MISO's Deficiency Letter Response provides additional support for the MCO filing.  Entergy adds that the most recent Auction results for the 2022/2023 Planning Year reflected a capacity shortage of 1.3 GW, causing Auction prices to escalate to $236.66/MW-day in Zones 1-7.  Entergy states that this result clearly demonstrates that reserve margins in MISO are tightening, and that a mechanism is needed to ensure that all LSEs responsibly engage in reasonable long-term resource planning practices to serve their respective needs.  Entergy submits that the MCO alone will not remake the resource planning practices of MISO LSEs and solve MISO's capacity shortfalls, but that the MCO will move MISO's resource adequacy construct in

---

[202] *Id.* at 4.

[203] *Id.* at 6.

[204] Midwest TDUs Protest to Deficiency Letter Response at 2-4.

[205] *Id.* at 5.

[206] *Id.* at 6-10.

the right direction to ensure that all LSEs are planning for the capacity resources needed to serve their loads.[207]

102.    In its May 20 Answer, MISO provides additional information regarding the interaction between the MCO and MISO's proposed accreditation provisions in the Seasonal RA Filing.[208]  MISO reiterates that it views its bilateral markets as sufficiently liquid to support the MCO, and that the MCO does not create market power concerns.[209]  MISO agrees with Entergy that the recent Auction results highlight the need for mechanisms to promote improvements to long-term resource planning practices of LSEs.[210]

103.    In its June 6 Answer, Midwest TDUs argue that MISO's May 20 Answer does not meaningfully address the potential for unreasonable interactions between the proposed MCO and MISO's Seasonal RA Filing.[211]  In addition, Midwest TDUs contend that MISO's May 20 Answer merely repeats unsupported assertions regarding the potential for market power abuse.[212]

## VI.    Discussion

### A.    Procedural Matters

104.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2021), the notices of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

105.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2021), prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority.  We accept the answers because they have provided information that assisted us in our decision-making process.

---

[207] Entergy Comments to Deficiency Letter Response at 2-3.

[208] MISO May 20 Answer at 4-6.

[209] *Id.* at 6-9.

[210] *Id.* at 9.

[211] Midwest TDUs June 6 Answer at 4-5.

[212] *Id.* at 6.

B.     **Substantive Matters**

106.    We reject MISO's proposed requirement on LSEs to procure 50% of their Reserve Requirements (subject to *de minimis* thresholds) from outside of the Auction.  We find that MISO has not demonstrated that its proposed MCO is just and reasonable and not unduly discriminatory and preferential and, therefore, reject it.

107.    To support the MCO, MISO argues that, given its rapidly transforming resource mix, permitting LSEs to procure all or high percentages of their Reserve Requirements through the Auction introduces higher than acceptable risk that an LSE, and potentially all or a portion of MISO, will have insufficient capacity if there is a sharp drop in capacity offered into the Auction.  MISO further argues that expecting LSEs to carry some amount of capacity to cover their loads or to offer into the Auction is an "important guardrail" to ensure that MISO members are focused on resource adequacy now and into the future.[213]

108.    We find this support unpersuasive.  MISO has not demonstrated that the MCO will address or mitigate resource adequacy concerns.  For example, MISO argues that the MCO incents LSEs to contract forward for at least a portion of their capacity obligation, thus reducing the potential for capacity shortfalls in future Auctions.  However, to the extent that MISO is concerned with diminishing reserve margins, we are not convinced that the proposed MCO will reverse this trend.  MISO's resource adequacy construct is not a multi-year forward construct but rather the Auction is held approximately six weeks in advance of the Planning Year, and the proposed MCO requirement deadline just precedes the Auction.  As such, the MCO requirement deadline is highly unlikely to facilitate the construction of new resources ahead of the relevant Planning Year, as resources, particularly generation resources, take longer to develop than 6 weeks.  As such, any capacity procured in the bilateral market to satisfy the MCO would likely be purchased from the same resources that would have otherwise been offered into the Auction.  Therefore, and, as MISO recognizes, nothing inherent in the proposed MCO is likely to support the construction of new capacity in time to meet resource adequacy needs relative to the status quo.[214]

109.    Further, we are not persuaded that the proposed MCO will reduce the likelihood of potential of capacity shortfalls in the Auction.  We agree that the MCO would result in an incremental amount of both capacity supply and capacity demand to move from the Auction into the bilateral market; however, we are not convinced that this would reduce the likelihood of a capacity shortfall in the Auction.  Instead, this would only reduce the

---

[213] Transmittal at 4-6.

[214] *See* MISO February 9 Answer at 6 ("MISO has not proposed the MCO to incentivize construction of new generation.").

amount of supply and demand that participates in the Auction in a given year. Thus, MISO has not demonstrated that the MCO will "support reliability in the MISO region with the changing risk profile and lower excess reserve margins."[215] Indeed, MISO's most recent Auction results for the 2022/2023 Planning Year demonstrate that the 50% MCO MISO proposed would not have affected the Auction's outcome of a capacity shortfall in MISO North in a manner that supported reliability. Even if LSEs were required to procure 50% of their Reserve Requirements prior to the 2022/2023 Planning Year Auction, there would not have been enough resources to meet MISO North's overall Reserve Requirements.

110.    Additionally, we are unpersuaded by arguments that individual LSEs relying primarily on the Auction undermine the Auction's purpose. In accepting MISO's original Auction proposal in 2008, the Commission found that "[t]he voluntary auction process will afford LSEs with an additional mechanism to procure needed capacity and increase transparency in the procurement of capacity."[216] The Commission also found that some Market Participants may be unable to contract for resources, and that "[a] voluntary capacity auction provides a meaningful alternative for those Market Participants by providing a single-step process for obtaining resources."[217] While the Commission has noted that "MISO's Auction is not—*and has never been*—the primary mechanism for its LSEs to procure capacity,"[218] this statement was referencing the Auction's role in MISO's overall resource adequacy construct, not whether restrictions should be placed on individual LSE participation in the Auction. In addition, we note that the record in this proceeding clearly indicates that despite some individual LSEs relying primarily on the Auction, the overwhelming majority of capacity in MISO is procured through FRAPs and by self-scheduling.[219] Thus, the record does not demonstrate that LSEs relying primarily on the Auction are undermining the Auction's purpose.

111.    Indeed, we find that MISO's resource adequacy construct affords LSEs several options to meet their Reserve Requirements. For example, the long-term, stable prices

---

[215] Transmittal at 7.

[216] *Midwest Indep. Transmission Sys. Operator, Inc.*, 125 FERC ¶ 61,060, at P 36 (2008).

[217] *Id.* P 37.

[218] 2020 Rehearing Order, 170 FERC ¶ 61,215 at P 13 (emphasis in original).

[219] *See* Wright Test. at 8 ("Historically, approximately 92% of LSEs either submitted a FRAP or participated by self-scheduling in the [Auction]; only about 8% of ZRCs have been offered economically in the [Auction].").

potentially available in long-term bilateral agreements provide incentives for LSEs to pursue bilateral agreements, can facilitate budgetary and financial planning, and can act as a hedge against uncertain Auction Clearing Prices.  Other LSEs might also choose to procure capacity primarily from the Auction, but do so with the understanding that they may be exposed to potentially high Auction Clearing Prices.  Since Auction participation is not mandatory (and, as noted, the vast majority of LSEs procure most of their capacity outside of the Auction), the proposed MCO reduces the flexibility currently offered to LSEs by putting an administrative cap on the amount of capacity LSEs can choose to procure through the Auction.  We agree with protestors that imposing such an administrative cap could adversely impact certain Market Participants.[220]

112.    Finally, we find that MISO has not adequately addressed concerns regarding the proposal's potential impact on market power.  As explained by the Market Monitor, MISO's proposal would limit buyers' recourse to purchase capacity in the Auction at mitigated prices.[221]  The disciplining effect of the Auction, a centralized market where capacity sellers are subject to market power mitigation, on the bilateral capacity market is an important component of both MISO's resource adequacy construct and the Commission's approach to market power more broadly.  Specifically, the Commission cited to MISO's annual capacity auctions in relieving market-based rate sellers of the obligation to submit indicative screens when requesting market-based rate authority.[222]  Were the Commission to accept the 50% limitation, it would need to revisit its analysis for resources who relied on the presence of the Auction to make the showings needed to secure market-based rate authority.

113.    MISO's expert provides a pivotal supplier analysis showing significant levels of net available capacity relative to the MCO and concluding that the proposal does not raise concerns about the exercise of market power.  However, we agree with the Market Monitor that this analysis is limited and does not address potential near-term changes in supply and demand that could impact sellers' ability to exercise market power.  In particular, the Market Monitor notes that multiple large thermal generators are expected

---

[220] *See. e.g.*, Clean Energy Coalition Protest at 8 ("By muting the transparent price signals sent by the 'Auction], MISO's Proposal may deter new entry, reduce capacity supply, increase Power Purchase Agreement prices for that limited supply, [and] ultimately raise costs to customers.").

[221] Potomac Economics Protest at 13.

[222] Order No. 861, 168 FERC ¶ 61,040 at P 48 ("MISO conducts annual capacity auctions subject to Commission-approved monitoring and mitigation, thereby disciplining the price of bilateral capacity sales and providing capacity buyers with protections.").

to retire in MISO South within the next three years, which, combined with the expiration of certain bilateral agreements, will provide Entergy with 41% market share.[223]  While we acknowledge that MISO's proposal does not yet apply the MCO on a sub-regional basis, we remain concerned that MISO's proposal does not adequately address these market power issues.  MISO's analysis therefore does not address the medium- and long-term impact of the proposal on role of the annual auction in disciplining the bilateral market. As such, we conclude that MISO has not met its section 205 burden to show that the proposal is just and reasonable.

The Commission orders:

  MISO's MCO proposal is hereby rejected, as discussed in the body of this order.

By the Commission.  Commissioner Danly is concurring in part with a separate statement attached.
        Commissioner Christie is concurring with a separate statement attached.

( S E A L )

         Kimberly D. Bose,
          Secretary.

---

[223] Potomac Economics Protest at 14-15.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc.          Docket Nos.  ER22-496-000
                                                                     ER22-496-001

(Issued August 31, 2022)

DANLY, Commissioner, *concurring in the judgment*:

1.      While I am not persuaded by the entirety of the Commission's reasoning for rejecting Midcontinent Independent System Operator, Inc.'s (MISO) tariff revisions to implement a Minimum Capacity Obligation (MCO),[1] I share my colleagues' concerns regarding the proposal's potential impact on market power.[2] Nonetheless, I believe that these concerns might have been resolved with more information.  I would have, therefore, preferred that the Commission set the matter for a paper hearing, consistent with FPA section 205(e),[3] to determine whether the tariff filing is just and reasonable.  Given both the challenges associated with navigating MISO's stakeholder process[4] and what appears to be MISO's desperate need for reform of its capacity construct,[5] the fact that MISO can

---

[1] For example, whether the Commission is persuaded that the proposal accomplishes MISO's goals is not the analysis under Federal Power Act (FPA) section 205.  *But see Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,142, at PP 107-109 (2022).  The question, under FPA section 205, is whether the proposal is just and reasonable.  *See* 16 U.S.C. § 824d.

[2] *See Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,142 at PP 112-113.

[3] 16 U.S.C. § 824d(e).

[4] *See* Transmittal at 12-13 (describing the stakeholder process and stating that "MISO originally presented the MCO concept to stakeholders at the Resource Adequacy Subcommittee . . . in September 2020").

[5] *See id.* at 2 (explaining that the "MISO Region is experiencing significant shifts in its generation portfolio due to resource retirement, increased reliance on intermittent resources and a corresponding reduction in excess capacity"); *id.* (agreeing with the North American Electric Reliability Corporation (NERC) in its Long-Term Reliability Assessment Report that "[t]o ensure reliability during the transition to greater reliance on wind and solar resources, emerging resource and energy adequacy issues must be addressed" and "[p]lanning for long-term resource adequacy is becoming increasingly complex with a resource mix that is more unpredictable and less energy-assured")

file another MCO proposal is, at best, cold comfort.  However, even though I would have preferred that the Commission set the proposal for a paper hearing, I concur in the judgment because I agree that on this record, and without further development, MISO has not satisfied its burden to demonstrate that its tariff filing is just and reasonable.

2.      I also note that the reasons presented as the basis for this proposal have furthered my misgivings regarding MISO's capacity construct.  Specifically, I am concerned by the increasing risk that MISO will be unable to retain sufficient dispatchable generation to ensure reliability and resource adequacy.  With these concerns in mind, I urge my colleagues to consider Commission action pursuant to FPA section 206.[6]

        For these reasons, I respectfully concur in the judgment.


_____

James P. Danly
Commissioner

_____

(quoting 2020 Long Term Reliability Assessment, N. Am. Elec. Reliability Corp. (Dec. 2020) at 7,
https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2020.pdf).

        [6] 16 U.S.C. § 824e.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Midcontinent Independent System Operator, Inc. | Docket Nos. | ER22-495-000 |
| | | ER22-495-001 |
| Midcontinent Independent System Operator, Inc. | Docket Nos. | ER22-496-000 |
| | | ER22-496-001 |

(Issued August 31, 2022)

CHRISTIE, Commissioner, *concurring*:

1.      I support accepting MISO's proposed seasonal resource adequacy construct in Docket Nos. ER22-495-000 and ER22-495-001.  It is now a truism, established through numerous Commission precedents,[1] that in an FPA section 205 filing, we are not looking for the perfect proposal, or even one that we may prefer as relatively better than the specific one proposed in the filing.  Instead, we look to see if the specific proposal filed

---

[1] *E.g.*, *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984); *PJM Interconnection, L.L.C.*, 170 FERC ¶ 61,243, at P 57 (2020) (citing *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984); *Cal. Indep. Sys. Operator Corp.*, 128 FERC ¶ 61,282, at P 31 (2009)); *see also Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,141, at P 79 (2022) (citations omitted).

meets the "just and reasonable" rates requirement of section 205.[2]  I believe MISO's proposal herein meets that standard.[3]

2.      I also support rejecting MISO's proposed Minimum Capacity Obligation (MCO) in Docket Nos. ER22-496-000 and ER22-496-001 because I believe the Market Monitor's concerns about the potential exercise of market power cast sufficient doubt on the proposal's claim to meet the section 205 standard.[4]  However, I emphasize that we are rejecting only the MCO proposal before us and that we are not prejudging a future MCO filing by MISO.

---

[2] I agree generally with the concern expressed by Commissioner Clements in paragraphs 44 and 45 of her dissent to the order, which I understand to mean that we are constrained by the precedents related to section 205 filings, including, of course, *NRG v. FERC*, 862 F.3d 108 (D.C. Cir. 2017), that do not let us make non-minor improvements to RTO proposals.  I also agree that trying to address every existing market design flaw through individual section 206 proceedings may simply not be workable.  I would favor a more comprehensive approach to evaluating threats to reliability that are increasingly becoming evident in RTO markets, and in a manner not subject to the *ex parte* communications limits of contested individual filings.  As I note herein in P 3 and Note 6, among the issues that should be examined in such a general proceeding should be the continued use of single-clearing price mechanisms in RTO markets.  The European Union is already re-evaluating such mechanisms in light of skyrocketing prices in EU power markets.  *See* Sam Fleming and Valentina Pop, *EU to unveil emergency measures to curb soaring prices:  Pressure grows for bloc to reform markets by cutting link between electricity and the cost of gas*, FINANCIAL TIMES, August 29, 2022 ("Wholesale electricity costs reflect the price of the last unit of energy bought via auctions held in member states.  In practice, this currently mirrors the price of natural gas rather than renewable energy or nuclear power. . . . However, [EU President Ursula] von der Leyen hinted in June that the commission would have to reconsider the system."), https://www.ft.com/content/02f848fc-3b80-4ddc-ba4f-26109d79db89.

[3] I note that the Organization of MISO States, Inc. (OMS) supports the seasonal resource adequacy filing, along with Michigan and Indiana individually.  Louisiana supports the concept of a seasonal resource adequacy construct, but not the details of the proposal filed.  Mississippi opposes the proposal.  I also note that, while critiquing aspects of the filing, the MISO Independent Market Monitor (Market Monitor) overall supports it.

[4] *See* Market Monitor Protest, Docket No. ER22-496-000, at 13-18.  I further note that OMS has filed no comments at all in the MCO proceeding, whether in support or opposition.  Only two individual states filed comments, with Indiana in support and Illinois opposed.

3.      Both cases serve to illustrate a much bigger issue:  Regardless of the details of the
market designs of the various RTOs/ISOs — which are not true markets at all but
administrative constructs using an increasingly opaque, complex and questionable pricing
mechanism [5] — it is the *states* which retain the primary responsibility to ensure their
load-serving entities (LSEs) have adequate resources to serve their states' consumers.
While regional system operators — RTOs and ISOs — are responsible for balancing the
system on a real-time operational basis to keep the lights on, RTOs/ISOs are not regional
long-term Integrated Resource Plan (IRP) planners of generating or other resources.
Rather, it is the states which have the ultimate authority to decide which resources get
built and which get retired and whether and how their regulated LSEs have sufficient
generating capacity or demand-side programs to ensure that the lights stay on for their
states' residents.  Yes, the market design of federally regulated RTO/ISO markets
certainly affects the entry or exit of generating resources from those markets, but even in
RTOs/ISOs the states still retain their inherent police-power authority to direct their LSEs
to achieve resource adequacy in ways other than through RTO/ISO markets — including
various forms of self-supply, such as rate-basing, or purchased power agreements or other
bilateral arrangements.

4.      This is particularly true in MISO.  No one disputes that the MISO capacity market
has always been a purely *residual* option; it is not the primary option for an LSE to obtain
the resources needed to ensure reliability.[6]  Importantly, states need to focus on their own

---

[5] For an excellent analysis of the theory behind Locational Marginal Pricing
(LMP) and how it is supposed to work in RTO markets (and why it increasingly may not
work any longer), see Tony Clark and Vince Duane, *Stretched to the Breaking Point:
RTOs and the Clean Energy Transition* (July 2021), https://www.wbklaw.com/wp-
content/uploads/2021/07/Wholesale-Electricity-Markets-White-Paper-07.08.21.pdf.

[6] As the Commission has explained:

> Notably, approximately 90% of the load in MISO is served by
> vertically integrated LSEs, the vast majority of which are
> subject to state integrated resource planning processes.  To
> accommodate the make-up of the MISO's footprint, MISO's
> proposed Tariff provisions accepted in the February 2018
> Order provide that its resource adequacy requirements "are
> complementary to the reliability mechanisms of the states and
> the Regional Entities . . . within the [MISO] region."
> Moreover, MISO's proposed Tariff language explains that the
> resource adequacy requirements "are not intended to and
> shall not in any way affect state actions over entities under the
> states' jurisdiction."  In other words, unlike the centralized
> capacity constructs used in the Eastern RTOs/ISOs, MISO's

authority to ensure adequate generating resources to serve their citizens and not default to an administrative construct regulated by FERC.[7]  I am encouraged by recent efforts by the Organization of MISO States to address this critical issue.[8]

   For the reasons given above, I respectfully concur.

_____

Mark C. Christie
Commissioner

---

    Auction is not—*and has never been*—the primary mechanism for its LSEs to procure capacity.

*Midcontinent Indep. Sys. Operator, Inc*., 170 FERC ¶ 61,215, at P 13 (2020) (emphasis in original) (quoting MISO, FERC Electric Tariff, Module E-1, § 68A (33.0.0)); *see also Midcontinent Indep. Sys. Operator, Inc*., 180 FERC ¶ 61,142, at P 110 (2022) (citation omitted).

  **[7]** Indeed, although the MISO tariff provides that MISO will calculate the Planning Reserve Margin Requirements (Reserve Requirements) for LSEs, the MISO tariff also provides that, if a state regulatory authority establishes an alternate Planning Reserve Margin, MISO will use the alternate Planning Reserve Margin to calculate LSEs' Reserve Requirements for the geographic area under that state's jurisdiction.  MISO, FERC Electric Tariff, Module E-1, § Module E-1, § 68A.7 (Establishing Planning Reserve Margin Requirements) (32.0.0).

  **[8]** *See* OMS Resource Adequacy Summit (Aug. 8-10, 2022), https://www.misostates.org/index.php/meetings/other-meetings/2-uncategorised/380-ra-summit; *see also* Darren Sweeney, *Midwest Utilities Delay Plant Retirements To Offset Reliability, Cost Concerns*, S&P Global Market Intelligence, Aug. 19, 2022, https://www.capitaliq.spglobal.com/web/client?auth=inherit#news/articleabstract?id=71797391.

181 FERC ¶ 62,080
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc.          Docket No. ER22-496-002

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(October 31, 2022)

Rehearing has been timely requested of the Commission's order issued on August 31, 2022, in this proceeding. *Midcontinent Indep. Sys. Operator*, *Inc.*, 180 FERC ¶ 61,142 (2022). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2021); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the requests for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Deputy Secretary.