**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**No. 22-1334, cons. w/No. 23-1151**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; and Entergy Texas, Inc.,**

**Petitioners,**

**v.**

**Federal Energy Regulatory Commission,**

**Respondent.**

_____

**ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION IN DOCKET NO.
ER22-496**

_____

**BRIEF FOR PETITIONERS**

_____

Michael C. Griffen
Entergy Services, LLC
101 Constitution Avenue, NW
Suite 200 East
Washington, DC 20001
(202) 530-7323
mgriffe@entergy.com

Marnie A. McCormick
Duggins Wren Mann & Romero, LLP
600 Congress Ave., Ste. 1900
Austin, Texas  78701
P.O. Box 1149
Austin, Texas  78767
(512) 744-9300
mmccormick@dwmrlaw.com

**ATTORNEYS FOR PETITIONERS**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)** **Parties.** The following are the principal parties and intervenors in this Court (all were also parties to the underlying administrative proceeding):

Entergy Arkansas, LLC, Petitioner

Entergy Louisiana, LLC, Petitioner

Entergy Mississippi, LLC, Petitioner

Entergy New Orleans, LLC, Petitioner

Entergy Texas, Inc., Petitioner

Federal Energy Regulatory Commission, Respondent

Cleco Corporate Holdings LLC, Intervenor

Cleco Power LLC, Intervenor

Cleco Cajun LLC, Intervenor

Midcontinent Independent System Operator, Inc., Intervenor

(Council of the City of New Orleans Motion to Withdraw Intervention granted 9/21/2023)

The following additional parties intervened before FERC and participated in the proceeding under review:

Alliant Energy  Corporate Services, Inc.

Ameren Services Company

American Clean Power Association

American Electric Power Service Corporation

American Municipal Power, Inc.

Arkansas Electric Cooperative Corporation

Arkansas Public Service Commission

Association of Businesses Advocating Tariff Equity

Big Rivers Electric Corporation

Calpine Corporation

Clean Grid Alliance

Coalition of Midwest Power Producers, Inc.

Coalition of MISO Transmission Customers

Constellation Energy Generation, LLC

Consumers Energy Company

Cooperative Energy

DTE Electric Company

Duke Energy Corporation

East Texas Electric Cooperative, Inc.

EDF Energy Services, LLC

EDF Trading North America, LLC

Energy Michigan, Inc.

Fresh Energy

Great Lakes Utilities

Great River Energy

Hoosier Energy Rural Electric Cooperative, Inc.

Illinois Commerce Commission

Illinois Industrial Energy Consumers

Illinois Municipal Electric Agency

Illinois Municipal Electric Agency

Indiana Industrial Group

Indiana Municipal Power Agency

Indiana Office of Utility Consumer Counselor

Indiana Utility Regulatory Commission

Indianapolis Power and Light Company

Kentucky Public Service Commission

Louisiana Public Service Commission

Madison Gas and Electric Company

Michigan Public Service Commission

MidAmerican Energy Company

Midwest Municipal Transmission Group

Mississippi Public Service Commission

Mississippi Public Utilities Staff

Missouri Joint Municipal Electric Utility Commission

Missouri Public Service Commission

Missouri River Energy Services

MTDUs

Natural Resources Defense Council

Nextera Energy Resources, LLC

NRG Power Marketing LLC

Organization of MISO States, Inc.

Potomac Economics, Ltd.

Public Service  Commission of Wisconsin

Public Utility Commission of Texas

Shell Energy North America (U.S.), L.P.

Sierra Clkub

SLEMCO and Concordia Elec. Cooperatives

Solar Energy Industries Association

Southern Illinois Power Cooperative

Southern Minnesota Municipal Power Agency

Southwest Louisiana Electric Membership Corporation

Sustainable FERC Project

Texas Industrial Energy Consumers

The Retail Energy Supply Association

Upper Michigan Energy Resources Corporation

Wabash Valley Power Association, Inc.

Wisconsin Electric Power Company

Wisconsin Public Service Corporation

WPPI Energy

Xcel Energy Services, Inc.

**(B)  Rulings Under Review.**  The following decisions of the Federal Energy Regulatory Commission are under review:

(i)    *Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Tariff Revisions, Docket Nos. ER22-496-000 and ER22-496-001, 180 FERC P 61,142 (Aug. 31, 2022) ("Aug. 31, 2022 Order");

(2)    *Midcontinent Independent System Operator, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. ER22-496-002, 181 FERC P 62,080 (October 31, 2022) ("Oct. 31, 2022 Order"); and

(3)    *Midcontinent Independent System Operator, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER22-496-002, 183 FERC P 61,112 (May 18, 2023) ("May 2023 Order").

**(C)  Related Cases**.  There are no other cases pending before this Court related to this consolidated proceeding.

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc. (the "Entergy Operating Companies") are utility operating subsidiaries of Entergy Corporation. Entergy Corporation is a registered public utility holding company, organized under Delaware law and with its principal office in New Orleans, Louisiana. Entergy Corporation, either directly or indirectly, owns all or a majority of the outstanding shares of stock of the Entergy Operating Companies, and no other publicly held corporation owns 10% or more of any Entergy Operating Company's stock. The Entergy Operating Companies are engaged in the manufacture, generation, transmission, distribution, and sale of electric energy in portions of Arkansas, Louisiana, Mississippi, and Texas. The Entergy Operating Companies are transmission owners and load serving entities in the Midcontinent Independent System Operator region.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES……….. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT……………………. vi

TABLE OF CONTENTS………………………………………………… vii

TABLE OF AUTHORITIES……………………………………………... ix

GLOSSARY…………………………………………………………….... xi

JURISDICTIONAL STATEMENT…………………………………………. 1

STATEMENT OF THE ISSUES…………………………………………… 3

STATEMENT OF THE CASE……………………………………………… 4

    I.    This case concerns a proposal to amend a Commission-regulated tariff for the Regional Transmission Organization known as "MISO."………………………………………………..… 4

    II.    MISO determined that its current tariff does not adequately incentivize load serving entities to take forward-looking steps to ensure there will be enough capacity available to ensure the grid continues to function reliably in the future………….………. 8

    III.    To incentivize more proactive planning, MISO proposed to require load serving entities to procure at least 50% of their capacity needs before each annual capacity Auction………..……………… 10

    IV.    Without holding a hearing, the Commission ultimately rejected MISO's MCO proposal on the lone theory that MISO had not "adequately addressed" market power concerns ………………. 12

SUMMARY OF THE ARGUMENT……………………………………….. 15

ARGUMENT………………………………………………………….. 17

I.    The Commission acts arbitrarily and capriciously unless it engages in reasoned decision-making by addressing arguments raised before it and articulating a rational connection between the facts found and the choice made……………………………………...……………….17

II.    The Commission did not adequately explain why mere "concerns" expressed in comments ab out market dynamics justified rejecting the MCO without giving the parties a meaningful opportunity to develop evidence on whether the concerns were legitimate or whether suggested mitigation measures would address any such concern…………………………………………….. 18

A. MISO submitted evidence supporting its proposal, and other parties submitted comments………………………………….. 18

B. The Commission did not meaningfully consider these arguments or adequately explain why it rejected MISO's proposal without a hearing……………………………………………..…….. 23

C. The Commission's decision is even less sufficient than another this Court already reversed………………………………… 26

III.   The Commission's rejection of the MCO on rehearing is also arbitrary and capricious because the agency did not adequately explain how its rejection of the MCO is consistent with its approval of a materially similar mechanism for the SPP region………………………….. 29

IV.   The Commission's suggestion that MISO can just try again later is not an adequate remedy…………………………………………….. 32

CONCLUSION………………………………………………………... 33

SIGNATURE………………………………………………………….. 34

RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE………………………… 34

CERTIFICATE OF SERVICE……………………………………………… 35

# TABLE OF AUTHORITIES

## CASES

*Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020)…………… 1, 2

*Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 854 (D.C. Cir. 2023)……..……… 1, 17

*Consolidated Edison Co. v. FERC*, 45 F.4th 265 (D.C. Cir. 2022)……………… 29

*Edison Mission Energy, Inc. v. FERC*, 394 F.3d 964 (D.C. Cir. 2005)………… 31

*El Paso Elec. Co. v. FERC*, 76 F.4th 352 (5th Cir. 2023)…………….……….. 20

*Entergy Arkansas, LLC v. FERC*, 450 F.4th 689 (D.C. Cir. 2022)……………… 17

*Evergy Kansas Central, Inc. v. FERC*, 77 F.4th 1050 (D.C. Cir. 2023)………. 5, 29

*FERC v. Electric Power Supply Ass'n*, 136 S.Ct. 760 (2016)…………..…….. 4, 5, 6

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970)………. 30

*New England Power Generators  Ass'n, Inc. v. FERC*, 881 F.3d 202
    (D.C. Cir. 2018)………………………………………………..…… 31, 32

\* *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177 (D.C. Cir. 2021)………………..… *passim*

*Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004 (D.C. Cir. 2005)…………………. 17

*Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10 (D.C. Cir. 2021)……………. 19

*TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015)………… 17

*Verso Corp. v. FERC*, 898 F.3d 1 (D.C. Cir. 2018)……………………………… 20

*Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548 (D.C. Cir. 2022)…………..……… 5

## STATUTES

16 U.S.C. § 825*l*(b)……………………………………………………………… 1, 2

**RULES**

18 C.F.R. Part 35…………………………………………………………………… 22

**ADMINISTRATIVE AUTHORITIES**

FERC, ENERGY PRIMER:  A HANDBOOK FOR ENERGY MARKET
      BASICS (April 2020)…………………………………………………….. 4

*Midcontinent Independent System Operator, Inc.*, 167 FERC P 61146 (2019)….5, 6

*Midcontinent Independent System Operator, Inc.*, 170 FERC P 61215
      (2020)………………………………………………………………… 7, 18

*Midcontinent Independent System Operator, Inc.*, 180 FERC P 61142 (2022)…... 1

*Midcontinent Independent System Operator, Inc.*, 181 FERC P 62080 (2022)…... 1

*Midcontinent Independent System Operator, Inc.*, 183 FERC P 61112 (2023)…... 2

*Pub. Citizen, Inc.*, 168 FERC P 61042 (July 19, 2019)…………………………… 6

*Southwest Power Pool, Inc.*, 164 FERC P 61092 (2018)………………………… 29

## **GLOSSARY**

| | |
|---|---|
| JA | Joint Appendix |
| FERC | Federal Energy Regulatory Commission |
| MCO | Minimum Capacity Obligation |
| MISO | Midcontinent Independent System Operator |
| OATT | Open Access Transmission Tariff |

## JURISDICTIONAL STATEMENT

Petitioners Entergy Operating Companies ("Entergy") are public utilities subject to regulation by Respondent Federal Energy Regulatory Commission (the "Commission") and parties to the underlying Commission proceeding.  They seek review of three Commission orders.  This Court has jurisdiction to review Commission orders under section 313(b) of the Federal Power Act.  16 U.S.C. § 825*l*(b); *Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 854 (D.C. Cir. 2023).

The Commission issued its first order deciding this case on August 31, 2022. *Midcontinent Independent System Operator, Inc.*, 180 FERC P 61142 (2022), Record Item 100, JA____.  The original applicant (Midcontinent Independent System Operator, Inc., "MISO") and intervenor Entergy timely sought rehearing of that order on September 30, 2022.  Record Item 101, JA____; Record Item 102, JA____.  On October 31, 2022, the Commission issued a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration. *Midcontinent Independent System Operator, Inc.*, 181 FERC P 62080 (2022), Record Item 103, JA____.  Entergy timely petitioned this Court for review of those orders on December 28, 2022.[1]  The Court held the case in abeyance to wait for the Commission's further order.

---

[1] In *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020), this Court held that FERC could not prevent judicial review of an order by issuing a "tolling order"

1

On May 18, 2023, the Commission issued its Order Addressing Arguments Raised on Rehearing. *Midcontinent Independent System Operator, Inc.*, 183 FERC P 61112 (2023); Record Item 105, JA____.  Entergy timely petitioned this Court for review of that order as well on June 14, 2023.[2]

The Court consolidated the two petitions on June 20, 2023, lifted the abeyance on September 21, 2023, and set a briefing schedule requiring Entergy to file its brief by November 13, 2023.  The Commission filed the certified index to the record on October 5, 2023.

---

to extend the 30-day statutory period to consider a request for rehearing before it will be "deemed to have been denied."  *See* 16 U.S.C. § 825*l*(a).

[2] This Court acknowledged in *Allegheny Defense Project*, *supra*, that the Commission still has the power to modify its previous order, in whole or in part, after a petition for review has been filed but before the administrative record has been filed with the Court.  *See Allegheny Defense Project*, 964 F.3d at 17.

## STATEMENT OF THE ISSUES

1.    Did the Commission act arbitrarily and capriciously by rejecting a proposed Regional Transmission Organization tariff revision on the sole ground that the proponent had not "adequately addressed" "market power concerns" when:  the only *evidence* in the record showed the revision would not create material market power concerns; the Commission did not meaningfully address that evidence or proposed solutions to those concerns; and the Commission refused to conduct a hearing to further develop evidence on these issues?

2.    Did the Commission act arbitrarily and capriciously by summarily rejecting the proposed, limited tariff change, even though the agency had approved a more onerous tariff requirement in a similarly-situated neighboring region, without: identifying any material difference between the two regions; meaningfully addressing the parties' arguments; or conducting a hearing to further develop evidence on the issue?

## STATEMENT OF THE CASE

**I.    This case concerns a proposal to amend a Commission-regulated tariff for the Regional Transmission Organization known as "MISO."**

The interstate electric transmission grid in many parts of the country is operated by Regional Transmission Organizations.  *See Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021).  Regional Transmission Organizations operate the grid in particular geographic areas, constantly balance supply and demand, and protect the reliability of the electric transmission system.  *See id.* at 1186-87 (citing FERC, ENERGY PRIMER: A HANDBOOK FOR ENERGY MARKET BASICS 61 (April 2020), https://www.ferc.gov/sites/default/files/2020-06/energyprimer-2020_Final.pdf (last accessed July 30, 2021)).  Some Regional Transmission Organizations also run competitive markets to set wholesale prices for wholesale electrical capacity.[3]  *FERC v. Electric Power Supply Ass'n*, 136 S.Ct. 760, 763 (2016); *Pub. Citizen*, 7 F.4th at 1186.

_____

[3] "[I]n a capacity market, distributors of electricity purchase commitments from generators to produce set amounts of electricity in the future.  With those commitments in hand, the electricity distributor can meet high demands for electricity by calling on the generators to produce it when the need arises.  Purchasing capacity, in other words, ensures that distributors can reliably meet predicted peak power demands in an upcoming month, season, or year." *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021) (citations and footnote omitted); *see also FERC v. Electric Power Supply Ass'n*, 136 S.Ct. 760, 768-69 (2016).

4

The Federal Power Act gives the Commission the authority to regulate "both the transmission and the wholesale marketing of electricity in interstate commerce" to protect the public interest. *Pub. Citizen,* 7 F.4th at 1182–1183. Under that authority, the Commission oversees prices for interstate electricity "and all rules and practices affecting such prices." *Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 551 (D.C. Cir. 2022) (quoting *Electric Power Supply Ass'n*, 136 S.Ct. at 767). That includes regulation of Regional Transmission Organizations. *Evergy Kansas Central, Inc. v. FERC*, 77 F.4th 1050, 1053 (D.C. Cir. 2023).

To ensure that generators receive equal access to transmission grids, the Commission requires Regional Transmission Organizations to offer standard terms and conditions for transmission service, outlined in a *pro forma* tariff designed by the Commission. *See Xcel Energy*, 41 F.4th at 552. These tariffs are commonly called Open Access Transmission Tariffs or "OATTs." Among other things, these tariffs set forth the rules and terms by which each Regional Transmission Organization will operate its region.

MISO is the Regional Transmission Organization that runs much of the grid in the corridor between Manitoba, Canada to the north and Louisiana in the south. *See Xcel Energy*, 41 F.4th at 554 (citing *Midcontinent Indep. Sys. Operator, Inc.*,

167 FERC P 61146, ¶ 8 (2019)).  MISO's tariff requires each "load serving entity"[4] in its region to procure sufficient rights to generation capacity to meet the entity's anticipated requirements for the upcoming year, subject to parameters and processes set forth in the tariff.  Record Item 100  (Aug. 31, 2022 Order) at ¶ 2, JA____.  Each MISO load serving entity currently has the discretion to choose among four different methods of procuring capacity and can rely upon any or all of them in part or full.  *See id.*; Record Item 2, Tab D (Wright Testimony) at 5 & 18, JA____.  One of those options is to purchase rights to capacity at an annual MISO Planning Resource Auction ("Auction").  *See Pub. Citizen*, 7 F.4th at 1187.

This Court explained in *Public Citizen* the basics of how the Auction works,[5] and observed, "[i]n addition to those basic rules, MISO applies specific rules intended to mitigate the risk that, if the marketplace is insufficiently competitive, a

---

[4] A "load serving entity" is a public utility or other entity that buys power at wholesale for resale to users.  *See Electric Power Supply Ass'n*, 136 S.Ct. at 763.

[5] "For purposes of the auctions, MISO's operational area is divided into nine separate regional 'zones.'  For each zone, MISO determines how much capacity will be required. It also determines a 'local clearing requirement,' which is 'the minimum amount of procured capacity that must be physically located within the Zone (rather than imported [from another Zone or region])' to meet anticipated need."  *See Pub. Citizen*, 7 F.4th at 1187 (citing *Public Citizen, Inc.*, 168 FERC P 61042 at 2 (2019)).  "In the auction, electricity generators offer to sell set amounts of capacity at specific prices.  MISO accepts offers, beginning with the lowest, until the zone's capacity requirements are met.  The price of the last increment of capacity needed to meet the zone's capacity requirements is the 'auction clearing price' for that zone, and all the capacity for that zone is then purchased at that price."  *Id.* (citation omitted).

seller might exercise market power, resulting in an unjust and unreasonable rate ."
*Id.*  In other words, there are mechanisms built into the Auction rules to protect
against the exercise of market power.

Historically, because most load serving entities in MISO have met their
capacity obligations primarily by owning or bilaterally contracting for it, there has
been a surplus of capacity available for sale in the annual Auctions at low prices.
Record Item 73 (Entergy Comments) at 5-6, JA_____.  In fact, Auction prices have
been so low that they often do not cover the generation owners' costs of maintaining
the resources that supply the capacity.  *Id.* at 6.  Moreover, there is currently no
requirement that any load serving entity procure any capacity in advance of the
Auction.  Record Item 2 at 4 (MISO Nov. 2021 Filing),  Tab D (Wright Testimony)
at 3], JA_____.  Some MISO load serving entities, therefore, have incentive to meet
all or a significant portion of their capacity needs through the annual Auction alone.
*Id.*, Tab C (Harvey Testimony) at 21, JA_____; *id.*, Tab D (Wright Testimony) at 3,
JA_____.

However, as the Commission itself has observed, the Auction was never
intended to be any load serving entity's primary source of capacity.  Record Item 73
(Entergy Comments) at 3, JA_____; *Midcontinent Independent System Operator,
Inc.*, 170 FERC P 61215 at 13 (2020).  The Auction was designed to facilitate the
incremental, residual procurement of capacity as a backstop to the broader

integrated, advance planning processes of regulators, market participants, and regulated utilities in the region.  Record Item 101 (MISO Request for Rehearing) at 5, JA_____.

## II.   MISO determined that its current tariff does not adequately incentivize load serving entities to take forward-looking steps to ensure there will be enough capacity available to ensure the grid continues to function reliably in the future.

The fleet of generation resources currently serving MISO is undergoing an unprecedented transformation. Record Item 100 (Aug. 31, 2022 Order) at ¶ 3, JA___.  Some traditional (thermal) generation plants are being retired early, and many of the replacement generation facilities (like solar and wind facilities) perform intermittently.  *Id.*; Record Item 2 (MISO Nov. 2021 Filing), Tab C (Harvey Testimony) at 1 & 23, JA_____; *id.*, Tab D (Wright Testimony) at 12-13, JA_____. These developments are causing a decline in excess capacity in MISO.  Record Item 93 (Entergy Response), JA_____.   At the same time, more frequent extreme weather events and generator outages are increasing the frequency of emergency grid operations.  Record Item 2 (MISO Nov 2021 Filing)at 2-5, JA_____; *id.*, Tab D (Wright Testimony) at 11, JA_____. Together, these developments threaten the long-term reliability of the MISO grid. *Id.* (MISO Nov. 2021 Filing) at 2-5, JA_____; *id.*, Tab C (Harvey Testimony) at 23, JA_____; *id.*, Tab D (Wright Testimony) at 9, JA_____.

MISO is concerned that by continuing to allow some load serving entities to lean heavily or exclusively on the Auction by procuring some or all of their capacity requirements through that vehicle, MISO's current tariff does not adequately incentivize them to take the forward-looking steps necessary to ensure that there will be enough capacity available in the Auction to serve its intended purpose as a residual (not primary) source of capacity in the future. Record Item 101 (MISO Request for Rehearing) at 5, JA____. MISO is concerned that without this incentive, there is a substantial risk that there will not be enough capacity available in the Auction to ensure reliable operation of the system in the near future. Record Item 2 (MISO Nov. 2021 Filing) at 2-5, JA____; *id.*, Tab D (Wright Testimony) at 8-9, JA____; Record Item 101 (MISO Request for Rehearing) at 5-6, JA____. Allowing load serving entities to rely solely on the Auction to procure all capacity needs places all load serving entities in a position of learning of capacity shortfalls when it might be too late to do anything about them and ensure reliability of the grid. Record Item 101 (MISO Request for Rehearing) at 6, JA____. For this reason, MISO determined it needs to revise its tariff to incentivize more robust planning and capacity procurement prior to the annual Auctions. *Id.*

**III.    To incentivize more proactive planning, MISO proposed to require load serving entities to procure at least 50% of their capacity needs before each annual capacity Auction.**

In an effort to address these progressive and accelerating threats, MISO in November 2021 proposed to change its tariff under section 205 of the Federal Power Act.  Record Item 2 (MISO Nov. 2021 Filing) at 2-6, JA____.  The proposal included the testimony of two witnesses (Messrs. Harvey and Wright) and an analysis by an independent consultant called the Brattle Group.  *Id.* (MISO Nov. 2021 Filing and attachments), JA_____.

MISO proposed to change its tariff to require each load serving entity to meet a "Minimum Capacity Obligation" ("MCO") to buy at least 50% of its annual capacity needs before each annual Auction takes place.[6]  *Id.* at 6, JA____; *id.*, Tab C (Harvey Testimony) at 9, JA____; *id.*, Tab D (Wright Testimony) at 2 & 15, JA____.  The proposal would allow load serving entities to meet this obligation by owning generation resources or by purchasing rights to capacity through bilateral contracts with sellers.  *Id.* (MISO Nov. 2021 Filing) at 6, JA____.  MISO also proposed a charge for noncompliance with this requirement.  *Id.* (MISO Nov. 2021 Filing) at 6-8, JA____; *id.*, Tab C (Harvey Testimony) at 9, JA____; *id.*, Tab D (Wright Testimony) at 19, JA____.  MISO posits that these requirements will help

_____

[6] The proposal includes a de minimis exception for very small load serving entities. Record Item 100 (Aug. 31, 2022 Order) at ¶ 5, JA____; Record Item 2 (MISO Nov. 2021 Filing) at 6, JA____.

keep load serving entities focused on resource adequacy in the future and lessen the chance that there will not be enough power available when needed. *Id.* (MISO Nov. 2021 Filing) at 7, JA____; *id.*, Tab C (Harvey Testimony) at 22 & 24-25, JA_____; *id.*, Tab D (Wright Testimony) at 14-16, JA____.

Recognizing that it does not have the luxury of taking a "wait and see" approach to address the trends described above, Record Item 2 (MISO Nov. 2021 Filing), Tab D (Wright Testimony) at 23, JA____, MISO proposed to apply its MCO on a region-wide basis beginning the 2023-2024 planning year, *id.* (MISO Nov. 2021 Filing) at 6 & 8, JA____; *id.*, Tab D (Wright Testimony) at 20, JA____. Before proposing the MCO to the Commission, MISO assessed whether the MCO would create the potential for the exercise of market power in forward bilateral transactions. MISO's consultant, the Brattle Group, determined there would be no such material concerns associated with implementing the MCO on a region-wide basis. *Id.* (MISO Nov. 2021 Filing) at 9, JA____; *id.*, Tab C (Harvey Testimony) at 2, 8, & 10-12, JA_____; *id.*, Tab C (Harvey Testimony) at Exh. 2 (Brattle Group Analysis at 4, which concluded "MISO's MCO proposal at the MISO-wide . . . level does not appear to raise concerns about the exercise of market power."), JA____].[7]

_____

[7] MISO also said it planned to explore applying the MCO on a sub-regional basis in the future. Record Item 2 (MISO Nov. 2021 Filing) at 8, JA____; *id.*, Tab D (Wright Testimony) at 20-21, JA____. MISO planned this future change because there is a major transmission constraint between parts of its region, and MISO hopes eventually to incentivize load serving entities to use capacity resources that are in

**IV.    Without holding a hearing, the Commission ultimately rejected MISO's MCO proposal on the lone theory that MISO had not "adequately addressed" market power concerns.**

Notice of MISO's proposal was published in the Federal Register, and several entities intervened on both sides.[8]  Record Item 100 (Aug. 31, 2022 Order) at ¶ 15, JA____.  The Independent Market Monitor ("IMM") for MISO (Potomac Energy) protested the proposal.  Record Item 79 (IMM Protest), JA____.  Petitioner Entergy intervened in support of MISO's proposal.  Record Item 32 (Entergy Notice of Intervention), JA____.  Several parties filed comments and responses to MISO's proposal and the IMM's protest.

Several months after MISO filed its proposal and various parties filed comments, the Commission by letter asked MISO some specific questions about the scope and operation of the proposal.  Record Item 85 (Deficiency Letter), JA____.

_____

the same area as their loads to avoid this constraint.  *Id.* (MISO Nov. 2021 Filing) at 8, JA____.  Because some stakeholders had expressed concerns that implementing the MCO on a sub-regional basis might raise the potential for the exercise of market power, MISO identified some potential safeguards against those concerns.  *Id.* (MISO Nov. 2021 Filing) at 9, JA____.  Ultimately, though, MISO made clear that it was not proposing implementation of the MCO requirement on a sub-regional basis in *this* proceeding.  Record Item 89 (MISO Response to Deficiency Letter) at 3, JA____.  If MISO proposes to implement the MCO requirement on a sub-regional basis in the future, it will have to initiate a new proceeding under section 205 of the Federal Power Act.

[8] Some parties to the Commission proceeding have intervened in this case.  MISO, Cleco Corporate Holdings LLC, Cleco Power LLC, and Cleco Cajun LLC intervened in support of Entergy.  The Council of the City of New Orleans, Louisiana intervened but withdrew on September 20, 2023.  No party has intervened on behalf of Respondent Commission.

MISO and other parties commented in response. *E.g.,* Record Item 89 (MISO Response), JA___; Record Item 91 (Potomac Response), JA____; Record Item 93 (Entergy Response), JA_____. But the Commission never implemented a process by which the parties could develop and present evidence or brief in detail the substance of comments about the proposal. Instead, the Commission summarily rejected MISO's proposal without even having a hearing. Record Item 100 (Aug. 31, 2022 Order), JA____.

In the Commission's first decision, three Commissioners gave several reasons for rejecting the proposal, one of which was a speculative "concern" that the MCO might enable the exercise of market power. *Id.* (Aug. 31, 2022 Order) at ¶¶ 106-113, JA____. Commissioner Christie concurred in the decision. *Id.* (Christie Concurrence), JA____. Commissioner Danly also concurred, but he opined that the Commission needed more information and should have set MISO's proposal for a hearing. *Id.* (Danly Concurrence), JA____.

MISO and Entergy (joined by the Cleco entities) sought rehearing. Record Item 101 (MISO Request for Rehearing), JA____; Record Item 102 (Entergy Request for Rehearing), JA____. Though those requests were overruled by operation of law, the Commission indicated it would address the rehearing arguments in a future order, and it did. Record Item 103 (Oct. 31, 2022 Order), JA____; Record Item 105 (May 2023 Order), JA____. In its last order, the

13

Commission expressly disclaimed all of the reasons it had given for rejecting MISO's proposal in the first order except one.  That is, the Commission determined that MISO had not "adequately addressed" concerns regarding negative impacts the MCO might have on competitive market dynamics.  Record Item 105 (May 2023 Order) at ¶¶ 11-18, JA____.  Commissioner Christie concurred in that decision.  *Id.* (Christie Second Concurrence), JA____.

Commissioner Danly *dissented* from the majority's final decision.  *Id.* (Danly Dissent), JA____.  That time, he was "even more firmly convinced" that the Commission should have pursued a paper hearing in this proceeding because more information was needed on the issue of market power.  Commissioner Danly observed, "without delving into the threshold question of whether there actually is the possibility of market power being exercised," the Commission cannot "truly be said to have engaged in reasoned decision making."  *Id.*  He also noted that the Commission had not adequately addressed the market power mitigation measures MISO had proposed, nor had the agency adequately addressed why its decision in this case is consistent with its own approval of a similar (but more onerous) tariff mechanism in a neighboring Regional Transmission Organization called Southwest Power Pool ("SPP").  *Id.*

14

## SUMMARY OF THE ARGUMENT

The Commission's orders are subject to review by this Court under the "arbitrary and capricious" standard. To satisfy that standard, the Commission's findings must be supported by evidence in the record, and the Commission must explain logically how it reached the decision it made based upon that evidence. The Commission must also respond meaningfully to the arguments the parties raise.

The Commission did not do any of that in this case. The only *evidence* in the record (attached to MISO's initial filing) shows that implementation of the MCO regionwide will not result in the exercise of market power. The Commission acknowledged that some parties nevertheless (in comments about MISO's filing) raised "concerns" that it might. But the Commission did not meaningfully address the merit of those "concerns." Nor did the Commission give any logical explanation for why one or more of the multiple solutions the parties proposed would not mitigate those concerns. Instead, the Commission simply summarily concluded that MISO had not met its burden to show the MCO is just and reasonable, based on speculation alone. And though Commissioner Danly pointed out more than once that a hearing would enable the parties and Commission meaningfully to resolve these issues, the Commission refused to conduct a hearing or even explain *that* decision. This is reason enough to reverse the orders.

The Commission also failed logically to explain why it refused to allow MISO to implement the MCO regionwide when the Commission has already allowed a similarly-situated, neighboring region (SPP) to implement a more demanding capacity procurement requirement. If the requirement to procure 100% of capacity via ownership or bilateral contract does not create the potential for the exercise of market power in SPP, it is illogical to *assume* that MISO's proposal to require those same processes to procure only 50% of capacity requirements will cause the exercise of market power in the MISO region. The Commission is bound by law to either follow its own precedent or explain logically why it chooses to depart from that precedent. The Commission did not do that in this case, opting instead to reject MISO's proposal on the theory that MISO did not carry its "burden." Again, the Commission did not allow the parties an opportunity to fully develop and analyze this issue, and failed even to explain *that* decision. This is an independent reason the Commission's orders should be reversed.

The only *evidence* in the record shows that MISO has a serious, current need to change its capacity procurement requirements so that MISO can protect the reliability of the electric grid in its region going forward. The Commission does not quarrel with this reality. Summarily rejecting MISO's attempt to improve this situation and requiring MISO and the other parties to start this laborious, time-intensive, and expensive process over is not a just, effective, or logical outcome.

Further delay will only exacerbate the problem MISO faces and put the whole region at further risk. The Commission has not even logically addressed *that* fact. This Court should, therefore, reverse the Commission's orders and remand the case for further proceedings and explanation.

## **ARGUMENT**

I.    **The Commission acts arbitrarily and capriciously unless it engages in reasoned decision-making by addressing arguments raised before it and articulating a rational connection between the facts found and the choice made.**

This Court reviews Commission orders under the arbitrary and capricious standard. *E.g., Citadel FNGE Ltd.*, 77 F.4th at 854. To satisfy that standard, the Commission's decision must be "principled," "reasoned," and "supported by the evidentiary record." *Id.* at 863. To determine whether the agency has met this test, the Court determines whether "the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Entergy Arkansas, LLC v. FERC*, 40 F.4th 689, 697–98 (D.C. Cir. 2022). That requires the agency to weigh competing views and intelligibly explain the reasons for making its choice. *Id.* at 701–02. "It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'" *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).

17

II.    **The Commission did not adequately explain why mere "concerns" expressed in comments about market dynamics justified rejecting the MCO without giving the parties a meaningful opportunity to develop evidence on whether the concerns were legitimate or whether suggested mitigation measures would address any such concern.**

    A.    **MISO submitted evidence supporting its proposal, and other parties submitted comments.**

MISO was the only party to this proceeding that proffered any testimony or study that addressed the market power issue. *See* Record Item 2 (MISO Nov. 2021 Filing with Attachments), JA_____.    Both of MISO's witnesses and its independent consultant (the Brattle Group) concluded that the MCO would not trigger material market power concerns. *Id.*

In support of MISO's proposal, Entergy pointed out that MISO's capacity market is based on load serving entities' owning or contracting for capacity resources to meet the bulk of their needs.    Record Item 73 (Entergy Comments) at 4-5, JA_____.    The Auction was not designed to function, nor is it reasonable to rely upon it, as the primary source of capacity to meet any load serving entity's needs. *Id.* at 5 & 3 n.6.    The Commission itself has already recognized as much, observing that most load in MISO is served by capacity planned and built by load serving entities under regulated integrated resource planning processes. *See Midcontinent Independent System Operator, Inc.*, 170 FERC P 61215, ¶ 13 (2020).    The Commission expressly observed that, "unlike the centralized capacity constructs

18

used in the Eastern RTOs/ISOs, MISO's auction is not – *and has never been* – the primary mechanism for LSEs to procure capacity." *Id.* (emphasis in original).

Entergy further explained the effect any load serving entity's inappropriate reliance on the Auction has on the whole region. Historically, the planning activities of vertically integrated utilities (like Entergy) have resulted in a surplus of capacity for the Auction and kept Auction prices low. Record Item 73 (Entergy Comments) at 5-6, JA____. That has incentivized some load serving entities to proactively procure capacity and instead rely on the Auction, contributing almost nothing to the costs of the investment larger, vertically integrated utilities have made. *Id.*, JA____. But large excess reserve margins are quickly diminishing. *Id.* at 5, JA____. If load serving entities do not engage in long-term planning, individual subregions may not be able to meet their local clearing requirements, and the risk of capacity shortages and grid unreliability in the future will increase. *Id.* A reliability issue for one is a reliability issue for all in MISO, including those who prudently planned in advance. In short, under the current state of affairs, some load serving entities are able to ride free, benefitting from burdens other load serving entities must bear, increasing the risk of reliability problems for all stakeholders in the region.

Tariffs that enable free ridership are prohibited by the Federal Power Act. *Public Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19 (D.C. Cir. 2021) (cost allocation method unjust and unreasonable because it fails to comport with cost-

causation principles); *Verso Corp. v. FERC*, 898 F.3d 1, 5 (D.C. Cir. 2018) (rate methodology unjust and unreasonable because it did not follow cost-causation principles); *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 361-62 (5th Cir. 2023) (same). Entergy pointed out that the proposed MCO will help restore the Auction to an appropriate, more limited role within the MISO resource adequacy construct, Record Item 73 (Entergy Comments) at 9, JA____, and reduce the ability of some load serving entities to ride free on the backs of others who plan their systems with adequate capacity in proximity to their load, *id.* at 11, JA____ .

The IMM nevertheless protested MISO's proposal, first arguing that the Brattle Group's analysis was not thorough enough. Record Item 79 (IMM Protest) at 13-14, JA____. The IMM also speculated that the MCO could create the potential for the exercise of market power for some sellers in southern MISO, specifying Entergy in particular.[9] *Id.* at 14-15. The IMM further speculated (in response to comments on the Commission's request for more information) that the capacity market might not be sufficiently liquid if the MCO is adopted. Record Item 91 (IMM Response to Deficiency Letter), JA____. But even the IMM recognized that if the

---

[9] Insofar as the IMM's protest addresses market power concerns, the IMM's argument appears to focus exclusively on application of the MCO on a sub-regional basis. However, MISO currently proposes to implement the MCO only on a *regional* basis. Application of the MCO on a sub-regional basis is not an issue before the Commission. Therefore, the IMM's comments are unpersuasive on their face, and are an insufficient basis for rejection of MISO's current proposal.

MCO were adopted, a mandatory "bulletin board" could mitigate market power concerns. *Id.* at 5, JA____. Further, the IMM recognized that the Commission could insist on adding tariff "provisions that will prevent suppliers from withholding their surplus available capacity from the bilateral contract market in the same way they are prevented from withholding such capacity from the [Auction] currently." Record Item 79 (IMM Protest) at 18, JA____.

In response to the IMM's protest, Entergy pointed out that the IMM's analysis about the potential for Entergy to exercise market power under the MCO is mere speculation. Record Item 81 (Entergy Response) at 11, JA____ (quoting IMM Protest argument based on speculation that entities with excess capacity might not be willing to sell it bilaterally and will have the ability to drive up bilateral contract prices). Entergy further pointed out that there is currently a worsening capacity situation in Zone 9, which includes Louisiana and Texas. *Id.* at 4, JA____. Entergy committed that if the MCO were adopted, Entergy would make any long-term surplus capacity available for future long term capacity sales to load serving entities in southern MISO at cost-based rates to eliminate any concerns about its ability to exercise market power. *Id.* at 3 & 11, JA_____. Any such contracted sales would be submitted to FERC for review under section 205 of the Federal Power Act. *Id.*, JA_____. And Entergy reiterated that allowing load serving entities to rely on the Auction in a way that was not intended allows them to enjoy the benefits of reliability

21

conferred by others' investments in capacity resources while contributing virtually nothing to the cost of those investments or to the collective cost of maintaining resources within MISO sufficient to serve the load in MISO reliably.  *Id.* at 7, JA____.

Entergy further noted that the Commission already has powerful remedial authority to address any market power concerns arising under the MCO proposal. Under Federal Power Act section 205 and its corollary regulations,[10] the Commission has authority to impose cost-based mitigation remedies on sellers determined to have market power or revoke the market-based rate authority of sellers.  Record Item 73 (Entergy Comments) at 13, JA____.  The Commission also has authority to impose substantial civil penalties on sellers that abuse market power and violate applicable tariffs and law.  *Id*. at 13 n.25, JA____ (citing Federal Power Act section 316A).  If the MCO were implemented, Entergy would file with the Commission any long-term bilateral capacity sales contracts in MISO and satisfy the Commission's regulations necessary to establish cost-based rates for such sales. Record Item 81 (Entergy Response) at 12, JA____.

---

[10] *See* 18 C.F.R. Part 35.

**B.** **The Commission did not meaningfully consider these arguments or adequately explain why it rejected MISO's proposal without a hearing.**

In its first order, the Commission wrote only two paragraphs about the market power issue.  Record Item 100 (Aug. 31, 2022 Order) at ¶¶ 112-113, JA____.  In a nutshell, the Commission found that:

- MISO had not "adequately addressed" the IMM's assertion that the MCO could enable sellers to avoid the "disciplining effect" the Auction process currently has on bilateral capacity markets, *id.* at ¶ 112, JA____;

- If the Commission approved the MCO, the agency would have to "revisit" its previous decision not to require MISO sellers to submit "indicative screens" supporting bilateral capacity sales because the Auction process currently serves that protective function, *id.*, JA____; and

- MISO's evidence on market dynamics was "limited" and did "not address" potential *near-term* changes that could impact sellers' ability to exercise market power, *id.* at ¶ 113, JA____.

Essentially, the Commission rejected the MCO proposal because, in the Commission's view, neither the Commission nor MISO had fully analyzed a high-level debate about "concerns," unsubstantiated by evidence, that the MCO might have an effect on the exercise of market power.

In its rehearing order, the Commission simply restated these same conclusions.  The agency reiterated its concern that the MCO might undermine the important disciplining effect the Auction currently has on the bilateral capacity market.  Record Item 105 (May 2023 Order) at ¶ 13, JA____.  The Commission

mused that this potential impact might be even more important as capacity becomes more scarce in the MISO region, given that the MCO would be applied in the context of MISO's current rules for dealing with the location of supply and demand and capacity constraints.  *Id.*

In its rehearing order, the Commission also noted that:

- MISO had not proposed an "on-going program" of market power analysis to address concerns with regional application of the MCO, *id.* at ¶ 14, JA____;

- Entergy's commitment to make capacity available at "embedded cost-based rates" to address market power concerns in future rate filings was "unclear" and not "concrete,"  *id.* at ¶ 15, JA____; and

- MISO's suggestion that an electronic bulletin board requirement could alleviate market power concerns was not persuasive because the *existing,* voluntary MISO bulletin board (not designed for this purpose) would not, *id.* at ¶ 16, JA____.

So again, the Commission acknowledged the parties suggested several ways to address concerns about the effect the MCO might have on the exercise of market power in MISO, but the Commission summarily disregarded all of them simply because they were not fully fleshed out in the record.

These are not logical reasons simply to reject the proposal.  The Commission, by expressly abandoning all but one of the rationales for its first order, at least tacitly acknowledged that there *is* a real problem in MISO that needs to be addressed soon, and that the MCO would be a step in the right direction.  But the Commission simply

24

refused to explore whether there was any merit to the alleged "concerns" over the potential exercise of market power under the MCO, and refused to explore the various mechanisms the parties proposed to mitigate those concerns.

The Commission's final order ignores that the Commission could have initiated a process to receive and analyze evidence exploring and developing these issues. The Commission did not explain why it could or should not "revisit" the possibility that a requirement to submit "indicative screens" could solve market power concerns. The Commission did not give the parties a chance to develop and submit evidence on how the MCO would benefit the region despite the potential "near-term changes" that the IMM relied upon to protest implementation of the MCO. The Commission did not consider at all whether an "on-going program" of market power analysis could address market power concerns. The Commission did not give Entergy a chance to clarify and prove how its proposal to make capacity available at "embedded cost-based rates" could address those concerns. Nor did the Commission consider how a differently-designed electronic bulletin board could alleviate those concerns. The Commission did not even *acknowledge* the existing statutory provisions that would enable the agency itself to monitor and address any market power concerns that might actually arise in the future. The agency simply pointed out that the record wasn't fully developed, did not provide for a hearing, and rejected the MCO proposal based upon speculation alone.

25

Commissioner Danly correctly pointed all of this out in his dissent. He observed that the Commission had "failed to sufficiently explore" the issues raised by the litigants, that his questions on the market power issue "remain unanswered," and that having a "paper hearing" could resolve these issues. Record Item 100 (Aug. 31, 2022 Order) (Danly concurrence), JA____; Record Item 105 (May 2023 Order) (Danly dissent), JA____. Even though Commissioner Danly pointed out in his first concurrence that a paper hearing could illuminate and resolve these issues, the Commission simply ignored that fact on rehearing. The agency gave *no* explanation for this refusal, *ever.*

As a result, there is *no* link between the only actual evidence in the record and the Commission's ultimate decision. The Commission's order does not give any logical reason for assuming the MCO would actually enable the exercise of market power, or for refusing to explore multiple proposed solutions if there were such a legitimate concern. The Commission certainly did not demonstrate that it weighed competing views, critically considered the arguments, or based its decision upon a principled, reasoned analysis.

### C. The Commission's decision is even less sufficient than another this Court already reversed.

This Court two years ago reversed a Commission order for failure to give sufficient explanation for its decision on alleged market manipulation in MISO Auctions.

In *Pub. Citizen,* 7 F.4th 1177, *supra*, a consumer protection organization challenged a Commission ruling that results of the 2015 MISO Auction for one regional zone were just and reasonable and did not violate the Commission's regulations regarding market manipulation. That Auction resulted in capacity prices of more than 40 times the price in neighboring zones and a nearly ninefold increase from prior year's price. The Commission had conducted an over three-year investigation into the matter. Though the Commission ordered the Auction rules changed prospectively, the Commission refused to find that the *2015* Auction prices were unjust and unreasonable. *See Pub. Citizen*, 7 F.4th at 1182.

Purportedly applying its own rules pertaining to anticompetitive market-based tariffs to deny relief for the 2015 Auction, the Commission summarily declared that "no further action [was] appropriate" and the results of the 2015 Auction were just and reasonable. *Id*. at 1190. The only reason the Commission gave was that there was "no evidence" that a market participant had violated the terms of the MISO tariff in effect in 2015. *Id.* at 1191. Then-Commissioner Glick dissented, observing the majority had not provided "even the scantest reasoning to support its finding . . . ." *Id.*

On rehearing, the majority summarily declared that the complainant had not accurately "addressed" the definition of "market manipulation" and had not "met its burden" to show that activity meeting that definition had occurred. *Id.* at 1192.

27

This Court reversed the Commission's decision as arbitrary and capricious. The Court observed that the Commission has established conditions to ensure that a market-based tariff is not anticompetitive, and that the Commission provides mechanisms for the public to participate in enforcing these requirements. *Pub. Citizen*, 7 F.4th at 1182 & 1186. The Court held:

> [t]he Commission failed to adequately explain why the problems it identified in the existing auction rules affecting pricing—problems it ordered fixed going forward—did not also affect the fairness of the 2015 Auction itself. … Based on the unwonted record before the Commission and the multi-year Commission investigation into market manipulation that record prompted, the agency's conclusory and unreasoned decision to sustain the 2015 Auction rates does not hold up.

*Id.* The Court further held:

> That is not to say that an extraordinary price spike necessarily evidences market manipulation or a malfunctioning auction process. The Commission could, on an appropriate record, reasonably conclude that a particular price spike, while unusual, was not unjust or unreasonable. The problem in this case is that the Commission did not do that work. And that failure made its order arbitrary and capricious.

> Because the Commission's orders did not adequately explain its conclusion that the 2015 Auction results in Zone 4 were just and reasonable given the evidentiary record and the Commission's own findings in the 2015 Order, we remand to the Commission for further analysis and explanation.

*Id.* at 1200.

The same result should obtain here. The Commission simply announced that MISO had not met its burden, without giving any explanation of why MISO's evidence was not persuasive to the Commission, why multiple suggested solutions

would not mitigate the speculative concerns raised, or why the parties were not entitled to a hearing on these issues. The order should be reversed and remanded for further proceedings for this reason alone.

### III. The Commission's rejection of the MCO on rehearing is also arbitrary and capricious because the agency did not adequately explain how its rejection of the MCO is consistent with its approval of a materially similar mechanism for the SPP region.

In its comments, Entergy pointed out that the MCO is consistent with the capacity construct the Commission has already approved for SPP. Specifically, SPP's construct includes a requirement for each load serving entity to demonstrate that it owns or has bilateral contracts sufficient to meet 100% of its summer and winter peak load plus a reserve margin. Record Item 81 (Entergy Response) at 9, JA____ (citing *Southwest Power Pool, Inc.*, 164 FERC P 61092 (2018) (accepting SPP Tariff amendments to implement a Resource Adequacy Requirement for the SPP footprint); *see also Southwest Power Pool, Inc., Open Access Transmission Tariff, Sixth Revised Volume I,* Attachment AA, Section 5 (Summer Season Resource Adequacy Requirement) and Section 6 (Winter Season Obligation)); Record Item 105 (May 2023 Order, Danly Dissent) at ¶ 7, JA____. The MCO would impose a requirement to meet only *half* that amount.

FERC may not charge "similarly situated entities ... different rates for no good reason." *Evergy Kansas Cent.*, 77 F.4th at 1056–57 (quoting *Consolidated Edison Co. v. FERC*, 45 F.4th 265, 282 (D.C. Cir. 2022)). Moreover, FERC must follow its

own precedents or, alternatively, provide a reasoned explanation for a material departure therefrom.  *See, e.g., Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970).  FERC wholly abdicated this responsibility here.

FERC did not address this issue at all in its first order.  Record Item 100 (Aug. 31, 2022 Order), JA____.  In its rehearing order, FERC noted that SPP does not administer a centralized capacity auction like MISO does, and summarily refused to find that the markets are "apposite" because Entergy did not show they are "similarly situated."  Record Item 105 (May 2023 Order) at ¶ 17, JA____.  Again, FERC inexplicably and inequitably refused to analyze the issue itself, or even to give the parties a chance to develop and debate evidence on this issue.

FERC's conclusory dismissal of this issue does not make logical sense on its face.  This case turns on whether adding the *50%* MCO requirement to MISO's construct would allow the exercise of unmitigated market power.  FERC requires SPP load serving entities to meet *100%* of their requirements in the same ways the MCO does.  There is nothing in the record to suggest that the SPP requirement creates dissatisfactory market dynamics, *even without an auction that "disciplines" the market like MISO has*.  On this record, there is no reason to assume that a lesser requirement in MISO (especially implemented region-wide and in conjunction with the existing Auction, which itself is subject to market power mitigation provisions) would create dissatisfactory market dynamics.

This Court has already reversed the Commission for failing to provide such an explanation in another case presenting similar issues.  In *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 209–10 (D.C. Cir. 2018), suppliers who had been participating in regional auctions challenged tariff provisions that benefitted only "new entrants" into the market.  The Commission refused to change the tariff.  The Commission failed to identify a material difference between existing and new entrants and brushed off a seemingly inconsistent decision regarding another Regional Transmission Organization's tariff.  This Court reversed, holding that, "FERC must reasonably explain how the existing suppliers and new entrants are not similarly situated and in what respects the reasons are material."  *Id*. at 212-13 (citing *Edison Mission Energy, Inc. v. FERC*, 394 F.3d 964, 968–69 (D.C. Cir. 2005) (vacating FERC ruling that allowed unreasonable price suppression for lack of adequate explanation)).  The Court concluded that because the Commission "failed to offer adequate rationale and explanation in the challenged Orders . . . [the Commission] must provide a more robust rationale for its seeming inconsistency with past precedent and practice."  *New England Power Generators Ass'n, ,* 881 F.3d at 209–10.

As this Court reiterated, "[i]t is textbook administrative law that an agency must provide[ ] a reasoned explanation for departing from precedent or treating similar situations differently . . . Although case-by-case adjudication sometimes

31

results in decisions that seem at odds but can be distinguished on their facts, it is the agency's responsibility to provide a reasoned explanation of why those facts matter." *Id.* at 210–12. "Conclusory and dismissive rejections of litigants' arguments on the merits of a question are arbitrary and capricious." *Id.*

The Commission gave less explanation in this case than it did in *New England Power Generators Ass'n*. FERC did not explain why it makes sense to require load serving entities to acquire *all* their capacity through ownership and bilateral contracts in SPP, but not require load serving entities in MISO to acquire just *half* of their capacity by those methods. FERC did not explain why the existence of a residual capacity Auction in MISO would *increase*, rather than *decrease*, the potential for the exercise of market power in MISO relative to SPP. There is no evidence in this record supporting the Commission's summary conclusions on this issue. This is an independent reason this Court should reverse the Commission's order and remand the case for further proceedings.

## IV.   The Commission's's suggestion that MISO can just try again later is not an adequate remedy.

Commissioner Christie pointed out in his last concurrence that MISO can just try to propose an MCO again later. Record Item 105 (May 2023 Order, Christie Second Concurrence) at ¶ 2, JA____. But as Commissioner Danly pointed out in his dissent, starting over will cost much time, expense, and effort, *id.* (Danly Dissent) at ¶ 6, JA____. And by expressly disclaiming on rehearing its initial views that

MISO does not have a serious challenge on its hands, and that the MCO would not mitigate some of that challenge, the Commission itself has signaled that it understands MISO needs to do something now, and that the MCO would at least be a step in the right direction.  Unless this Court reverses the Commission's order and remands the case for further proceedings, the parties will have to start the whole lengthy and laborious process anew.  Meanwhile, MISO and its stakeholders need at least a partial solution now, to ensure the reliability of the MISO grid.  This Court should not sanction the Commission's unexplained abdication of its responsibility to meaningfully consider and address MISO's proposed solution to MISO's very real, current problem.

## **CONCLUSION**

For the foregoing reasons, Petitioner Entergy Operating Companies respectfully request the Court reverse the Commission's Order rejecting MISO's proposal to implement an MCO and remand the case to the Commission for further proceedings and explanation.  Petitioner Entergy Operating Companies further request any other relief to which they may show themselves justly entitled.

Respectfully submitted,


/s/_*Marnie A. McCormick*_____
Marnie A. McCormick
Duggins Wren Mann & Romero, LLP
600 Congress Ave., Ste. 1900
Austin, Texas 78701
P.O. Box 1149
Austin, Texas 78767
(512) 744-9300
mmccormick@dwmrlaw.com

and

Michael C. Griffen
Entergy Services, LLC
101 Constitution Avenue, NW
Suite 200 East
Washington, DC 20001
(202) 530-7323
mgriffe@entergy.com

Attorneys for Petitioners Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; and Entergy Texas, Inc.

## RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Rule 32(a)(7)(b). The parts of the brief subject to the word limitation contain 7,831 words and have been prepared using Microsoft Word in 14-point Times New Roman font.

*/s/ Marnie A. McCormick*_____
Marnie A. McCormick

## **CERTIFICATE**

I hereby certify that copies of the above and foregoing Brief for Petitioners have been served upon the Solicitor of the Federal Energy Regulatory Commission and all Counsel of record through the Court's CM/ECF system this 13th day of November, 2023.

  */s/ Marnie A. McCormick*
Marnie A. McCormick