# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 25, 2024           Decided April 15, 2025

No. 22-1334

ENTERGY ARKANSAS, LLC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CLECO CAJUN LLC, ET AL.,
INTERVENORS

———

Consolidated with 23-1151

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Marnie A. McCormick* argued the cause for petitioners. With her on the briefs was *Michael C. Griffen*.

*Jason T. Perkins*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and

2

*Robert H. Solomon*, Solicitor. *Beth G. Pacella*, Attorney, entered an appearance.

Before: KATSAS, *Circuit Judge*, and GINSBURG and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: In this consolidated case, a series of Entergy companies petition for review of three Federal Energy Regulatory Commission orders. FERC had rejected tariff changes proposed by Midcontinent Independent System Operator, reasoning that the new tariff would give Entergy too much market power. Entergy urges us to find that FERC's decisions were arbitrary and capricious.

We do not reach the merits of this dispute. Entergy lacks standing. The company's opening brief failed to discuss standing, thereby forfeiting any arguments in support of this jurisdictional prerequisite. Entergy's omission of standing also ran afoul of Circuit Rule 28(a)(7). Given both the forfeiture principles inherent in Rule 28(a)(7) and our court's past practice, dismissal is the appropriate consequence. Even if we were to consider the standing arguments Entergy now belatedly advances, the company has not demonstrated the necessary concrete, imminent, and redressable injury.

**I.**

Under the Federal Power Act, FERC is charged with "regulation of matters relating to generation" and "transmission of electric energy in interstate commerce." 16 U.S.C. § 824(a). In exercising its regulatory authority, the agency must ensure that "[a]ll rates and charges" related to "the transmission or sale of

3

electric energy subject to the jurisdiction of the Commission," including "all rules and regulations affecting or pertaining to such rates," are "just and reasonable." *Id.* § 824d(a).

FERC's regulatory ambit includes "regional transmission organizations." These entities coordinate the interstate electricity market in a specific geographic area. Their responsibilities include "operating the electrical grid . . . , balancing energy supply and demand, establishing markets for the sale and purchase of electricity, and ensuring the reliable transmission of electricity." *Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 848 (D.C. Cir. 2023). One common form of an electricity market is a "capacity market," where "distributors of electricity purchase commitments from generators to produce set amounts of electricity in the future." *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021). In other words, electricity distributors—typically, consumer-facing utilities—use capacity markets to secure future supplies of electricity for their customers. To administer capacity markets, regional transmission organizations publish "tariffs" that establish the rules governing the market. These tariffs are subject to FERC review under the "just and reasonable" standard. *PJM Power Providers Grp. v. FERC*, 880 F.3d 559, 561 (D.C. Cir. 2018) (quoting 16 U.S.C. § 824d(a)).

This case concerns Midcontinent Independent System Operator, a regional transmission organization responsible for the power grid and electricity markets in fifteen Midwestern and Southern states. MISO's existing tariff sets the operating requirements for distributors in its geographic area. One such requirement mandates that distributors procure sufficient future capacity to meet all projected electricity needs for each new year. Distributors may comply in one of three ways. First, they may themselves operate generation facilities. Second, distributors

4

may bilaterally contract with electricity generators for a certain amount of capacity. Third, distributors may participate in MISO's capacity market, termed the "Planning Resource Auction," where generators sell their spare capacity to distributors. *See Pub. Citizen*, 7 F.4th at 1187 (describing MISO's capacity auction). Distributors are free to satisfy their capacity needs through any combination of the three sources.

In 2021, MISO proposed tariff amendments requiring distributors to secure at least 50 percent of their needed capacity outside the Auction. MISO explained that its geographic region was facing "significant shifts in its generation portfolio" due to power plant retirements and increased use of renewables. J.A. 0002. These trends were causing a "reduction in excess capacity" that, absent this change, could lead Auction supply to outstrip demand. *Id.* And given some distributors' heavy reliance on the Auction, utilities might be unable to satisfy their customers' needs. Thus, by encouraging pre-Auction bilateral contracting, MISO believed it could reduce the market's dependence on Auction-based generation and promote "long-term Resource Adequacy in the MISO Region." J.A. 0004. In addition, MISO suggested that bilateral contracting would "help in retaining capacity needed to meet reliability needs." J.A. 0007.

After robust public comment, a Commission deficiency letter, and responses by multiple parties, FERC denied MISO's proposed changes. The Commission raised several objections, including that MISO "ha[d] not adequately addressed concerns regarding the proposal's potential impact on market power." J.A. 0677. FERC explained that the Auction had a "disciplining effect" on prices by providing a "centralized market" where capacity sellers and buyers were on equal footing. *Id.* Moreover, since distributors could choose to purchase up to 100 percent of

5

their capacity in the Auction, bilaterally negotiated contracts benefitted from the same competitive pricing dynamics. *Id.* FERC emphasized that Potomac Economics, an entity acting as MISO's independent "market monitor," had highlighted the potential for "anticompetitive price[s]," J.A. 0657, in part deriving from Entergy's projected 41 percent market share in some sub-markets within MISO, J.A. 0678.

MISO, Entergy, and intervenor Cleco sought rehearing. After reconsideration, FERC reaffirmed its earlier order. It "clarif[ied]" that its rejection "turn[ed] on" the market power concerns. J.A. 0714. Specifically, the Commission worried that any limits on the Auction would produce "negative impacts on bilateral market dynamics" which could favor large generators like Entergy. *Id.* Entergy then timely petitioned for review.[1] After briefing and oral argument, FERC submitted a supplemental brief on standing at our invitation.

## II.

When petitioners seek direct review of agency action in our court, they "bear[] the burden" of establishing their standing. *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). In general, "the manner and degree of evidence" a plaintiff must produce to substantiate its standing varies at "successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561. Since a direct-review petitioner is, unlike a typical plaintiff, immediately "asking the court of appeals for a final judgment on the merits," the burden of production is "the same as that of a plaintiff moving for summary judgment." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). The petitioner

---

[1] Cleco also intervened in this case and joined Entergy's brief.

6

must therefore either point to "record evidence sufficient to support its standing" or submit additional evidence making that showing. *Id.*; *see also Government of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019). A petitioner's "[f]ailure to establish" standing "requires dismissal of the action." *Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023).

"[E]xperience teaches that full development of the arguments for and against standing requires the same tried and true adversarial procedure" required for any merits issue. *Sierra Club*, 292 F.3d at 900; *see also Twin Rivers*, 934 F.3d at 613. This process requires litigants to actively advocate for their positions, not "merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

Forfeiture ordinarily applies whenever a party relies on an argument not raised in its opening brief. *See Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 484 (D.C. Cir. 2016). For that reason, "[i]ssues may not be raised for the first time in a reply brief," *Rollins Env't Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991), or at oral argument, *see United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015). Moreover, parties must do more than merely mention an issue: petitioners cannot be "obscure on the issue in their opening brief and only warm[] to the issue in their reply brief." *Twin Rivers*, 934 F.3d at 615 (quoting *Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 316 n.5 (D.C. Cir. 2009)).

Since these "ordinary rules of forfeiture apply to standing," a petitioner's standing arguments "are forfeited if raised for the

7

first time in reply."[2] *Twin Rivers*, 934 F.3d at 615 (first excerpt quoting *Bernhardt*, 923 F.3d at 179). A "petitioner must make this evidentiary presentation [on standing] no later than when it files the opening brief." *Id.* at 613 (collecting cases); *see also Core Commc'ns, Inc. v. FCC*, 545 F.3d 1, 2 (D.C. Cir. 2008) (emphasizing that the petitioner must establish standing in its "opening brief—and not . . . [the] reply to the brief of the respondent agency" (alterations in original) (quoting *Sierra Club*, 292 F.3d at 900)). Requiring this argumentative back and forth—across the opening brief, response, and reply—provides notice and thus "prevents unfairness to an agency that may have reasonable grounds to challenge a petitioner's standing" while "conserv[ing] the resources of the court and the litigants." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005). Adversary proceedings also ensure the most accurate resolution of the standing question, for it is "not the province of an appellate court to 'hypothesize or speculate about the existence of an injury [Plaintiff] did not assert.'" *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (alteration in original) (quoting *Kawa Orthodontics, LLP v. Sec'y*, 773 F.3d 243, 246 (11th Cir. 2014)).

We have "codified" these principles in Circuit Rule 28(a)(7). *Twin Rivers*, 934 F.3d at 613. The Rule states: "In cases involving direct review in this court of administrative actions, the brief of the appellant or petitioner must set forth the basis for the claim of standing" in a separate section of its brief. The Clerk of the Court's office specifically cites the rule in its

---

[2] Of course, we may always question a party's standing sua sponte. The forfeiture rules only operate in one direction: "[a]lthough a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction." *Scenic Am., Inc. v. DOT*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016).

8

standard briefing order. For example, in this case, the order quoted the rule and noted that, should litigants fail to comply, "[t]he court ordinarily will not consider issues and arguments raised for the first time in the reply brief." Order, *Entergy Ark., LLC v. FERC*, No. 22-1334, Doc. No. 2018282 (Sept. 21, 2023), at 2.

Entergy's opening brief provided neither argument, nor analysis, nor evidence to support its standing. The words "standing," "injury," "traceability," and "redressability" do not appear in the document. In its responsive brief, FERC argued that Entergy lacked standing. Only then, in the reply brief, did Entergy argue that "the bases for Entergy's standing [were] readily apparent." Reply Br. 3 n.1. But even if the *bases* and evidence were there, the argumentation was not. No reasonable reader of the principal Entergy brief would walk away with a clear understanding of petitioners' precise injuries, the chain of causation, and how a decision of this court could redress those harms. Its brief was about an APA challenge, not standing.

For similar reasons, we have previously declined to repackage merits arguments as support for a petitioner's standing. *See Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 850 F. App'x 9, 11 (D.C. Cir. 2021) (declining to invent a standing argument "from the brief's arguments on the merits"). If "Petitioners' opening brief fails to make any argument, let alone produce or point to any evidence, that [petitioner] has standing," then "[t]hat failure constitutes a forfeiture." *Id.* at 10; *see also Public.Resource.Org, Inc. v. FCC*, No. 23-1311, 2024 WL 5165702, at *3 n.1 (D.C. Cir. Dec. 19, 2024) (rejecting notion that "their standing was self-evident based on the nature of their claims" as "leaving the court to do counsel's work" (second excerpt quoting *Bernhardt*, 923 F.3d at 179)).

9

To be sure, we occasionally excuse forfeiture and noncompliance with Rule 28(a)(7) for "good cause." *Twin Rivers*, 934 F.3d at 614 (quoting *Sierra Club*, 292 F.3d at 900). That arises in two circumstances: (1) "if the petitioner 'reasonably, but mistakenly, believed' that its opening brief adequately proved standing," or (2) "if the petitioner 'reasonably assumed' that its standing was 'self-evident' from the administrative record." *Sierra Club v. DOE*, 107 F.4th 1012, 1015 (D.C. Cir. 2024) (quoting *Twin Rivers*, 934 F.3d at 614).[3]

Neither exception applies. The first exception comes into play when the opening brief discussed standing but did so insufficiently. *Cf. Ams. for Safe Access v. DEA*, 706 F.3d 438, 444 (D.C. Cir. 2013) (rejecting a Rule 28(a)(7) objection to supplemental filings on standing because petitioners made "a serious effort to satisfy the requirements of the rule by setting forth their evidence and arguments in support of standing in their opening brief"). Yet Entergy's opening brief never once mentioned any theory of standing. The second exception is also inapplicable because Entergy's standing is not "self-evident." The administrative record does not clearly lay out the specific

---

[3] The "self-evident" exception is based on the Rule itself, which textually only applies when the "petitioner's standing is not apparent from the administrative record." D.C. Cir. R. 28(a)(7). But in January 2025, our court gave notice of a proposed Rule 28(a)(7) modification which would eliminate the exception. *See* U.S. Ct. of Appeals for the D.C. Cir., *Notice of Proposed Circuit Rule Change and Opportunity for Comment* (Jan. 13, 2025), https://perma.cc/B6GU-HYGV. The proposed amendment clarifies that "*every appellant or petitioner* must include in its brief arguments and citations to evidence establishing by a 'substantial probability' its claim of standing." *Id.* (emphasis added); *see also* U.S. Ct. of Appeals for the D.C. Cir., *Circuit Rule 28* (Jan. 13, 2025), https://perma.cc/9F8D-HAFB (proposed rule text and redline).

10

injuries that Entergy now claims to experience, nor does it explain how those injuries are traceable and redressable. In any event, both exceptions require a reasonable belief that the opening brief was sufficient. Yet in its reply brief, Entergy explained that a "clerical oversight" resulted in the omission of any discussion of standing from its opening brief. *See* Reply Br. 3 n.1. Since Entergy had *intended* to advance arguments about its standing but simply neglected to do so, it could not possibly have "reasonably, but mistakenly, believed" that the opening brief demonstrated standing or "reasonably assumed" that standing was self-evident.

That brings us to the appropriate remedy. We have held that, "[u]nder our precedents and Circuit Rule 28(a)(7), petitioners' failure to provide evidence of any injury from the [agency action] is a *sufficient ground* to dismiss these cases for lack of standing." *Concerned Household Elec. Consumers Council v. EPA*, No. 22-1139, 2023 WL 3643436, at *2 (D.C. Cir. May 25, 2023) (emphasis added); *cf. Ams. for Safe Access*, 706 F.3d at 444. And our court's past cases have almost universally dismissed petitions when we have found a violation of Rule 28(a)(7).[4]

---

[4] We have found a violation of Rule 28(a)(7) in at least fifteen cases. In thirteen of those cases, we dismissed the petition. *See Twin Rivers*, 934 F.3d at 613–16; *Sierra Club*, 107 F.4th at 1015–17; *Public.Resource.Org*, 2024 WL 5165702, at *3; *Concerned Household*, 2023 WL 3643436, at *2; *Antero Res. Corp. v. FERC*, No. 22-1278, 2024 WL 194189, at *3 (D.C. Cir. Jan. 18, 2024); *Spaulding v. Garland*, No. 23-1007, 2024 WL 686983, at *2 (D.C. Cir. Feb. 20, 2024); *Core Commc'ns*, 545 F.3d at 2; *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022); *Press v. FCC*, 735 F. App'x 731, 732 (D.C. Cir. 2018); *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255–56 (D.C. Cir. 2018); *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 851 F.3d 1324, 1327 (D.C. Cir. 2017); *Arizona v. EPA*, 77 F.4th 1126,

11

In sum, we see no basis for excusing Entergy's noncompliance. As FERC noted, Entergy has complied in other cases. *See* Resp't Br. 22 n.7. Dismissal is the appropriate remedy.

**III.**

Even if we consider the arguments that Entergy now advances, they do not establish its standing.[5] Entergy's reply brief articulates two injuries: (1) future unreliability in the electricity grid, and (2) "free rid[ing]" by other utilities on Entergy's investments in power plants. *See* Reply Br. 4–5.

First, the unreliability injury does not support standing. Entergy points to nothing in the record indicating that it will be financially injured by grid unreliability. Entergy's briefing never actually states that it will suffer a financial injury and never seeks to quantify any costs. Of course, it's easy to imagine potential injuries—say, costs to add backup capacity or to prepare for shortages—but those appear nowhere in the brief. As the party bearing the burden, Entergy must actually state—and show—that it will be harmed by grid unreliability.

---

1131 (D.C. Cir. 2023); *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 147 (D.C. Cir. 2012), *rev'd in part on other grounds sub nom. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014). Only two times did we excuse a violation of the rule. In one case, we found the "self-evident" exception satisfied. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015). And in one other case, we permitted supplemental briefing on standing. *See Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021).

[5] These concerns also demonstrate why standing is not "self-evident" from the face of the record.

12

Entergy's grid unreliability argument is analogous to an "increased risk" theory of standing, though here Entergy challenges the Commission's decision not to decrease risk. "To ground standing on the risk of future harm, a party must show both that the risk is substantial and that the challenged action substantially increases it." *Viasat, Inc. v. FCC*, 47 F.4th 769, 779 (D.C. Cir. 2022). In other words, Entergy must show that the risk of future grid unreliability under the status quo is substantial and that the foregone action of the Commission would have substantially decreased the risk. Entergy fails both steps.

Entergy fails to demonstrate that the risk of future harm is substantial, because the record evidence is split on whether the risk is "actual or imminent." *Defs. of Wildlife*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Some parts of the record do suggest an "urgent" problem, J.A. 0522, of "immediate concern," J.A. 0536. But other evidence in the record is equivocal, indicating that reliability has never been an issue and future developments merely "*could* result" in an "impact on reliability . . . over the next decade." J.A. 0458 (emphasis added). MISO's initial submission to FERC stated that it is "not prudent to assume," and "there is no assurance that," the grid will have sufficient generating capacity in the future. J.A. 0005. Even if so, MISO cautioned that "the exact pace of th[e] transformation [to more intermittent renewable generation sources] is admittedly not yet clear given the varying estimates provided." *Id.* And Entergy itself describes the problem in its brief as the "long-term reliability" of the grid. Pet'rs' Br. 8. Once again, given that Entergy bears the burden of showing an imminent injury, mixed evidence and equivocal statements about that topic do not suffice—especially in the absence of briefing, argument, and analysis explaining why we should credit some statements over others.

13

Moreover, Entergy has not shown that MISO's proposal would have substantially decreased the risk of grid instability. For example, consider the sworn declaration of Scott Harvey, which was submitted by MISO and upon which Entergy relies. In his words, only "a very small number of [power purchasers, known as Load Serving Entities], representing a very small portion of the overall MISO planning reserve margin[,] contract for very little or none of their planning reserve margin requirement prior to the [Auction]." J.A. 456. In fact, the "proposed [changes] would have had no effect on the capacity procurement choices of all but a few MISO LSEs in past [Auctions]." J.A. 443. As with imminence, mixed record evidence cannot support standing absent any argumentation by Entergy.

Second, the free-riding injury suffers from a redressability problem. In essence, Entergy complains that the Auction prices are too low to recoup its capital investment in power plants. Requiring utilities to purchase off-Auction capacity, the argument goes, would force all utilities to make "planning and investment commitments" which could pay for the generation capacity. J.A. 0644. But several events must occur to remedy Entergy's injury: other utilities must turn to Entergy for their bilateral contracts, those utilities and Entergy must come to agreement, and those agreements must include higher prices that compensate Entergy for its capital expenditures.

Entergy wholly fails to articulate how this chain of events would occur. In its brief, its only evidence that it would enter into more bilateral contracts is an assertion that it "owns significant generation resources in MISO," followed by a citation to two record pages. Reply Br. 5 (citing J.A. 656–57). But those record pages merely catalog objections raised by the market monitor and other parties about Entergy's "unmitigated

14

seller market power in the bilateral market," status as a "pivotal supplier" with 41 percent market share, and potential to become a "dominant" player able to charge "anticompetitive price[s]." J.A. 656–67. Implicitly, then, Entergy's causal chain rests on an exercise of market power—a fact which Entergy repeatedly and strenuously rejects. Entergy cannot credit the market power objections for standing purposes but disavow them on the merits.

In any event, when "redressability depend[s] on the conduct of a third party not before the court, 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020) (quoting *Defs. of Wildlife*, 504 U.S. at 562). One certainly may credit "market forces" in a redressability analysis, *id.* (quoting *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 117 (D.C. Cir. 1990)), but Entergy must describe the chain of events. And it must provide its basis for predicting the likely behavior of third parties. A citation to statements about market share is insufficient to show that the entire sequence of events is likely to occur. *See Antero Res. Corp. v. FERC*, No. 22-1278, 2024 WL 194189, at *4 (D.C. Cir. Jan. 18, 2024) (explaining that while standing can be "rooted in the basic laws of economics," dismissal was appropriate because "[n]either of the petitioners' opening briefs provide[d] any details of when or how the harms they describe[d] will occur" (first excerpt quoting *Growth Energy v. EPA*, 5 F.4th 1, 33 (D.C. Cir. 2021))).

\* \* \*

Accordingly, because Entergy has failed to demonstrate standing, the petitions for review are dismissed.

*So ordered.*